**Mayra A. Ledesma,** OSB #183942
mayra@nwjp.org
**Corinna Spencer-Scheurich,** OSB #130147
corinna@nwjp.org
Northwest Workers' Justice Project
812 SW Washington St, Suite 225
Portland, OR  97205
Telephone: (503) 525-8454
Facsimile: (503) 946-3029

**D. Michael Dale**, OSB #771507
michaeldale@dmichaeldale.net
Law Office of D. Michael Dale
P.O. Box 1032
Cornelius, OR  97113
Telephone: (503) 730-1706
Facsimile: (503) 946-3089

**Daniel Werner**, GSB # 422070
dan@decaturlegal.com
Radford & Keebaugh, LLC
315 W. Ponce de Leon Ave, Suite 1080
Decatur, Georgia 30030
(*Pro hac vice* motion forthcoming)

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **MAURA ESCOBAR, ROGELIO RODRIGUEZ, RAQUEL ESCOBAR, JUAN ACEITUNO, BRENDA ACEITUNO, EFRAIN MARTINEZ, CECILIA GUTIERREZ, FRANCISCO UMANA, EDWARD UMANA, RAFAELA GUTIERREZ, LUIS ALFARO, LILENA VÁSQUEZ, MARTHA DOMINGUEZ, MARCO SERVIN, PATRICIA ALVAREZ, EMMANUEL ALVAREZ, VICTOR HUGO GARCIA, SILVIA** | Case No.: 3:20-cv-1695 <br><br> COMPLAINT <br><br> Fair Labor Standards Act, Trafficking Victims Protection Act, Internal Revenue Code, Oregon Wage and Hour Law, Oregon Labor Contractor Law, Washington Wage and Hour Law, |

COMPLAINT - 1

| | |
|---|---|
| **BARRAZA, JORGE GARCIA, ULISAR MORALES, ALEJANDRO SANCHEZ, HILDA ARIVAZU, SOLOMON DENBEL, ZETZAEL MADRIGAL, MARIA MADRIGAL, IGNACIO LOPEZ, CONCEPCION CRUZ, CONCEPCION SOLIS, GERARDO RAMIREZ-CRUZ, GERARDO RAMIREZ-SOLIS, JESSICA RAMIREZ-SOLIS, LUIS SOLIS, KAREN MARTINEZ, TATIANA DIKHAINDZHIYA, and GREGORY DIKHAINDZHIYA**, individuals, <br><br> Plaintiffs, <br><br> v. <br><br> **NATIONAL MAINTENANCE CONTRACTORS, LLC**, a Delaware limited liability company, and **NMC FRANCHISING, LLC**, a Delaware limited liability company, **MARSDEN SERVICES, LLC**, a Delaware limited liability corporation, <br><br> Defendants. | Contract Law <br> Fraud Law <br><br><br> DEMAND FOR JURY TRIAL |

## I.    INTRODUCTION

1.      National Maintenance Contractors, Inc. was founded by Lyle Graddon in Bellevue, Washington in 1970, and registered as a janitorial-services franchisor in Washington in 1975 and in Oregon in 1978. By 1992, the Fair Practices Division of the Office of the Attorney General in Washington had completed a full investigation into National Maintenance Contractors, Inc., and a consent decree was entered. National Maintenance Contractors, Inc., conceded that it had engaged in predatory practices in its recruitment of "franchisees," including that National Maintenance Contractors, Inc., made untrue statements of material fact about its franchise agreement to

prospective "franchisees" in violation of the Consumer Protection Act and Franchise Investment Protection Act.

2.      Marsden Services, LLC ("Marsden") acquired National Maintenance Contractors, Inc., in 2006. At that time, National Maintenance Contractors, Inc., was converted to National Maintenance Contractors, LLC.

3.      NMC Franchising, LLC, was registered in 2011. National Maintenance Contractors, LLC, and NMC Franchising, LLC are collectively referred to herein as "NMC."

4.      The consent decree enjoined National Maintenance Contractors, Inc. and its founder Lyle Graddon and their officers, agents, servants, employees, and attorneys, and those persons in active concert with them who received an actual notice or otherwise of the consent decree. NMC, in spite of the consent decree, continued to engage in its predatory practice of making material misrepresentations of the terms in its franchise agreement to prospective "franchisees."

5.      Plaintiffs are each low-wage workers targeted by NMC.

6.      NMC and Marsden deliberately used a franchisor/franchisee business model to misclassify plaintiffs as "franchisees." In doing so, NMC denied its workers fundamental protections under federal and state wage and hour laws.

7.      Plaintiffs seek rescission of NMC's franchise agreement and that they be treated as employees, as the laws require.

8.      Plaintiffs seek unpaid minimum wages and, in some cases, overtime premiums under the Fair Labor Standards Act, 29 U.S.C. 201, *et seq* ("FLSA"). They are entitled to liquidated damages and attorneys' fees and costs.

COMPLAINT - 3

9.      The Plaintiffs who worked in Oregon seek redress under Oregon's wage and hour laws, O.R.S. §§ 652.140, 652.150, 652.200, 652.610, 652.615, 653.025, and 653.055, 653.261, for NMC's failure to pay Oregon's minimum wage and, in some cases, overtime premiums. They are entitled to penalty wages and attorneys' fees and costs under those statutes.

10.     Plaintiffs who worked in Washington seek redress under Washington's wage and hour laws, R.C.W. §§ 39.12.020, 49.46.020, 49.46.090, 49.48.010, 49.48.030, and 49.52.070, for NMC's failure to pay Washington's minimum wages and, in some cases, prevailing wages and overtime premiums.  They are entitled to liquidated damages, attorneys' fees and costs.

11.     NMC Franchising, LLC, is a janitorial labor contractor operating in violation of the Oregon Contractor Registration Act, O.R.S. §§ 658.405, 658.440, and 658.453. Certain Plaintiffs who are covered by OCRA's provisions seek statutory penalties and attorneys' fees and costs.

12.     NMC Franchising, LLC filed fraudulent tax information returns misrepresenting the income received by certain Plaintiffs in violation of 26 U.S.C. § 7434 entitling them to compensatory damages and attorneys' fees and costs.

13.     NMC's and Marsden's practices also included intimidating workers to perform janitorial services for low, illegal wages. Certain Plaintiffs were continually subjected to serious threats to their life savings, money that they paid in franchise fees, and threats to their ability to earn a living, in violation of the Trafficking Victims Protection Act, 18 U.S.C. § 1589. They are entitled to general and special damages, including damages for emotional distress, punitive damages, and attorneys' fees under 18 U.S.C. § 1595.

## II.      JURISDICTION

14.     Jurisdiction is conferred on this Court by 28 U.S.C. §1331, as this action arises under the laws of the United States; 26 U.S.C. § 1337, as this action arises under Acts of Congress

regulating commerce; the Fair Labor Standards Act, 29 U.S.C. § 216(b); the Internal Revenue Code, 26 U.S.C. § 7434; and the Trafficking Victims Protection Act, 18 U.S.C. § 1595(a).

15.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367, as the Oregon and Washington claims are so related to claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

16.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because there is no district in which an action may otherwise be brought and this Court has personal jurisdiction.

### III.    PARTIES

17.     Plaintiffs Maura Escobar, Rogelio Rodriguez, Raquel Escobar, Juan Aceituno, Brenda Aceituno, Efrain Martinez and Cecilia Gutierrez are natural persons who reside in Portland, Oregon in Multnomah County.

18.     Plaintiffs Ulisar Morales, Francisco Umana, Edward Umana, Victor Hugo Garcia, and Silvia Barraza are natural persons who reside in Beaverton, Oregon in Washington County.

19.     Plaintiff Lilena Vásquez is a natural person who resides in Hillsboro, Oregon in Washington County.

20.     Plaintiffs Rafaela Gutierrez, Luis Alfaro, Martha Dominguez, and Marco Servin are natural persons who reside in Aloha, Oregon in Washington County.

21.     Plaintiffs Patricia Alvarez and Emmanuel Alvarez are natural persons who reside in Tualatin, Oregon in Washington County.

22.     Plaintiffs Alejandro Sanchez and Hilda Arivazu are natural persons who reside in Renton, Washington in King County.

23.     Plaintiffs Ignacio Lopez, Concepcion Cruz, Gerardo Ramirez-Cruz, Concepcion Solis, Gerardo Ramirez-Solis, and Jessica Ramirez-Solis are natural persons who reside in Kent, Washington in King County.

24.     Plaintiff Jorge Garcia is a natural person who resides in Vancouver, Washington in Clark County.

25.     Plaintiff Solomon Denbel is a natural person who resides in Marysville, Washington in Snohomish County.

26.     Plaintiffs Tatiana Dikhaindzhiya and Gregory Dikhaindzhiya are natural persons who reside in Spokane Valley, Washington in Spokane County.

27.     Plaintiffs Luis Solis and Karen Martinez are natural persons who reside in SeaTac, Washington in King County.

28.     Plaintiff Zetzael Madrigal and Maria Madrigal are natural persons who reside in Yakima, Washington in Yakima County.

29.     Exhibit 1 represents the relationships of the Plaintiffs and the location of their work.

30.     Maura Escobar, Rogelio Rodriguez and Raquel Escobar ("Escobar group"), Brenda Aceituno and Juan Aceituno ("Aceituno group"), Efrain Martinez and Cecilia Gutierrez ("Martinez group"), Francisco Umana and Edward Umana ("Umana group"), Rafaela Gutierrez and Luis Alfaro ("Alfaro group"), Lilena Vásquez ("Vásquez"), Martha Dominguez and Marco Servin ("Dominguez group"), Patricia Alvarez and Emmanuel Alvarez ("Alvarez group") were employed by defendants NMC to perform janitorial services in Oregon for illegally low wages.

31.     Victor Hugo Garcia and Silvia Barraza ("Barraza group"), Jorge Garcia and Ulisar Morales ("Garcia group") were employed by NMC to perform janitorial services in Oregon and Washington for illegally low wages.

32.     Collectively, the Plaintiffs in the Escobar, Aceituno, Martinez, Umana, Alfaro, Vásquez, Dominguez, Alvarez, Barraza and Garcia groups are referred to as the "Oregon Plaintiffs," and the Plaintiff-owners in each of these groups are referred to as the "Oregon Plaintiff-owners."

33.     Alejandro Sanchez and Hilda Arivazu ("Sanchez group"), Solomon Denbel ("Denbel"), and Zetzael Madrigal and Maria Madrigal ("Madrigal group"), Ignacio Lopez and Concepcion Cruz ("Lopez group"), Gerardo Ramirez-Cruz, Concepcion Solis, Gerardo Ramirez-Solis and Jessica Ramirez-Solis ("Ramirez group"), Luis Solis and Karen Martínez ("Solis group"), Tatiana Dikhaindzhiya and Gregory Dikhaindzhiya ("Dikhaindzhiya group") were employed by NMC to perform janitorial services in Washington for illegally low wages.

34.     Collectively, the Plaintiffs in the Barraza, Garcia, Sanchez, Denbel, Madrigal, Lopez, Ramirez, Solis and Dikhaindzhiya groups are referred to as the "Washington Plaintiffs," And the Plaintiff-owners in each of these groups are referred to as the "Washington Plaintiff-owners."

35.     Defendant National Maintenance Contractors, LLC, is a Delaware limited liability company with its principal place of business in Tigard in Washington County, Oregon.

36.     Defendant NMC Franchising, LLC, is a Delaware limited liability company with its principal place of business in Tigard in Washington County, Oregon.

37.     Defendant Marsden Services, LLC, is a Delaware limited liability corporation with its principal place of business in Saint Paul in Ramsey County, Minnesota. On information and belief, Marsden conducts business in the State of Oregon and within this district, including employing individuals who engage in outside sales of its services. Marsden acquired National Maintenance Contractors, LLC, in 2006 and has its employees on its payroll. Marsden uses online

COMPLAINT - 7

job sites to also post its sale of "franchises" in conjunction with National Maintenance Contractors, LLC, and NMC Franchising, LLC.

## IV.    FACTS

38.    National Maintenance Contractors, LLC, and/or NMC Franchising, LLC, purports to be a Washington-based franchisor with "franchisees" in Oregon and Washington who provided janitorial, landscaping, carpet and duct cleaning, and maintenance services (herein referred to as "janitorial services") to customers in Washington and Oregon.

39.    National Maintenance Contractors, LLC, and/or NMC Franchising, LLC, became a franchisor to evade any employer liabilities and defraud workers by illegally underpaying them far below federal, state, and local minimum wages.

40.    In furtherance of that scheme, NMC engaged in predatory recruitment and employment practices. These practices included, but were not limited to:

a.    NMC sold a substantial percentage of its "franchises" to "franchisees" who are foreign born and for whom English is a second language, and NMC knew that the prospective "franchisees" had no formal post-secondary education or business background.

b.    NMC made misrepresentations about how much a "franchisee" could earn based on the amount of money that was paid as franchisee fees.

c.    NMC failed to disclose the fact that nearly all its "franchisees" had either failed, were terminated, or were earning far below the amount that was originally promised to them by NMC.

d.    NMC failed to adequately disclose its account replacement policy and misrepresented that the "administrative fee" guaranteed account replacement.

COMPLAINT - 8

e.   NMC used tactics, including failing to assign them new accounts, to terminate
certain "franchises."

41.    NMC has been strictly prohibited from continuing to use these and other predatory practices under a 1992 consent decree issued by the Superior Court for the State of Washington in King County.

42.    Even after Marsden acquired NMC, and in spite of the existing consent decree, NMC continued to operate in the same unlawful manner.

43.    Marsden acquired NMC in 2006.

44.    Thereafter, NMC was the authorized agent of Marsden.

45.    In 2006, when Marsden acquired NMC, it knew or should have known that NMC had been found to have engaged in unlawful franchising practices.

46.    After Marsden acquired NMC, it knew or should have known that NMC was continuing to employ these unlawful franchising practices.

47.    All authorized agents of NMC are on Marsden's payroll.

48.    NMC continued to predatorily recruit prospective "franchisees" primarily from immigrant communities, most of whom understood English only at an elementary proficiency level, at best.

49.    To recruit prospective immigrant "franchisees" successfully, NMC partnered with immigrant organizations like World Relief, used its existing "franchisees" to recruit others through word of mouth, and used media outlets such as community newspapers.

50.    The franchise disclosure document used by NMC was over one-hundred pages long and entirely in English. Although a franchise disclosure document may have been given to prospective "franchisees" at the beginning of the recruitment process, NMC knew that most of the

prospective "franchisees" understood English at only an elementary proficiency level and lacked any post-secondary education, or business experience.

51.    Prior to fully executing an agreement, NMC held an initial meeting with each prospective "franchisee."

52.    NMC told prospective franchisees that the first meeting would be used to discuss the terms and conditions of the NMC franchise agreement.

53.    Instead, the first meeting was used to entice prospective "franchisees" to sign the franchise agreement and make them believe that they would be independent janitorial business owners.

54.    NMC never provided nor offered interpreters at the initial meeting even though it was well aware that almost all prospective "franchisees" it recruited spoke little to no English.

55.    NMC required prospective "franchisees" to organize a limited liability company.

56.    NMC knew that its prospective "franchisees" had no business experience and were unable to comply with many of the conditions of their agreement, including forming and maintaining a limited liability company.

57.    NMC often invented business names and submitted electronic registrations to the Oregon and Washington Secretaries of State on behalf of newly registered "franchisees."

58.    With NMC's help, the following "franchises" were formed, and the following plaintiffs entered into an agreement with NMC (herein, "Plaintiff-owners"):

| Franchise Name | Plaintiff-owner of Franchise |
|---|---|
| Hernandez Framing Specialists, LLC | Maura Escobar |
| AJ Cleaning Services, LLC | Brenda Aceituno |
| Alpha Janitorial Services, LLC | Efrain Martinez |
| FJ Cleaning Services, LLC | Francisco Umana |
| Alfaro's Deep Cleaning, LLC | Rafaela Gutierrez |
| Lilena's Cleaning Service, LLC | Lilena Vásquez |
| Servin Maintenance, LLC | Martha Dominguez |

| | |
|---|---|
| PA Janitorial Services, LLC | Patricia Alvarez |
| Hugo's M&C Cleaning Services, LLC | Victor Garcia |
| Urban Cleaning Services PDX, LLC | (Justa Morales)[1] |
| Sister's Janitorial, LLC | Alejandro Sanchez<br>Hilda Arivazu |
| Solomon Office Building Maintenance Service, LLC | Solomon Denbel |
| D&Z Maintenance Company, LLC | Zetzael Madrigal |
| Jireh Janitorial Service, LLC | Ignacio Lopez |
| Brooms and Mops, LLC | Gerardo Ramirez-Solis |
| Seattles Best Cleaning Services, LLC | Luis Solis |
| Prof Cleaning LLC | Tatiana Dikhaindzhiya |

59.    The concept of a franchise was foreign to all of the Plaintiff-owners.

60.    Plaintiff-owners relied on NMC's promise that they would be owners of a janitorial business of their own and that they would be able to control how much they earned monthly.

61.    NMC promised the Plaintiff-owners that it would help them grow their janitorial businesses when, in fact, this was an employment arrangement and Plaintiff-owners would never be able to manage their own businesses or make a profit.

62.    NMC explained that the initial franchise fee would equal five times the amount that a Plaintiff-owner wanted to earn monthly, so if a prospective "franchisee" wanted to earn $1,000 a month the worker had to pay $5,000 in franchise fees.

63.    In fact, it was rare that Plaintiff-owners were able to gross the amounts promised by NMC.

64.    NMC deducted between 20-25% from the "franchises'" gross monthly earnings.

65.    NMC told the Plaintiff-owners that the deduction was an administrative fee to cover the cost for NMC's support in growing their janitorial business.

---

[1] Justa Morales is not a plaintiff in this lawsuit.

66.     In reality, the 20-25% was in part a royalty fee, which was never explained to Plaintiff-owners.

67.     At the initial meetings, NMC also told Plaintiff-owners that they could renew their franchise agreement every five years, for a total of fifteen years. To renew, Plaintiff-owners were required to pay 10% of the value of the franchise. The value of the franchise equaled the total amount that the "franchisee" had paid in franchise fees. In exchange, the franchise would be renewed for an additional five year right to continue operating an NMC franchise.

68.     NMC was not transparent with the Plaintiff-owners about any of the other terms or conditions that were outlined in the 100-page franchise disclosure document or the franchise agreement that they would ultimately sign, including a provision requiring them to arbitrate any disputes.

69.     Plaintiff-owners do not read English and had no way of understanding its provisions on their own.

70.     NMC knew that Plaintiff-owners relied on its description of what it would be like to operate a "franchise." Plaintiff-owners believed NMC and gave them their life savings. Plaintiff-owners believed they were buying a legitimate business to support themselves and their families and to build equity in an ongoing business.

71.     Plaintiff-owners often did not receive sufficient contracts for cleaning assignments to be able to gross the income that NMC had promised would be available based on the amount of the franchise fee the worker had paid.

72.     Plaintiff-owners were often promised more cleaning assignments, but only if they bought another franchise.

COMPLAINT - 12

73.    Plaintiff-owners were often induced to pay additional franchise fees and enter into new franchise agreements (not renewals) relying on NMC's empty promises that they would gross more.

74.    NMC also arranged for Plaintiff-owners to obtain business insurance.

75.    In or around 2012, NMC was under investigation by Washington's Labor and Industries for misclassification of employees as "franchisees." In response, NMC started requiring that the Plaintiff-owners purchase workers' compensation insurance.

76.    Workers' compensation insurance companies often denied Plaintiff-owners' applications for insurance, because the "franchisees" did not have employees.

77.    To circumvent the insurance companies' requirements, and to protect their fictitious franchising scheme, NMC induced Plaintiff-owners to lie to the insurance companies by having Plaintiff-owners count their spouse or children, some of whom were minors, as employees. NMC used threats of serious financial harm to get Plaintiff-owners to lie by threatening them with loss of their franchise fees and termination of their franchisor-franchisee relationship.

78.    NMC also started requiring that "franchisees" register with their respective secretaries of state as limited liability companies.

79.    In 2016, the Oregon Legislative Assembly amended the Oregon Contractor Registration Act to include janitorial labor contractors and required them to register with Oregon's Bureau of Labor and Industries ("BOLI"). NMC refused to register with BOLI, and instead required its "franchisees," the Oregon Plaintiffs-owners, to register, even though they do not recruit, solicit, supply or employ janitorial labor for another for remuneration.

80.    These actions represent NMC's attempt to disguise the Oregon Plaintiff-owners as "franchisees" when they were actually treated as employees.

81.    Plaintiff-owners worked exclusively for NMC, as their "franchises" were not allowed to enter into independent janitorial agreements. To do so would be considered a violation of the franchise agreement's non-compete clause.

82.    Consequently, only NMC would enter into service contracts with building owners. NMC would then exercise exclusive control in assigning these contracts to Plaintiff-owners.

83.    When assigning service contracts to a Plaintiff-owner, NMC first required the Plaintiff-owner to sign a franchise account acceptance form that contained information about the account that was being assigned.

84.    Plaintiff-owners also received a copy of NMC's specifications of the different duties that were to be performed on the account.

85.    NMC also dictated the time allotted to Plaintiff-owners to perform janitorial services.

86.    Plaintiff-owners could not complete the janitorial services alone within the time allotted by NMC, but hiring employees was financially out-of-reach because the Plaintiff-owners were unable to control their profits or losses.

87.    Because of this, Plaintiff-owners often had their spouses and children, many of whom were minors, (herein, "Plaintiff-family(ies)") help them perform the janitorial services specified by NMC. NMC was aware of this practice and often ran background checks on the immediate families of the Plaintiff-owners. The Plaintiffs listed below are family members who assisted in such manner.

| **Franchise Name** | **Plaintiff-family(ies) of "franchisee"** |
|---|---|
| Hernandez Framing Specialists, LLC | Rogelio Escobar, Spouse Raquel Escobar, Daughter |
| AJ Cleaning Services, LLC | Juan Aceituno, Spouse |
| Alpha Janitorial Services, LLC | Cecilia Gutierrez, Spouse |

| | |
|---|---|
| FJ Cleaning Services, LLC | Edwardo Umana, Son |
| Alfaro's Deep Cleaning, LLC | Lusi Alfaro, Spouse |
| Lilena's Cleaning Service, LLC | Lilena Vásquez , Spouse |
| Servin Maintenance, LLC | Marco Servin, Spouse |
| PA Janitorial Services, LLC | Jorge Alvarez, Spouse[2] <br> Emmanuel Alvarez, Son |
| Hugo's M&C Cleaning Services, LLC | Silvia Barraza, Spouse |
| Urban Cleaning Services PDX, LLC | Ulisar Morales, Son <br> Jorge Garcia, Non-Relative <br> Patricia Tobar, Non-Relative (Jorge Garcia's spouse)[3] |
| Sister's Janitorial, LLC | N/A |
| Solomon Office Building Maintenance Service, LLC | N/A |
| D&Z Maintenance Company, LLC | Maria Madrigal, Spouse |
| Jireh Janitorial Service, LLC | Concepcion Cruz, Spouse |
| Brooms and Mops, LLC | Gerardo Ramirez-Cruz, Father <br> Jessica Ramirez, Sister <br> Concepcion Solis, Mother |
| Seattles Best Cleaning Services, LLC | Karin Martinez, Spouse |
| Prof Cleaning LLC | Gregory Dikhaindzhiya, Son |

88.     NMC treated Plaintiff-owners and Plaintiff-families as if they were employees.

89.     NMC dictated the manner and means by which work was done by Plaintiff-owners and their Plaintiff-families.

90.     Before Plaintiff-owners and their Plaintiff-families could perform janitorial services on the assigned service contracts, NMC required that they complete trainings provided by NMC, including health and safety trainings.

91.     NMC also often had other "franchisees" or supervisors train new "franchisees" on how to perform varying janitorial services.

92.     NMC supervised the work performed by Plaintiff-owners and Plaintiff-families through NMC's Operation Coordinators ("OC(s)"). OCs were at the jobsites daily and intervened

---

[2] Not a plaintiff in this lawsuit.
[3] Not a plaintiff in this lawsuit.

if there were any cleaning standard issues. They would write up a "franchisee" for any performance issues or submit the issue to an NMC director who would then write up a "franchisee."

93.    Although NMC often entered into service contracts for entire buildings, it generally did not assign the building to one franchise, but instead split identifiable parts of the building among various franchises. For this type of arrangement, OCs would supervise the entire time that Plaintiff-owners and Plaintiff-families were performing the janitorial services.

94.    For smaller buildings like banks, the OCs had scheduled times when they would arrive to review the "franchisees" work performance.

95.    NMC required most Plaintiff-owners and Plaintiff-families to wear uniforms with NMC's company logo. The uniform cost was deducted by NMC from the gross monthly earnings credited to the franchise.

96.    NMC often controlled the tools of the trade by requiring Plaintiff-owners and their Plaintiff-families to buy and use equipment, tools, and materials from NMC's preferred vendors.

97.    NMC never made, kept or preserved time records for the hours worked by Plaintiff-owners or their Plaintiff-families.

98.    Until it was investigated by BOLI for misclassification in or around 2012, NMC made out paychecks to the franchises rather than to Plaintiff-owners in an attempt to legitimize its misclassification of employees.

99.    NMC mailed and emailed monthly itemized paystubs to the "franchise." The paystub itemized each service contract assigned, the 20-25% deduction for royalty and office support fees, and any loan, interest or note payment deduction amount.

100.    Plaintiff-owners who could not afford to front the franchise fees had to repay the cost, plus a 6% per annum interest rate. In essence, NMC loaned Plaintiff-owners' money to cover the franchise fees, tools, materials and/or other fees imposed.

101.    Plaintiff-owners also had to cover any operational costs from their monthly paychecks that included but were not limited to:

      a.  cleaning supplies;

      b.  workers' compensation insurance;

      c.  business liability insurance;

      d.  gas and vehicle maintenance associated with traveling between properties;

      e.  Secretary of State registration and renewal fees; and

      f.  1099-MISC taxes and accountant fees.

102.    These deductions and out-of-pocket costs brought Plaintiffs' wages well-below the federal, state, and/or local minimum wages.

103.    NMC also knew or should have known that they had a legal duty to withhold taxes from all Plaintiff-owners and their Plaintiff-families earnings and to provide Plaintiff-owners and their Plaintiff-families with accurate W-2 tax statements for each tax year during which Plaintiffs worked.

104.    Instead, NMC issued 1099-MISC for all wages earned.

105.    NMC knew or should have known that they had a legal duty to provide Plaintiff-owners and their Plaintiff-families with accurate 1099-MISC statements for each tax year during which Plaintiffs worked.

106.    NMC's actions were willful, and showed reckless disregard for the provisions of the Internal Revenue Code by misrepresenting royalties as non-wage income.

107.    As a consequence of NMC's misclassification of Plaintiff-owners' and Plaintiff-families' wages as non-wage income, NMC filed false information returns with the IRS.

108.    NMC had a legal obligation to file accurate tax statements with the IRS.

109.    As required by 26 U.S.C. § 7424(d), Plaintiff will provide a copy of this Complaint to the Internal Revenue Service.

### "Escobar" group: Maura Escobar, Rogelio Rodriguez, and Raquel Escobar Hernandez Framing Specialists, LLC

110.    In or around 2015, Plaintiff-owner Maura Escobar was recruited by NMC through a third-party, another "franchisee," through word of mouth to perform janitorial labor services in Oregon.

111.    Escobar was provided the franchise disclosure document two weeks before her initial meeting. She was not able to read or understand the document. NMC did not explain to Escobar what the document was.

112.    Because Escobar spoke little to no English, she took her daughter Raquel Escobar, a minor at the time, to NMC's initial meeting.

113.    Escobar comprehends English at an elementary level and has no formal post-secondary education.

114.    Gregg McDonald, NMC's Regional Director at the time, met with Escobar and her daughter.

115.    At the initial meeting, McDonald misrepresented how NMC operated in order to entice Escobar to sign the franchise agreement.

116.    McDonald promised that NMC would treat Escobar as an independent janitorial business owner by allowing her to enter into service contracts and by helping her expand her customer base.

117.    McDonald explained to Escobar that she could earn as much as she wanted. All Escobar had to do was spend a certain amount in franchise fees. He represented that she would earn $1,000 a month for each $5,000 she paid in franchise fees.

118.    Escobar told McDonald that she wanted to earn $2,000 a month.

119.    McDonald promised Escobar that she would earn $2,000 a month minus a 24% fee if she paid $10,000 in franchise fees upon signing.

120.    McDonald explained that the 24% fee was an administrative fee that covered the cost of NMC finding additional service contracts, and that payment of the fee was a requirement if Escobar wanted to be eligible for additional service contracts in the future.

121.    McDonald failed to disclose adequately the risk of the "franchise" to Escobar, including the fact that a substantial percentage of NMC "franchisees" never make the monthly gross earnings promised and in fact often earned far less.

122.    Based on these representations, Escobar entered into an agreement with NMC.

123.    Because Escobar was purchasing an existing franchise from another "franchisee," she paid $10,000 to the third-party "franchisee" and $1,500 as a transfer fee to NMC in exchange for NMC's promise that the Escobar franchise would be paid $2,000 a month minus a 24% administrative fee.

124.    Only after the franchise agreement was signed and NMC performed a walk-through with Escobar of the building assigned to her, NMC revealed that she would be earning $900 a month, rather than $2,000.

125.    Escobar was very upset and complained that there was a discrepancy between the amount she was promised at the initial meeting and what NMC was now representing.

126.    After many complaints, NMC agreed to increase Escobar's monthly earnings to $1,200, but never increased the amount to the $2,000 a month she was promised at the initial meeting.

127.    NMC knew that Rogelio Rodriguez, Escobar's husband, her daughter, Raquel Escobar, and, her son, David Escobar[4], performed work on the service contracts assigned to the Escobar franchise in order to complete the assignment.

128.    On or around March 2017, NMC notified Escobar that she needed to pay another $1,000 if she wanted to continue to work. This money would renew her contract for another 5 years.

129.    When Escobar tried to pay the renewal fee, Noe Valladares, a director for NMC at the time, wrote a letter to Escobar indicating that the renewal fee was $2,000 instead of the $1,000 that was originally represented to her.

130.    In that letter, NMC also requested that she provide "proof" that the Escobar franchise had at least one employee and had obtained workers' compensation insurance.

131.    Escobar felt pressured to try to comply with these demands because of the threats she received from NMC about losing the money she had paid in franchise fees.

132.    Escobar was able to obtain workers' compensation insurance for the Escobar franchise, but she could not afford to hire anyone because she and her family were not making minimum wage.

133.    NMC did not pay the Escobar group workers the minimum wage. For example, the Escobar group and David Escobar[5] worked a combined total of approximately 320 hours during December 2015, for which the franchise received $1,650.58.

---

[4] Not a plaintiff in this lawsuit.
[5] Plaintiff-owner's son who is not a part of this lawsuit but did contribute to the hours worked.

134.    That payment of $1,650.58 was reduced by $396.14 in royalty and office support fees and out-of-pocket costs of approximately $100, bringing the Escobar group workers below the Oregon minimum wage, to approximately $3.92 per hour.

135.    NMC used the Escobar franchise to illegally pay these individuals below minimum wage.

136.    NMC treated the Escobar group workers as employees, not franchisees.

137.    NMC dictated the Escobar group's work schedule.

138.    The Escobar group workers did not have the ability to make profits and manage their franchise.

139.    NMC controlled the cleaning chemicals used by requiring the Escobar group to buy chemicals from their preferred vendors.

140.    The Escobar group was also required to purchase an industrial vacuum using an NMC preferred vendor.

141.    NMC did not allow the Escobar group to have any contact with its property service clients.

142.    The Escobar group was never allowed to participate in the conversations or negotiations between NMC and the property service clients for whom they worked.

143.    NMC required the Escobar group to take accounts regardless of their profitability by threatening them that they would lose their franchise if they refused.

144.    In or around July 2017, NMC terminated its employment relationship with Escobar group workers.

145.    Escobar asked that NMC rescind her franchise agreement in an effort to try to recollect the money she paid in franchise fees but was denied.

COMPLAINT - 21

146.    The Escobar franchise was entitled, under the franchise agreement, to receive service contracts until sometime in 2020.

*"Aceituno" group: Juan Aceituno and Brenda Aceituno*
*AJ Cleaning Services, LLC*

147.    In or around 2010, Plaintiff-owner Brenda Aceituno was recruited by NMC to perform janitorial services in Oregon using a third-party, another "franchisee."

148.    An initial meeting was scheduled between Gregg McDonald, the third-party "franchisee," Brenda Aceituno and her husband, Juan Aceituno.

149.    NMC did not provide an interpreter.

150.    The Aceitunos spoke very little English and had no formal post-secondary education or business background.

151.    At the initial meeting, McDonald misrepresented how NMC operated to entice Aceituno to sign the franchise agreement.

152.    McDonald promised that NMC would treat Aceituno as an independent janitorial business owner by allowing her to enter into service contracts and helping her expand her customer base.

153.    McDonald explained to Aceituno that she could earn as much as she wanted. All Aceituno had to do was spend a certain amount in franchise fees. McDonald represented that she could earn $1,000 a month for each $5,000 she paid in franchise fees.

154.    Aceituno told McDonald that she wanted to earn $2,000 a month.

155.    McDonald promised Aceituno that her "franchise" would earn $2,000 a month minus a 24% fee.

156.    The 24% fee was explained as an administrative fee that covered the cost of NMC finding service contracts, and the fee was a requirement if she wanted to be eligible for additional service contracts in the future.

157.    McDonald failed to disclose adequately the risk of the "franchise" to Aceituno, including the fact that a substantial percentage of NMC franchisees never earn the monthly gross earnings promised or that a number of "franchisees" fail, are terminated or are otherwise inactive.

158.    Based on these representations, Aceituno entered into an agreement with NMC.

159.    Because the Aceituno was purchasing an already-existing franchise, NMC had them pay $9,000 to the third-party "franchisee" and $850 as a transfer fee to NMC. McDonald oversaw the transaction at the initial meeting.

160.    NMC never paid Aceituno the promised $2,000 a month.

161.    The Aceitunos complained to NMC about the low earnings, and, in 2012, NMC told them that the only way to earn more money was to pay more in franchise fees. NMC had them pay an additional $5,000 in franchisees fees for the promise to assign them service contracts that would supposedly pay out $4,500 a month.

162.    Despite that promise, NMC never consistently paid $4,500 a month.

163.    In fact, in or around 2014 NMC lost a service contract that had been assigned to the Aceituno worker group, causing the Aceitunos' gross monthly earnings to fall substantially below the amount promised by NMC.

164.    NMC encouraged Aceituno to sell part of the franchise if she wanted to recoup any of the franchise fees she had paid. Aceituno felt she had no alternative because she was earning far below the promised gross monthly earnings.

COMPLAINT - 23

165.    Aceituno found a buyer that would purchase part of her franchise value. NMC oversaw the transaction. She was able to recoup $7,000 of the franchise fees she originally paid to NMC. This left Aceituno with a franchise valued at $8,000, which meant she was now entitled to $1,600 a month.

166.    In or around October 2016, Aceituno was notified that she owed a renewal fee of $800.

167.    Aceituno was scheduled to meet with Noe Valladares, a director for NMC, but at the last minute Valladares cancelled that meeting and began avoiding her.

168.    On or around November 2016, NMC lost all service contracts assigned to the Aceitunos.

169.    The Aceitunos were out of work between November 2016 and August 2017. Because their franchise was not allowed to secure service contracts, the Aceitunos continued to contact NMC with the hope of receiving direction and work assignments. NMC avoided their many phone calls and attempts to secure work.

170.    NMC finally assigned a service contract to the Aceituno several months later, in or around August 2017.

171.    Though the Aceituno had returned to work under NMC's direction, she continued earning substantially less than minimum wage. For example, the Aceitunos worked a combined total of approximately 200 hours during December 2017, for which they were paid $1,435.30. Even without the royalty and office support fee deductions and out-of-pocket costs, the hourly rate for the Aceitunos in December 2017 was well below the federal and Oregon minimum wage.

172.    That payment of $1,435.30 was reduced by $344.48 in royalty and office support fees and out-of-pocket costs of approximately $250, bringing the Aceitunos' earnings even farther below federal and Oregon minimum wage, to approximately $4.20 per hour.

173.    NMC used the Aceituno franchise agreement to illegally pay these individuals below minimum wage.

174.    NMC treated the Aceituno group workers as employees, not franchisees.

175.    NMC dictated the Aceitunos work schedule.

176.    The Aceitunos did not have the ability to make profits and manage their franchise.

177.    NMC controlled the cleaning chemicals used by requiring the Aceitunos to buy chemicals from their preferred vendor.

178.    The Aceitunos were also required to purchase an industrial vacuum using an NMC preferred vendor.

179.    NMC did not allow Aceituno to have any contact with her property service clients.

180.    Aceituno was never allowed to participate in the conversations or negotiations between NMC and the property service clients for whom she and her husband worked.

181.    NMC required the Aceitunos to take accounts regardless of their profitability by threatening them that they would lose their franchise if they refused.

182.    On or around March 2018, NMC lost the service contracts assigned to the Aceitunos.

183.    The Aceitunos asked for another assignment but were only offered an account in Washington State.

184.    An out of state reassignment was a tactic practiced by NMC when it wanted to terminate an employment relationship with its janitors. NMC knew that an out of state

reassignment was cost prohibitive for its janitors because that meant they would have to register with the secretary of state in Washington and become insured in that state.

185.    NMC's refusal to assign service contracts to the Aceituno franchise was not due to a lack of accounts; it was actively recruiting "franchisees" or subcontractors in 2018 and assigning service contracts to the newer recruits.

186.    Under their NMC franchise agreement, the Aceituno "franchise" was entitled to be assigned service contracts until 2025.

*"Martinez" group: Efrain Martinez and Cecilia Gutierrez*
*Alpha Janitorial Services, LLC*

187.    In or around 2008, Plaintiff-owner Efrain Martinez was recruited by NMC to work providing janitorial services in Oregon.

188.    A franchise disclosure document was provided before the initial meeting, but Martinez could not understand its provisions.

189.    An initial meeting was scheduled between with Gregg McDonald, Noe Valladares, and Martinez.

190.    No interpreters were provided.

191.    Martinez had only an elementary understanding of English and had no formal post-secondary education or business background.

192.    At the initial meeting, McDonald misrepresented how NMC operated to entice Martinez to sign the franchise agreement.

193.    McDonald promised that NMC would treat Martinez as an independent janitorial business owner by allowing him to enter into service contracts and helping him expand his customer base.

194.    McDonald explained to Martinez that he could earn as much as he wanted. All Martinez had to do was spend a certain amount in franchise fees. He could earn $1,000 a month for each $5,000 he paid in franchise fees.

195.    Martinez was interested in earning $3,800 a month.

196.    McDonald promised Martinez that he would earn $3,800 a month minus a 25% administrative fee if he paid $19,000 in franchise fees.

197.    The 25% fee was explained as an administrative fee that covered the cost of NMC finding service contracts, and it was a requirement if he wanted to be eligible for additional service contracts in the future.

198.    McDonald failed to disclose adequately the risks of the "franchise" to Martinez, including the fact that a substantial percentage of NMC franchisees never earn the monthly gross earnings promised or that a number of "franchisees" fail, are terminated, or otherwise are inactive.

199.    Based on these representations, Martinez entered into an agreement with NMC.

200.    Martinez paid $19,000 to NMC in franchise fees in exchange for NMC's promise that he would earn $3,800 a month minus a 25% administrative fee.

201.    NMC never kept its promise.

202.    NMC knew that Cecilia Gutierrez, Martinez's wife, would also be performing janitorial labor on any assignments. NMC required that both Martinez and Gutierrez pass background checks before they performed janitorial services.

203.    Between 2009 and approximately 2012, NMC issued paychecks both for Martinez's and Gutierrez's work, but only with Martinez's name on them.

204.    NMC also arranged liability insurance and workers' compensation during that time.

205.    In or around 2012, NMC notified the Martinez group workers that they would need to form a limited liability company, obtain liability insurance, and enroll in workers' compensation.

206.    The Martinez group workers felt that they had no alternative but to comply because NMC threatened that the group would lose their $19,000 investment.

207.    NMC also began issuing paychecks to the Martinez franchise instead of to Martinez directly.

208.    Even after the Martinez limited liability company was formed, NMC continued to require Martinez and Gutierrez to perform additional cleaning work outside of the service contracts assigned to their "franchise." Again, the Martinez worker group felt that they had to do this additional work because NMC threatened that they would lose their $19,000, if they refused.

209.    Also, during a renewal year, NMC made threats to cancel their assigned accounts if Martinez did not renew the contracts.

210.    Over the years, Martinez continued to renew his franchise agreements, paying approximately $34,500 in franchise fees in exchange for NMC's promise that the Martinez franchise would gross $6,900 monthly.

211.    NMC failed to pay the Martinez franchise pursuant to those agreements.

212.    NMC did not pay the Martinez group workers the minimum wage. For example, Martinez and Gutierrez a combined total of approximately 344 hours during October 2017, for which they received $3,196.50. Even without the royalty and office support fee deductions and out-of-pocket costs, the hourly rate for the Martinez group workers in October 2017 was well below the Oregon minimum wage.

213.    That payment of $3,196.50 was reduced by $767.16 in royalty and office support fees, $144.14 as a note payment and $2.17 as interest, and approximately $100 in out-of-pocket costs, bringing Martinez's and Gutierrez's earnings even farther below the federal and Oregon minimum wage, to approximately $6.35 per hour.

214.    Among other weeks, Martinez and Gutierrez each worked approximately 43 hours during the week of October 16, 2017, to October 20, 2017, and were not paid time and a half as required by the FLSA for hours worked in excess of 40.

215.    NMC used the Martinez franchise agreement to illegally pay Martinez and Gutierrez below minimum wage.

216.    NMC treated Martinez and Gutierrez as employees, not franchisees.

217.    NMC dictated the Martinez group's work schedule.

218.    The Martinez group did not have the ability to make profits and manage their franchise.

219.    NMC required Martinez to purchase a number of industrial vacuums using NMC's preferred vendors.

220.    NMC did not allow Martinez to have any contact with his property service clients.

221.    Martinez was never allowed to participate in the conversations or negotiations between NMC and the property service clients for whom he and his wife worked.

222.    NMC required the Martinez group to take accounts regardless of their profitability by threatening them that they would lose their franchise if they refused.

223.    In or around 2017, NMC started requiring its "franchisees" including the Martinez franchise to register as janitorial labor contractors with BOLI.

224.     The Martinez franchise refused to register and in turn NMC reassigned their janitorial contracts to other "franchisees" and stopped providing work assignments.

225.     NMC explained to the Martinez group workers that they would no longer receive assignments because they were not in compliance with this requirement.

226.     NMC's refusal to assign service contracts to the Martinez group workers was not due to a lack of service contracts because NMC was actively recruiting "franchisees" or subcontractors in 2018 and assigning service contracts to the newer recruits.

227.     Under the franchise agreement, the Martinez group workers were entitled to work assignments through 2024.

*"Umana" group: Francisco Umana and Edward Umana*
*FJ Cleaning Services, LLC*

228.     On or around September 10, 2014, Francisco Umana was recruited by NMC using a third-party, another "franchisee," to work in Oregon.

229.     A franchise disclosure document was provided to him before the initial meeting. Umana could not understand its provisions.

230.     At the initial meeting on or around September 24, 2014, McDonald misrepresented how NMC operated in order to entice Umana to sign the franchise agreement.

231.     McDonald promised that NMC would treat Umana as an independent janitorial business owner by allowing him to enter into service contracts and helping him expand his customer base.

232.     McDonald explained to Umana that he could earn as much as he wanted. All Umana had to do was spend a certain amount in franchise fees. He could earn $1,000 a month for each $5,000 he paid in franchise fees.

233.    Because Umana was purchasing an existing franchise, McDonald explained that Umana would need to pay $7,500 to the third-party "franchisee" that recruited him, and $750 to NMC as a transfer fee. In exchange, McDonald explained that NMC would pay him $1,500 a month minus a 24% fee.

234.    The 24% fee was explained as an administrative fee that covered the cost of NMC finding service contracts, and a requirement if he wanted to be eligible for additional service contracts in the future.

235.    McDonald failed to disclose adequately the risk of the "franchise" to Umana, including the fact that a substantial percentage of NMC franchisees never earn the monthly gross earnings promised or that a number of "franchisees" fail, are terminated, or otherwise are inactive.

236.    NMC required that Umana and his son Edward Umana pass background checks before performing janitorial services on any service contracts.

237.    NMC did not pay the Umana group workers the minimum wage. For example, the Umanas worked a combined total of approximately 120 hours during December 2017, for which they received $1,110.00. Even without the royalty and office support fee deductions and out-of-pocket costs, the hourly rate for the Umana group workers was well below the Oregon minimum wage.

238.    That payment of $1,110.00 was reduced by $266.40 in royalty and office support fees and approximately $166.67 in out-of-pocket costs, bringing each of the Umanas's earnings even farther below the federal and Oregon minimum wage, to approximately $5.64 per hour.

239.    NMC used the Umana franchise agreement to illegally pay the Umana group workers below minimum wage.

240.    NMC treated the Umana group workers as employees, not franchisees.

COMPLAINT - 31

241.   NMC dictated the Umana group's schedule.

242.   Umana did not have the ability to make profits and manage his franchise.

243.   NMC controlled the cleaning chemicals by requiring Umana to buy chemicals from their preferred vendor.

244.   Umana was also required to use industrial vacuums from NMC's preferred vendors. Umana purchased a used industrial vacuum from another "franchisee."

245.   NMC did not allow Umana to have any contact with his property service clients.

246.   Umana was never allowed to participate in the conversations or negotiations between NMC and the property service clients for whom he and his son worked.

247.   NMC required the Umanas to take accounts regardless of their profitability by threatening them that they would lose their franchise if they refused.

248.   In or around January 2018, NMC abruptly stopped assigning work to the Umana franchise.

249.   Under the franchise agreement, the Umana franchise was entitled to assignments until around 2019 and had two options to renew: the first through 2024 and the second through 2029.

*"Alfaro" group: Rafaela Gutierrez and Luis Alfaro*
*Alfaro's Deep Cleaning, LLC*

250.   In or around 2007, Rafaela Gutierrez was recruited by NMC to perform janitorial services in Oregon.

251.   An initial meeting was scheduled between Gregg McDonald and Gutierrez. Gutierrez's English is at an elementary proficiency level. No interpreter was provided.

252.   At the initial meeting, McDonald misrepresented how NMC operated in order to entice Gutierrez to sign the franchise agreement.

253.    McDonald promised that NMC would treat Gutierrez as an independent janitorial business owner by allowing her to enter into service contracts and helping her expand her customer base.

254.    McDonald explained to Gutierrez that she could earn as much as she wanted. All Gutierrez had to do was spend a certain amount in franchise fees. She could earn $1,000 a month for each $5,000 she paid in franchise fees.

255.    Gutierrez was interested in earning $1,000 a month.

256.    Gutierrez was promised $1,000 a month minus a 24% fee if she paid $5,000 to NMC in franchise fees.

257.    The 24% fee was explained as an administrative fee that covered the cost of NMC finding additional service contracts, and the fee was a requirement if she wanted to be eligible for additional service contracts in the future.

258.    McDonald failed to disclose adequately the risk of the "franchise" to Gutierrez, including the fact that a substantial percentage of NMC franchisees never earn the monthly gross earnings promised or that a number of "franchisees" fail, are terminated, or otherwise are inactive.

259.    Based on these representations, Gutierrez entered into an agreement with NMC.

260.    Gutierrez paid NMC $5,000 in exchange for NMC's promise to pay her $1,000 a month minus a 24% fee.

261.    NMC never paid Gutierrez $1,000 a month.

262.    Luis Alfaro, Gutierrez's husband, also worked on any janitorial assignments. NMC was aware of this.

263.    In or around 2010, NMC had secured a service contract and offered it to Gutierrez. NMC convinced Gutierrez to pay NMC another $5,000 in franchise fees in exchange for that work

assignment and the promise that she would earn an additional $1,000 a month, for a total of $2,000 a month.

264.    In or around 2012, NMC announced that they would be requiring franchisees to register as a limited liability company, obtain liability insurance and enroll in workers' compensation.

265.    Gutierrez felt she had no option other than to comply with NMC's demands, as NMC threatened her that she would lose her service contracts and the money she paid in franchise fees.

266.    In or around 2015, NMC notified Gutierrez that she needed to renew her account. She was required to pay $2,500 in renewal fees.

267.    In or around 2017, Gutierrez was again required to pay $2,500 in franchise fees if she wanted to continue to work.

268.    NMC did not pay the Gutierrez group workers the minimum wage. For example, Gutierrez and Alfaro worked a combined total of approximately 360 hours during August 2018 for which the Alfaro franchise received $2,942.70. Even without the royalty and office support fee deductions and out-of-pocket costs, the hourly rate for Gutierrez and Alfaro was well below the Oregon minimum wage.

269.    That payment of $2,942.70 was reduced by $706.25 in royalty and office support fees and approximately $53.00 in out-of-pocket expenses, bringing Gutierrez's and Alfaro's earnings even farther below the federal and Oregon minimum wage, to approximately $6.07 per hour.

270.    Among other weeks, Gutierrez and Alfaro each worked 45 hours during the week of November 5, 2018, to November 9, 2018, and were not paid one and a half times their regular

rate of pay as required by the FLSA and Oregon wage and hour laws for hours worked in excess of 40.

271.    NMC used the Gutierrez franchise agreement to illegally pay Gutierrez and Alfaro below the minimum wage.

272.    NMC treated the Gutierrez group workers as employees, not franchisees.

273.    NMC dictated the Gutierrez work group's schedule.

274.    NMC controlled the cleaning chemicals and industrial vacuums used by the Gutierrez franchise by requiring it to buy from NMC's preferred vendors.

275.    NMC did not allow Gutierrez to have any contact with her property service clients.

276.    Gutierrez was not allowed to participate in the conversations or negotiations between NMC and the property service clients for whom the Gutierrez group worked.

277.    NMC required the Gutierrez franchise to take on accounts regardless of their profitability by threatening Gutierrez that she would lose her franchise if she refused.

278.    Gutierrez and Alfaro continue to perform janitorial services with NMC. However, she constantly receives threats from NMC that it will take away her service contracts if she does not register as a janitorial labor contractor with BOLI.

*Lilena Vásquez*
*Lilena's Cleaning Service, LLC*

279.    In or around 2014, Lilena Vásquez was recruited by NMC using a third-party, another "franchisee," to perform janitorial services in Oregon.

280.    A franchise disclosure document was provided to Vásquez, but she was not able to understand its provisions.

281.    An initial meeting was scheduled with Gregg McDonald and Vásquez. Vásquez only comprehends English at an elementary level and had no formal post-secondary education or business background. NMC did not provide an interpreter.

282.    At the initial meeting, McDonald misrepresented how NMC operated in order to entice Vásquez to sign the franchise agreement.

283.    McDonald promised that NMC would treat Vásquez as an independent janitorial business owner by allowing her to enter into service contracts and helping her expand her customer base.

284.    McDonald explained to Vásquez that she could earn as much as she wanted. All Vásquez had to do was spend a certain amount in franchise fees. She could earn $1,000 a month for each $5,000 she paid in franchise fees.

285.    Vásquez was interested in earning $2,000 a month.

286.    McDonald promised that Vásquez would earn $2,000 a month minus a 24% fee if she paid a franchise fee of $10,000.

287.    The 24% fee was explained as an administrative fee that covered the cost of NMC finding additional service contracts, and the fee was a requirement if she wanted to be eligible for additional service contracts in the future.

288.    McDonald failed to disclose adequately the risk of the "franchise" to Vásquez, including the fact that a substantial percentage of NMC franchisees never earn the monthly gross earnings promised or that a number of "franchisees" fail, are terminated, or otherwise are inactive.

289.    Because Vásquez was purchasing an existing franchise, McDonald explained that she would be paying $7,500 to the third-party "franchisee" who recruited her and a $750 transfer fee to NMC. McDonald oversaw the transaction.

290.    NMC never paid Vásquez the $2,000 a month that it promised.

291.    After Vásquez complained that she was not receiving her promised wages, NMC informed Vásquez that if she wanted to earn more, she would need to pay additional franchise fees.

292.    Vásquez did not have any more money to pay franchise fees, so NMC offered to loan her $10,000 with a 6% per annum interest rate.

293.    NMC held another meeting and met with her to sign a second franchise agreement.

294.    At that meeting, NMC promised Vásquez that she would earn an additional $2,000 a month, for a total of $4,000 a month.

295.    NMC assigned Vásquez a service contract that paid $650 a month and no other accounts.

296.    Vásquez never earned the additional $2,000 a month that she was promised.

297.    NMC did not pay Vásquez the minimum wage. For example, Vásquez worked approximately 120 hours during August 2018, for which Vásquez received $2,274.54.

298.    That payment of $2,274.54 was reduced by $589.08 in royalty and office support fees, an unknown charge of $250 for "Turquoise Learning – Deduction," and approximately $245 in out-of-pocket costs, bringing her below the Oregon minimum wage.

299.    NMC used the Vásquez franchise agreement to illegally pay Vasquez below minimum wage.

300.    NMC treated Vásquez as an employee, not franchisee.

301.    NMC dictated Vásquez's work schedule.

302.    Vásquez did not have the ability to make profits and manage her franchise.

303.    Vásquez was required to finance an industrial vacuum using an NMC preferred vendor.

304.    NMC did not allow Vásquez to have contact with her property service clients.

305.    Vásquez was never allowed to participate in the conversations or negotiations between NMC and the property service clients for whom she worked.

306.    NMC required Vásquez to take accounts regardless of their profitability by threatening her that she would lose her franchise if she refused.

307.    On or around October 2018, NMC denied Vásquez any more work assignments because she could not obtain workers' compensation insurance. Vásquez was not able to find an insurance company that would issue workers' compensation to Vásquez because she had no employees. Vásquez objected to NMC's requirements, and in retaliation, NMC ended communications with her.

308.    Vásquez was entitled to assignments through approximately January 2020 and had two options to renew to extend her agreement: the first through 2025 and the second through 2030.

*"Dominguez" group: Martha Dominguez and Marco Servin*
*Servin Maintenance, LLC*

309.    In or around 2012, Plaintiff-owner Martha Dominguez was recruited by NMC using a third-party, another "franchisee," to perform janitorial services in Oregon.

310.    A franchise disclosure document was given to Dominguez, but she did not understand the provisions.

311.    She and her husband, Marco Servin, met with the third-party franchisee and NMC's Gregg McDonald and Noe Valladares at the Tigard, Oregon headquarters.

312.    NMC did not provide an interpreter for the meeting.

313.    Dominguez and Servin lacked English language skills and had no formal post-secondary education or business background.

314.    At the initial meeting, McDonald and Valladares misrepresented how NMC operated in order to entice Dominguez to sign the franchise agreement.

315.    McDonald and Valladares promised that NMC would treat Dominguez as an independent janitorial business owner by allowing her to enter into service contracts and helping her expand her customer base.

316.    McDonald and Valladares explained to Dominguez that she could earn as much as she wanted. All Dominguez had to do was spend a certain amount in franchise fees. She could earn $1,000 a month for each $5,000 she paid in franchise fees.

317.    Because Dominguez was purchasing an already existing franchise, McDonald and Valladares promised that Dominguez would earn $2,800 a month minus a 24% administrative fee if she paid $12,500 in franchise fees to the third-party franchisee to cover the value of that franchise.

318.    The 24% fee was explained as an administrative fee that covered the cost of NMC finding new service contracts, and the fee was a requirement if she wanted to be eligible for additional service contracts in the future.

319.    McDonald and Valladares failed to disclose adequately the risk of the "franchise" to Dominguez, including the fact that a substantial percentage of NMC franchisees never earn the monthly gross earnings promised or that a number of "franchisees" fail, are terminated, or otherwise are inactive.

320.    Based on these representations, Dominguez entered into an agreement with NMC.

321.    Dominguez paid $12,500 to the third-party "franchisee" who recruited her, and a $1,250 transfer fee to NMC. NMC oversaw the transaction at the initial meeting.

322.    In or around 2017, NMC required Dominguez to pay a $1,400 renewal fee if she wanted to continue to work. Dominguez was threatened that, if she refused, she and Servin would lose their jobs.

323.    Dominguez received a second franchise disclosure document and agreement. Even though she did not understand its provisions, Dominguez felt that if she did not sign a new franchise agreement, she and her husband would lose their jobs.

324.    NMC did not pay the Dominguez group workers the minimum wage. For example, Dominguez and Servin worked a combined total of approximately 312 hours during February 2018, for which they received $3,147.02. Even without the royalty and office support fee deductions and out-of-pocket costs, the hourly rate for Dominguez and Servin was well below the Oregon minimum wage.

325.    That payment of  $3,147.02 was reduced by $755.28 in royalty and office support fees, $120.49 in franchise loan and interest, and approximately $147.00 in out-of-pocket costs, bringing Dominguez's and Servin's earnings even farther below the federal and Oregon minimum wage, to approximately $6.80 per hour.

326.    Dominguez and Servin each worked approximately 49 hours during the week of October 16, 2017, to October 20, 2017, and were not paid one and a half times their regular rate of pay as required by the FLSA for hours worked in excess of 40.

327.    NMC used the Dominguez franchise agreement to illegally pay Dominguez and Servin below the minimum wage.

328.    NMC treated the Dominguez group workers as employees, not franchisees.

329.    NMC dictated the Dominguez work group's schedule.

330.    The Dominguez group workers did not have the ability to make profits and manage their franchise.

331.    NMC required the Dominguez work group to wear the NMC uniform. The cost of the uniforms was deducted from their pay.

332.    NMC did not allow the Dominguez group to have any contact with their property service clients.

333.    The Dominguez group was not allowed to ever participate in the conversations and negotiations between NMC and the property service clients for whom they worked.

334.    NMC required the Dominguez group workers to take accounts regardless of their profitability by threatening that they would lose their franchise if they refused.

335.    Around May 2019, NMC lost the service contracts assigned to the Dominguez franchise.

336.    Since then, NMC has refused to assign Dominguez and Servin any work in Oregon and has only offered them work in Washington.

337.    Offering Oregon workers assignments in Washington is a tactic often used by NMC to end its relationship with "franchisees."

338.    NMC knows that it is a financially challenging for a "franchisee" to agree to work in Washington. Dominguez and Servin cannot afford to accept work in Washington because of the cost of securing insurance coverage and registering the franchise in that state.

339.    Dominguez had never agreed to receive work in Washington.

340.    Dominguez remains entitled to work assignments until 2022, with at least one option to renew through 2027.

/ / /

COMPLAINT - 41

*"Alvarez" group: Patricia Alvarez and Emmanuel Alvarez*
*PA Janitorial Services, LLC*

341.    In or around February 2007, Plaintiff-owner Patricia Alvarez was recruited by NMC to perform janitorial services in Oregon.

342.    Alvarez met with Gregg McDonald and was provided a franchise disclosure document, but she could not understand its provisions.

343.    At the initial meeting, on or around February 21, 2007, McDonald misrepresented how NMC operated in order to entice Alvarez to sign the franchise agreement.

344.    McDonald promised that NMC would treat Alvarez as an independent janitorial business owner, by allowing her to enter into service contracts and helping her expand her customer base.

345.    McDonald explained to Alvarez that she could earn as much as she wanted. All Alvarez had to do was spend a certain amount in franchise fees. She could earn $1,000 a month for each $5,000 she paid in franchise fees.

346.    Alvarez was interested in earning $2,000 a month.

347.    McDonald promised Alvarez that if she paid $10,000 in franchise fees, she would earn $2,000 a month minus a 20% fee.

348.    The 20% fee was explained as an administrative fee that covered the cost of NMC finding new service contracts, and the fee was a requirement if she wanted to be eligible for additional service contracts in the future.

349.    McDonald failed to disclose adequately the risk of the "franchise" to Alvarez, including the fact that a substantial percentage of NMC franchisees never earn the monthly gross earnings promised or that a number of "franchisees" fail, are terminated, or otherwise are inactive.

350.    Relying on McDonald's representations, Alvarez paid NMC $5,000 and financed another $5,000 with an interest rate of 6% per annum through NMC in exchange for their promise to pay $2,000 a month minus a 24% fee.

351.    Alvarez communicated to NMC that her husband Jorge Alvarez[6] and her son Emmanuel Alvarez would be working with her on any work assignments.

352.    Each of the workers in the Alvarez group had to pass background checks before they perform work for NMC.

353.    In or around 2009, Alvarez paid an additional $3,000 in franchise fees to NMC in exchange for its promise that she would earn an additional $600 a month, for a total of $2,600 per month.

354.    On or around December 2, 2011, McDonald represented to Alvarez that to continue to receive work assignments, she would need to sign a "Termination and Release Agreement." Alvarez cannot speak or read English and was unaware of what she was signing.

355.    That same day McDonald had Alvarez execute an entirely new franchise agreement.

356.    On or around June 27, 2013, Greg McDonald approached Alvarez and offered her service contracts. These contracts belonged to another "franchisee" so Alvarez would have to pay the franchise fees to that franchisee in order to receive the assignment. Alvarez also would need to pay NMC a 10% transfer fee.

357.    Alvarez did not have $10,000 to pay the other "francisee," so McDonald offered financing through NMC with a 6% per annum interest rate. McDonald promised that if she signed

---

[6] Jorge Alvarez is not a part of this lawsuit.

the agreement, Alvarez's total franchise value would be $23,000 and, therefore, she would be entitled to $4,600 a month.

358.    Alvarez never grossed $4,600 a month.

359.    In or around January 29, 2016, McDonald again represented to Alvarez that to receive another service contract assignment she would need to buy out another "franchisee." Alvarez paid $3,000 as franchise fees to the "franchisee" and $150 to NMC as a transfer fee. McDonald promised that if Alvarez did this her total franchise value would be at $26,000 and, therefore, she would be entitled to $5,200 a month.

360.    Alvarez never grossed $5,200 a month.

361.    In total, Alvarez believes she paid a total of $30,000 in franchise fees. Alvarez was unaware that she had entered into multiple franchise agreements because she was never able to read or understand what she was signing.

362.    Alvarez did understand that she should have been earning one fifth of her franchise value, which is $6,000 a month.

363.    The Alvarez group workers felt compelled to continue to work for NMC because of how much money they had paid in franchise fees.

364.    NMC did not pay the Alvarez group workers the minimum wage. For example, Patricia Alvarez, Jorge Alvarez[7], and Emmanuel Alvarez worked a combined total of approximately 387 hours during February 2019, for which the Alvarez franchise received $3,491.51. Even without the royalty and office support fee deductions and out-of-pocket costs, the hourly rate for the workers in the Alvarez group was well below the Oregon minimum wage.

---

[7] Plaintiff-owner's husband who is not a part of this lawsuit but did contribute to the hours worked.

365.    That payment of $3,491.51 was reduced by $837.96 in royalty and office support fees and $105 in out-of-pocket costs, bringing Patricia Alvarez's and Emmanuel Alvarez's earnings even farther below the federal and Oregon minimum wage, to approximately $6.59 per hour.

366.    Among other weeks, plaintiff Emmanuel Alvarez worked approximately 55.5 hours during the week of February 22, 2018, to February 19, 2018, and was not paid one and a half times his regular rate of pay as required by the FLSA and Oregon wage and hour laws for hours worked in excess of 40.

367.    NMC used the Alvarez franchise agreement to illegally pay the Alvarez group workers below minimum wage.

368.    NMC treated the Alvarez group workers as employees, not franchisees.

369.    NMC dictated the Alvarez group's schedule.

370.    The Alvarez group did not have the ability to make profits and manage their franchise.

371.    NMC did not allow the Alvarez group to have any contact with their property service clients.

372.    The Alvarez group was never allowed to participate in the conversations or negotiations between NMC and the property service clients for whom they worked.

373.    On or around August 2018, Patricia Alvarez was injured on an NMC job site, became a paraplegic, and no longer worked with the Alvarez group.

374.    Between March 2019 and May 2020, NMC lost the service contract assigned to the Alvarez franchise.

375.    During that time, NMC only offered the Alvarez work group service contracts in Vancouver, Washington.

376.    NMC knows that it is financially challenging for a "franchisee" to agree to work in Washington. The Alvarez work group could not afford to accept work in Washington because of the cost of securing insurance coverage and registering the franchise in that state.

377.    The Alvarez franchise received a cleaning assignment, in or around May 2020, and another in July 2020, after months of complaining to NMC.

378.    Under the franchise agreement, the Alvarez franchise is entitled to work assignments through 2021.

*"Barraza" group: Victor Hugo Garcia and Silvia Barraza*
*Hugo's M&C Cleaning Services, LLC*

379.    In or around November 2011, Plaintiff-owner Victor Hugo Garcia was recruited by NMC using a third-party, another "franchisee," to perform janitorial services in Oregon and Washington.

380.    A franchise disclosure document was provided to Garcia before his initial meeting.

381.    At the initial meeting, on or around November 1, 2011, McDonald misrepresented how NMC operated in order to entice Gracia to sign the franchise agreement.

382.    McDonald promised that NMC would treat Garcia as an independent janitorial business owner and would help him grow his business by helping him expand his customer base.

383.    McDonald explained to Garcia that he could earn as much as he wanted. All Garcia had to do was spend a certain amount in franchise fees. He could earn $1,000 a month for each $5,000 he paid in franchise fees.

384.    McDonald promised that Garcia would earn $750 a month minus a 24% administrative fee if he paid $3,500 in franchise fees to the third-party "franchisee" who recruited him, and a $350 transfer fee to NMC.

385.    The 24% fee was explained as an administrative fee that covered the cost of NMC finding new service contracts, and the fee was a requirement if he wanted to be eligible for additional service contracts in the future.

386.    McDonald failed to disclose adequately the risk of the "franchise" to Garcia, including the fact that a substantial percentage of NMC franchisees never earn the monthly gross earnings promised or that a number of "franchisees" fail, are terminated, or otherwise are inactive.

387.    Based on these representations, Garcia entered into an agreement with NMC.

388.    Because Garcia was purchasing an already-existing franchise, NMC had him pay $3,500 in franchise fees to the third-party "franchisee" for the value of the franchise and a $350 transfer fee to NMC. McDonald oversaw the transaction and promised Garcia that NMC would assign service contracts equaling at least $700 a month.

389.    On or around September 26, 2017, NMC induced Garcia to pay another $10,000 in additional franchise fees because Garcia wanted more work.

390.    NMC promised that Garcia would earn an additional $2,000 a month, for a total of $2,700 per month.

391.    NMC knew that Garcia's wife Silvia Barraza also performed janitorial services on the service contracts that were assigned to the Barraza franchise.

392.    Barraza was required to pass a background check and was also treated as an employee by NMC.

393.    The Barraza franchise often did not receive the $2,700 a month promised by NMC.

394.    NMC did not pay the Barraza group workers the minimum wage. For example, Garcia and Barraza worked a combined total of approximately 104 hours during December 2017, for which they received $1,740.42.

395.    That payment of $1,740.42 was reduced by $417.70 in royalty and office support fees, $198.31 as a repayment for the franchise fee and $10.14 as interest, and approximately $215 in out-of-pocket expenses, bringing Garcia and Barraza well below the Washington minimum wage to approximately $8.64 per hour.

396.    NMC used the Barraza franchise agreement to illegally underpay the Barraza work group workers below minimum wage.

397.    NMC treated the Barraza group workers as employees, not franchisees.

398.    NMC dictated the Barraza work group's schedule.

399.    The Barraza group were required to purchase industrial vacuums from NMC's preferred vendors.

400.    The Barraza group was never allowed to participate in the conversations or negotiations between NMC and the property service clients for whom they worked.

401.    NMC did not allow the Barraza group to have any contact with their property service clients.

402.    NMC stopped assigning service contracts to the Barraza franchise on or around October 2018.

403.    NMC's refusal to assign service contracts to the Barraza franchise was not for the lack of property service contracts, as NMC continues to actively recruit janitors and assign service contracts to the present day.

COMPLAINT - 48

404.    Under the franchise agreement, Garcia is entitled to work assignments until 2019, with at least one option to renew through 2024.

*"Garcia" group: Jorge Garcia and Ulisar Morales*
*Urban Cleaning Services PDX, LLC*

405.    In or around 2017, Jorge Garcia and Ulisar Morales were recruited by NMC to perform janitorial services in Oregon and Washington.

406.    However, Garcia had been employed by NMC as an OC, so NMC policy dictated that he was prohibited from buying a franchise on his own.

407.    In order to circumvent this policy, NMC encouraged Garcia to find a "business partner."

408.    Garcia and Morales, who are good friends, agreed that they would work for NMC.

409.    To do that, Morales's mother, Justa Morales,[8] entered into the franchise agreement even though she would not be performing janitorial labor for NMC.

410.    Noe Valladares met with Justa Morales, Jorge Garcia, and Ulisar Morales. Valladares promised them that Morales and Garcia would earn at least $2,000 a month if they paid $10,000 in franchise fees. Jorge Garcia and Ulisar Morales agreed to pay the $10,000.

411.    Valladares reminded them that their monthly paychecks would be reduced by 24%, a franchise fee that he said would cover the cost of NMC having to find new service contracts.

412.    Jorge Garcia, his wife, Patricia Tobar[9], and Ulisar Morales all worked on the assignments; not Justa Morales. All three had to pass a background check before they could begin working.

---

[8] Justa Morales is not a plaintiff in this lawsuit.
[9] Patricia Tobar is not a plaintiff in this lawsuit.

413.    NMC did not pay the Garcia group workers the minimum wage. For example, Garcia, Tobar[10], and Morales worked a combined total approximately 48 hours during March 2018, for which they received $405 for work they performed in Oregon.  Even without the royalty and office support fee deductions and out-of-pocket costs, the hourly rate for Garcia and Morales was well below the federal and Oregon minimum wages.

414.    That payment of $405 was reduced by $97.20 in royalty and office support fees and approximately $25 in out-of-pocket costs, bringing Jorge Garcia's and Ulisar Morales's earnings even farther below the federal and Oregon minimum wages; to approximately $5.89 per hour.

415.    For the month of April 2018, Garcia, Tobar, and Morales worked a combined total of 638 hours in Oregon and Washington, for which were paid $9,559.15 for the work they performed.

416.    That payment of $9,559.15 was reduced by $2,397.34 in royalty and office support fees, $410.92 as a loan repayment and $18.89 as interest, and approximately $50.00 in out-of-pocket costs, bringing Jorge Garcia's and Ulisar Morales's earnings below both Oregon and Washington minimum wages, to approximately $10.47 per hour.

417.    Among other weeks, plaintiff Jorge Garcia worked upwards of 70 hours during the week of April 15, 2018, through April 21, 2018, but was not paid time and one half his regular rate in violation of FLSA and Washington's wage and hour laws for hours worked in excess of 40.

418.    NMC used the Morales franchise agreement to illegally pay the Garcia group below minimum wage.

419.    NMC treated Garcia and Morales as employees, not franchisees.

420.    NMC dictated the Garcia group's work schedule.

---

[10] Plaintiff Jorge Garcia's wife who is not a part of this lawsuit but did contribute to the hours worked.

421.    The Garcia group did not have the ability to make profits and manage their franchise.

422.    The Garcia group was required to purchase industrial vacuums from NMC's preferred vendor.

423.    NMC did not allow the Garcia group to have any contact with their property service clients.

424.    On or around July 2018, the Garcia group stopped receiving work assignments from NMC.

425.    Under the Morales franchise agreement, Garcia and Morales are entitled to receive work assignments through 2023.

*"Sanchez" group: Alejandro Sanchez and Hilda Arivazu*
*Sister's Janitorial LLC*

426.    On or around August 13, 2001, Plaintiff-owners Hilda Arivazu and Alejandro Sanchez were recruited by NMC to perform janitorial services in Washington.

427.    Sanchez and Arivazu received the franchise disclosure document on the same day that they signed the franchise agreement. They did not get the opportunity to read or understand its provisions because it was in English.

428.    Sanchez and Arivazu met with Jim Wade, the Director of Franchising. Wade does not speak Spanish, and Arivazu and Sanchez have only an elementary understanding of written and spoken English. No interpreter was utilized nor offered for this meeting.

429.    At the initial meeting, Wade misrepresented how NMC operated in order to entice Sanchez and Arivazu to sign the franchise agreement.

COMPLAINT - 51

430.    Wade promised that NMC would treat Sanchez and Arivazu as independent janitorial business owners by allowing them to enter into service contracts and helping them expand their customer base.

431.    Wade explained to Sanchez and Arivazu that they could earn as much as they wanted. All Sanchez and Arivazu had to do was spend a certain amount in franchise fees. They could earn $1,000 a month for each $5,000 they paid in franchise fees.

432.    Sanchez and Arivazu asked to earn $2,000 a month.

433.    Wade promised that Sanchez and Arivazu would gross $2,000 a month minus a 20% administrative fee if she paid $10,000 in franchise fees.

434.    The 20% fee was explained as an administrative fee that covered the cost of NMC finding new service contracts, and the fee was a requirement if they wanted to be eligible for additional service contracts in the future.

435.    Wade failed to disclose adequately the risk of the "franchise" to Arivazu or Sanchez, including the fact that a substantial percentage of NMC franchisees never earn the monthly gross earnings promised or that a number of "franchisees" fail, are terminated or otherwise inactive.

436.    Based on these representations, Sanchez and Arivazu entered into an agreement with NMC.

437.    Sanchez and Arivazu paid $10,000 in franchise fees in reliance on NMC's promise to pay them $2,000 a month minus a 20% administrative fee.

438.    The entire meeting lasted approximately 30 minutes. Sanchez and Arivazu felt pressured to sign the agreement that day.

439.    On or around March 30, 2004, Wade required that Sanchez and Arivazu pay another $10,000 in franchise fees if they wanted to receive additional work assignments from them.

440.    In exchange for the additional $10,000 in franchise fees, NMC promised that the Sanchez franchise would gross an additional $2,000 a month, for a total of $4,000 in monthly earnings. Sanchez and Arivazu were told that if they refused, they would lose their jobs.

441.    In total, Sanchez and Arivazu paid approximately $30,000 in franchise fees in exchange for NMC's promise that her franchise would gross $6,000 monthly.

442.    The Sanchez franchise did not gross $6,000 as NMC had promised.

443.    NMC did not pay the Sanchez group workers the minimum wage. For example, Sanchez and Arivazu worked approximately 364 hours during January 2018, for which they received $2,150.30.  Even without the royalty and office support fee deductions and out-of-pocket costs, the hourly rate for Sanchez and Arivazu was well below the federal and Washington minimum wages.

444.    That payment of $2,150.30 was reduced by $516.08 in royalty and office support fees and $187.67 in out-of-pocket expenses, bringing Sanchez's and Arivazu's earnings even farther below the federal and Washington minimum wage, to approximately $3.97 per hour.

445.    Among other weeks, Sanchez and Arivazu each worked approximately 45.5 hours during the week of January 22, 2018, to January 26, 2018, and was not paid time and a half of their regular rate in violation of FLSA and Washington wage and hour laws for hours worked in excess of 40.

446.    As recently as 2018, Sanchez and Arivazu performed janitorial services for NMC at the Southcenter Library in King County, Washington. NMC failed to pay the required prevailing wage for the completed work.

447.    NMC used their franchise agreement to illegally pay Sanchez and Arivazu below minimum wage.

448.    NMC the Sanchez group workers as employees, not franchisees.

449.    NMC dictated the Sanchez group's schedule.

450.    The Sanchez group did not have the ability to make profits and manage their franchise.

451.    NMC controlled the cleaning chemicals used by requiring the Sanchez group to buy chemicals from their preferred vendor.

452.    The Sanchez franchise was also required to purchase industrial vacuums through NMC's preferred vendors.

453.    NMC did not allow the Sanchez group to have any contact with their property service clients.

454.    NMC did not allow the Sanchez group to participate in the conversations or negotiations between NMC and the property service clients for whom they worked.

455.    NMC required the Sanchez group to take accounts regardless of their profitability by threatening that they would lose their franchise if they refused.

456.    NMC required Sanchez and Arivazu to renew their franchise agreement in or around 2017. Sanchez and Arivazu paid $3,000 in renewal fees.

457.    In or around April 2018, NMC lost the service contracts assigned to the Sanchez franchise. Arivazu and Sanchez have not worked since.

458.    Sanchez and Arivazu is entitled to work assignments until on or around 2022, with at least one option to renew the agreement through 2027.

/ / /

COMPLAINT - 54

*Solomon Denbel*
*Solomon Office Building Maintenance Service, LLC*

459.    On or around July 31, 2008, Plaintiff-owner Solomon Denbel was recruited by a third-party, another "franchisee," to perform janitorial labor for NMC in Washington.

460.    Denbel met with Jim Wade, the Director of Franchising, to discuss the franchise disclosure document and agreement that was given to him that same day. Denbel comprehends English at an elementary level and has no post-secondary education or business background. No interpreter was utilized nor offered for this meeting.

461.    At the initial meeting, Wade misrepresented how NMC operated in order to entice Denbel to sign the franchise agreement.

462.    Wade promised that NMC would treat Denbel as an independent janitorial business owner by allowing him to enter into service contracts and helping him expand his customer base.

463.    Wade explained to Denbel that he could earn as much as he wanted. All Denbel had to do was spend a certain amount in franchise fees. He could earn $1,000 a month for each $5,000 he paid in franchise fees.

464.    Wade explained that Denbel would gross $1,000 monthly minus a 25% fee if he bought the franchise from the third-party "franchisee."

465.    The 25% fee was explained as an administrative fee that covered the cost of NMC finding new service contracts, and the fee was a requirement if he wanted to be eligible for additional service contracts in the future.

466.    Wade failed to disclose adequately the risk of the "franchise" to Denbel, including the fact that a substantial percentage of NMC franchisees never earn the monthly gross earnings promised or that a number of "franchisees" fail, are terminated or otherwise inactive.

467.    Based on these representations, Denbel entered into an agreement with NMC.

468.    Because Denbel was purchasing an already existing franchise, Wade promised that Denbel would earn $1,000 a month minus a 25% administrative fee if he paid $4,000 in franchise fees to the third-party "franchisee" to cover the value of that franchise. Denbel was also required to pay $400 as a transfer fee to NMC. Wade oversaw the transaction.

469.    From 2008 to 2012, NMC issued paychecks directly in Denbel's name.

470.    In or around 2012, NMC held a meeting for its "franchisees" and explained that certain changes needed to be made. NMC required that all of its "franchisees" obtain workers' compensation and liability insurance and that they create a limited liability company.

471.    NMC threatened Denbel that he would lose his service contracts if he did not meet their requirements.

472.    Denbel agreed to sign up for workers' compensation and liability insurance with NMC's preferred vendor.

473.    Denbel paid for workers' compensation and liability insurance for approximately seven months. After that, he canceled his insurance plans because he could not afford to pay these costs. Denbel calculated that he was working for free during those months.

474.    Sometime between 2008 and 2013, NMC had Denbel to pay another $5,000 in franchise fees. The only information provided to Denbel at that time was that if he wanted another service contract NMC would need to deduct money from his monthly paycheck. Denbel was not aware that he had financed $5,000 with a 6% per annum interest rate. He only understood that NMC was deducting some amount from his paychecks so that he could keep his job.

475.    Based on NMC's scheme (i.e., $5,000 in franchise fees equaled $1,000 in gross monthly earnings), Denbel would now be entitled to earn $2,000 in monthly earnings.

476.    Throughout the entire time that Denbel worked for NMC, he was never assigned enough work to gross the monthly earnings promised to him.

477.    NMC did not pay Denbel the minimum wage. For example, Denbel worked approximately 120 hours during January 2018, for which he received $1,893.70.

478.    That payment of $ 1,893.70 was reduced by $454.49 in royalty and office support fees and $101 in out-of-pocket expenses, bringing Denbel's earnings below the Washington minimum wage, to approximately $11.15 per hour.

479.    NMC used the Denbel franchise agreement to illegally pay Denbel below minimum wage.

480.    Throughout his time working for NMC, Denbel was treated as an employee.

481.    NMC dictated Denbel's work schedule.

482.    Denbel did not have the ability to make profits or manage his franchise.

483.    NMC required Denbel to purchase cleaning chemicals and industrial vacuums from NMC's preferred vendors.

484.    NMC did not allow Denbel to have any contact with their property service clients.

485.    Denbel was never allowed to participate in the conversations or negotiations between NMC and the property service clients for whom he worked.

486.    NMC required Denbel to take accounts regardless of their profitability by threatening that he would lose his franchise if he refused.

487.    On or around June 2018, NMC stopped giving Denbel work assignments.

488.    NMC's refusal to give Denbel work assignments was not for the lack of available work. NMC was actively recruiting "franchisees" or subcontractors in 2018 and assigning service contracts to the newer recruits.

489.    Under the franchise agreement, Denbel was entitled to service contract assignments until 2023.

*"Madrigal" group: Zetzael Madrigal and Maria Madrigal*
*D&Z Maintance Company, LLC*

490.    On or around April 2014, Plaintiff-owner Zetzael Madrigal was recruited by NMC to work in janitorial work in Washington.

491.    Madrigal was provided a franchise disclosure document, but he was not able to understand its provisions.

492.    On or around April 1, 2014, Madrigal met with Ryan Lee, a District Manager at NMC, in the parking lot of a bank.

493.    At the initial meeting, Lee misrepresented how NMC operated in order to entice Madrigal to sign the franchise agreement.

494.    Lee promised that NMC would treat Madrigal as an independent janitorial business owner and would help him grow his business by helping him expand his customer base.

495.    Lee explained to Madrigal that he could earn as much as he wanted. All Madrigal had to do was spend a certain amount in franchise fees. He could gross $1,000 a month for each $5,000 he paid in franchise fees.

496.    Madrigal was interested in earning $3,000 a month but told Lee that he could not afford $15,000 in franchise fees. Lee overcame that objection by offering Madrigal an option to finance the franchise fees with a 6% per annum interest rate.

497.    Madrigal agreed to finance $15,000 in franchise fees in exchange for NMC's promise that he would earn $3,000 monthly minus 24% as an administrative fee.

498.    The 24% fee was explained as an administrative fee that covered the cost of NMC finding new service contracts, and the fee was a requirement if he wanted to be eligible for additional service contracts in the future.

499.    Madrigal objected to the 24% administrative fee. Lee told him that the 24% fee was only temporary because NMC would teach him to get his own service contracts.  However, this never happened.

500.    Lee failed to disclose adequately the risk of the "franchise" to Madrigal, including the fact that a substantial percentage of NMC franchisees never earn the monthly gross earnings promised or that a number of "franchisees" fail, are terminated or otherwise inactive.

501.    Based on these representations, Madrigal entered into an agreement with NMC and financed $15,000 through NMC with a 6% per annum interest rate. In exchange, Lee promised that Madrigal would gross $3,000 a month.

502.    Madrigal never grossed $3,000 a month.

503.    NMC knew that Maria Madrigal, Madrigal's wife, would also be working on any janitorial assignments to the franchise.

504.    Before Maria Madrigal began working for NMC, she and Madrigal were both required to pass a background check.

505.    Even before the Madrigal franchise was set up to process payments, NMC wanted the Madrigals to begin working, so they paid them through a different "franchisee's" account.

506.    In January 2015, NMC offered Madrigal service contracts. In exchange, NMC required Madrigal to finance an additional $15,000 in franchisee fees. Madrigal did not understand the franchisor-franchisee relationship and believed that he needed to pay this additional money in order to receive these service contracts.

507.    Under this agreement, Madrigal should have grossed at least $6,000 a month, but that never happened.

508.    Lee also required Madrigal to purchase equipment such as the industrial vacuums he was required to use through NMC's preferred vendors. Madrigal financed $3,287.00 through NMC at 6% per annum for these purchases.

509.    Based on these representations, Madrigal entered into a second franchise agreement.

510.    In or around 2016, Lee approached Madrigal and suggested that he could earn more if he bought another "franchisee's franchise." Madrigal was hesitant, because he was not grossing the $6,000 a month that he was promised.

511.    Madrigal felt bullied into buying out another "franchisee" in Yakima. Lee bullied Madrigal by threating that he would lose his franchise and the franchise fees he had paid to NMC if he did not buy out the other "franchise." Hesitantly, Madrigal paid the "franchisee" $4,000.  Lee told Madrigal that there was no need to memorialize the transaction, so no paperwork would be drawn up.

512.    The Madrigals paid $4,000 to the "franchisee" and began working on the service contracts in Yakima.

513.    Lee frequently bullied Madrigal into doing work assignments without compensation by threatening that he would lose his jobs. Madrigal at one point complained to NMC Corporate and was reprimanded by Lee for complaining.

514.    In total, the Madrigals paid approximately $50,000 to NMC in franchise fees in exchange for NMC's promise that their franchise would gross at least $10,000 a month.

515.    The Madrigals never grossed the promised minimum of $10,000 a month.

516.    NMC did not pay the Madrigal group workers the minimum wage. For example, the Madrigals worked a combined total of approximately 30 hours during April 2018, for which the Madrigal franchise received $310. Even without the royalty and office support fee deductions and out-of-pocket costs, the hourly rate for each Madrigal worker was below Washington minimum wage.

517.    That payment of $310 was reduced by $74.40 in royalty and office support fees and $25 in out-of-pocket costs; thereby bringing the Madrigals' earnings even farther below the federal and Washington minimum wage, to approximately $7.02 per hour.

518.    Among other weeks, the Madrigals each worked upwards of 84 hours during the week of November 12, 2017, to November 18, 2017, and were not paid time and a half their regular rate in violation of FLSA and Washington's wage and hour laws for hours worked in excess of 40.

519.    Throughout 2017 and 2018, the Madrigals performed janitorial services for NMC at a public works project or public building maintenance contract at the Yakima County Department of Corrections in Yakima, Washington, and at the Office of the Attorney General in Yakima, Washington. NMC failed to pay the required prevailing wage for the completed work.

520.    NMC used the Madrigal franchise agreement to illegally pay the Madrigals below minimum wage.

521.    NMC treated the Madrigal group workers as employees, not franchisees.

522.    NMC dictated the Madrigal's work schedule.

523.    The Madrigals did not have the ability to make profits and manage their franchise.

524.    NMC required the Madrigals to purchase industrial vacuums from their preferred vendors.

525.    NMC did not allow the Madrigals to have any contact with their property service clients.

526.    The Madrigals were never allowed to participate in the conversations or negotiations between NMC and the property service clients for whom they worked.

527.    NMC required the Madrigals to take accounts regardless of their profitability by threatening them that they would lose their franchise.

528.    In or around December 2018, NMC revoked all of Madrigal's service contracts without explanation.

529.    NMC's refusal to provide the Madrigals with work was not due to a lack of service contracts. NMC was actively recruiting "franchisees" or subcontractors in 2018 and assigning service contracts to the newer recruits.

530.    Under the franchise agreement, Madrigal was entitled to work assignments until sometime in 2019, and he had two options to renew his contract through 2024 and again through 2029.

*"Ramirez" group: Gerardo Ramírez-Cruz, Concepcion Solis,*
*Gerardo Ramírez-Solis, and Jessica Solis*
*Brooms and Mops, LLC*

531.    On or around December 17, 2010, NMC recruited Concepcion Solis and her husband, Gerardo Ramirez-Cruz, to provide janitorial service in Washington.

532.    Solis and Ramirez-Cruz were given a franchise disclosure document, but they did not understand its provisions.

533.    The Ramirez family understood little to no English.

534.    A meeting was scheduled between Solis and Jim Wade, who did not speak any Spanish. NMC did not provide or offer Solis an interpreter, so Solis took her son, Gerardo

Ramirez-Solis, who was a minor at the time and only spoke very broken English. Solis and her son also had no post-secondary education or business background.

535.    At the initial meeting, Wade misrepresented how NMC operated in order to entice Solis to sign the franchise agreement.

536.    Wade promised that NMC would treat Solis and Ramirez-Cruz as independent janitorial business owners and would help them grow their business by helping them expand their customer base.

537.    Wade explained to Solis and her son Ramirez-Solis that she and her husband Ramirez-Cruz could earn as much as they wanted. All Solis and Ramirez-Cruz had to do was spend a certain amount in franchise fees. They could gross $1,000 a month minus a 24% for each $5,000 they paid in franchise fees.

538.    The 24% fee was explained as an administrative fee that covered the cost of NMC finding new service contracts, and the fee was a requirement if they wanted to be eligible for additional service contracts in the future.

539.    Solis told Wade she was interested in grossing $2,000 a month, but that she did not have $10,000.

540.    Wade explained that NMC had a financing option.

541.    Wade failed to disclose adequately the risk of the "franchise" to Solis, including the fact that a substantial percentage of NMC franchisees never earn the monthly gross earnings promised or that a number of "franchisees" fail, are terminated, or otherwise are inactive.

542.    Based on these representations, Solis entered into an agreement with NMC on behalf of herself and her husband Ramirez-Cruz.

543.    Solis and Ramirez-Cruz paid $4,000 to NMC and financed $6,000 through NMC at 6% percent interest per annum.

544.    NMC never kept its promise that Solis and Ramirez-Cruz would gross $2,000 a month.

545.    NMC was aware that Gerardo Ramirez-Solis and Jessica Ramirez-Solis, both minors at the time, would be helping their parents with any work assignments.

546.    On or around March 2, 2015, NMC required Solis and Ramirez-Cruz to pay an additional $10,000 in franchise fees if they wanted to receive a service contract assignment. Solis and Ramirez-Cruz felt like they had to agree in order to keep their jobs and not lose their franchise.

547.    On or around February 1, 2016, the franchise agreement was transferred from Solis and Ramirez-Cruz to their son Ramirez-Solis, who was 18 years old by that time.

548.    The Ramirez group paid approximately $50,000 in franchise fees in exchange for NMC's promises that they would gross at least $10,000. NMC never kept that promise.

549.    NMC required the Ramirez group to pay additional franchise fees whenever it had a profitable service contract to assign.

550.    To get the Ramirez group to pay these additional franchise fees, NMC constantly threatened that they would lose their service contracts and ultimately lose their franchise if they did not continue to "invest."

551.    NMC did not pay the Ramirez group workers the minimum wage. For example, the Ramirez group worked a combined total of approximately 56 hours during October 2017 for which they were paid $160.  Even without the royalty and office support fee deductions and out-of-pocket costs, the hourly rate for the Ramirez group was well below the federal and Washington minimum wage.

552.    That payment of $160 was reduced by $38.40 in royalty and office support fees bringing their earnings even farther below the federal and Washington minimum wage, to approximately $2.19 per hour.

553.    During February 2018, the Ramirez group worked approximately 56 hours on a public works or public maintenance contract at the Greenbridge Library in King County, Washington, for which they were paid $702.79.

554.    That payment of $702.79 was reduced by $168.67 in royalty and office support fees, bringing the Ramirez group's earnings well below Washington's prevailing wage, to approximately $9.54 per hour.

555.    NMC used the Ramirez franchise agreements to illegally pay the group workers below minimum and prevailing wage.

556.    NMC treated these workers as employees, not as franchisees.

557.    NMC dictated the Ramirez group's work schedule.

558.    The Ramirez group did not have the ability to control their profits and manage their franchise.

559.    NMC required the Ramirez group to purchase industrial vacuums from their preferred vendors.

560.    NMC has never allowed the Ramirez group to have any contact with their property service clients.

561.    The Ramirez group was never allowed to participate in the conversations and negotiations between NMC and the property service clients for whom they worked.

562.    NMC required the Ramirez group to take accounts regardless of their profitability by threatening that they would lose their franchise if they refused.

563.    From April 2018 through February 2020, NMC did not provide work assignments to the Ramirez group workers. No explanation was given. NMC ignored the many phone calls made by the Ramirez group.

564.    NMC's refusal to assign property service contracts to the Ramirez group workers during this time was not for the lack of property service contracts. NMC was actively recruiting "franchisees" or subcontractors and providing those "franchisees" or subcontractors with work.

565.    Under the franchise agreement, the Ramirez group workers are entitled to work assignments through 2030.

*"Solis" group: Luis Solis and Karen Martínez*
*Seattles Best Cleaning Services, LLC (herein, "Solis" franchise)*

566.    In or around 2015, Plaintiff-owner Luis Solis was introduced to NMC by his uncle. His uncle was a "franchisee."

567.    NMC gave Solis one week to read the contract. Solis did not understand the contract because he did not speak any English at the time.

568.    At the initial meeting, an NMC employee named Jesse Wilmore misrepresented how NMC operated in order to entice Solis to sign the franchise agreement.

569.    Wilmore promised that NMC would treat Solis as an independent janitorial business owner and would help him grow his business by helping him expand his customer base.

570.    Wilmore explained to Solis that he could earn as much as he wanted. All Solis had to do was spend a certain amount in franchise fees. They could gross $1,000 a month minus a 24% fee for each $5,000 he paid in franchise fees.

571.    The 24% fee was explained as an administrative fee that covered the cost of NMC finding new service contracts, and the fee was a requirement if he wanted to be eligible for additional service contracts in the future.

572.    Solis expressed that he was only interested in purchasing his uncle's franchise, which NMC indicated was valued at $10,000 at that time.

573.    Wilmore explained that to do that he would need to enter into an agreement with NMC, pay a $300 transfer fee, and pay his uncle the franchise fees.

574.    Wilmore failed to disclose adequately the risk of the "franchise" to Solis, including the fact that a substantial percentage of NMC franchisees never earn the monthly gross earnings promised or that a number of "franchisees" fail, are terminated, or otherwise are inactive.

575.    Because Solis was purchasing an already existing franchise, Solis paid his uncle $10,000 as franchise fees to cover the value of his franchise, along with paying NMC a $300 transfer fee.

576.    Wilmore promised that Solis would gross $2,000 monthly for the $10,000 franchise sale.

577.    During the signing, Wilmore also told Solis to file taxes at the end of each year. He also told Solis he had to declare at least one employee.

578.    Because Solis could not afford to employ anyone else, NMC suggested that he declare his wife Karen Martinez as an employee.

579.    On or around October 2015, NMC gave Solis two accounts totaling $426.28 per month.

580.    On or around March 2016, NMC gave Solis two additional accounts, bringing his monthly earnings at the time to $924.08.

581.    On or around October 2016, NMC gave Solis another account, raising his monthly earnings at that time to $1,652.08.

582.    Solis never earned the $2,000 he had been promised.

583.    After Solis complained that he was not earning the amount he was promised, NMC suggested he pay additional franchise fees.

584.    On or around March 2017, Solis bought an additional franchise for $5,000 in exchange for NMC's promise that he would earn an additional $1,000 a month, for a total of $3,000 a month.

585.    NMC did not pay Solis the promised $3,000 a month.

586.    On or around June 2018, Solis discovered one of his accounts had been lost by NMC when he was not paid for work he performed for that month.  NMC did not provide advance notice, nor did it deliver a replacement service contract.

587.    NMC did not pay the Solis group the minimum wage. For example, Solis and Martinez worked approximately 56 hours during June 2018, but did not receive any earnings for that work, bringing Solis and Martinez below federal and Washington minimum wage.

588.    To date, NMC has not paid Solis or Martinez for this work.

589.    While working for NMC, Solis and Martinez attempted to obtain a service contract on their own, but an NMC employee told Solis that he would lose his accounts if he did and their employment relationship would be terminated.

590.    Solis and Martinez spent approximately $200 every month on equipment, tools, and uniforms for which he was never reimbursed.

591.    While working for NMC, whenever Solis or Martinez would ask to take sick time or vacation, NMC would threaten to take away accounts. NMC also threatened that Solis and Martinez would have to pay $35 an hour to have another "franchisee" cover their shifts.

592.    Solis and Martinez continue to work for NMC.

/ / /

*"Lopez" group: Ignacio Lopez and Concepcion Cruz*
*Jireh Contractor Maintenance, LLC*

593.    In or around 2010, Plaintiff-owner Ignacio Lopez was recruited by NMC to work in Washington.

594.    Lopez received a franchise disclosure document, but he did not understand its provisions.

595.    A meeting between Lopez and Jim Wade, a Franchising Director at NMC was scheduled. This meeting was conducted entirely in English. Lopez understands and reads English only at an elementary proficiency level and has no post-secondary education or business background.

596.    Wade explained to Lopez that he could earn as much as he wanted. All Lopez had to do was spend a certain amount in franchise fees. He could earn $1,000 a month for each $5,000 he paid in franchise fees.

597.    Wade told him that he needed someone to clean a UPS office Monday through Friday. Wade promised that if Lopez entered into a franchise agreement with NMC for $10,000, he would gross $2,000 a month minus a 24% fee.

598.    The 24% fee was explained as an administrative fee that covered the cost of NMC finding new service contracts, and the fee was a requirement if he wanted to be eligible for additional service contracts in the future.

599.    Lopez entered into an agreement with NMC.

600.    A year later, in 2012, Lopez complained to Wade because he was not earning $2,000 a month. Wade persuaded Lopez to pay another $10,000 in franchise fees to NMC in exchange for NMC's promise to pay an additional $2,000 a month, for a total of $4,000 a month.

601.    On two or more occasions, NMC lost the service contracts assigned to Lopez. Lopez felt very deceived because he was not earning the monthly promised amount.

602.    In total, Lopez believes that he and Cruz paid $35,000 in franchise fees in exchange for NMC's promise that the Lopez franchise would gross $7,000 monthly. This promise was never kept.

603.    NMC stopped assigning work to Lopez and Cruz on or around September 2017.

604.    NMC's refusal to give Lopez and Cruz work assignments was not for the lack of service contracts. During this time, NMC was actively recruiting "franchisees" or subcontractors and assigning service contracts to the newer recruits.

605.    Under the franchise agreement, Lopez was entitled to work through approximately 2020, with at least one option to renew the agreement through 2025.

*"Dikhaindzhiya" group: Tatiana Dikhaindzhiya and Gregory Dikhaindzhiya*
*Prof Cleaning, LLC*

606.    On or around 2013, Plaintiff-owner Tatiana Dikhaindzhiya was recruited to perform janitorial services in Washington by NMC.

607.    On or around December 2013, Dikhaindzhiya signed the franchise agreement and promised to pay approximately $15,000 in exchange for NMC's promise that her franchise would earn at least $3,000 monthly. Dikhaindzhiya paid a down payment of $2,500 and the remaining $12,500 was financed at 6% per annum by NMC.

608.    NMC promised Dikhaindzhiya one account that should have earned her $3,000 monthly. This promise was made during a meeting with Steve Walkins, Director of Operations, and his wife Lisa Walkins. At this same meeting, Steve Walkins told her that an OC would be checking her work every day.

609.    A week after Dikhaindzhiya and, her son, Gregory Dikhaindzhiya began working for NMC, she was told that she would be assigned a property service contract for $1,800 a month.

610.    Dikhaindzhiya complained that the $1,800 was too little for the amount of work, so Walkins told her NMC would correct this payment and pay her $2,500 every month instead.

611.    Dikhaindzhiya never received $2,500 for any month she worked on this property service contract.

612.    On or around July 2014, Dikhaindzhiya refused to continue working for NMC because it had yet to provide the promised minimum pay.

613.    At the time Dikhaindzhiya refused to continue working, NMC told her it would help her find work closer to home if she continued working for NMC.

614.    However, after the conversation, NMC relieved her of her duties on the original assignment, and did not replace the assignment with another.

615.    Dikhaindzhiya told Wayne Napier, an NMC employee, she wanted to terminate the franchise agreement and asked whether she could have her money back. He refused and said she had lost any portion of the franchise fees she paid, and she also forfeited the franchise.

616.    Dikhaindzhiya refused to pay the remainder of the franchise loan and interest.

*Plaintiff-owners and Plaintiff-families Demands to NMC*

617.    NMC employed Plaintiff-owners and their Plaintiff-families under an elaborate pyramid scheme designed to mask their failure to adhere to local, state, or federal wage and hour laws.

618.    NMC's failure to pay the Martinez, Alfaro, Dominguez, Sanchez, and Madrigal group Plaintiffs and individual plaintiffs Emmanuel Alvarez and Jorge Garcia the federal overtime rate was willful.

619.    NMC willfully failed to pay the Escobar, Aceituno, Martinez, Umana, Vásquez, Dominguez, Garcia, Barraza, Sanchez, Denbel, Madrigal, and Solis group Plaintiffs their full wages upon termination of their employment.

620.    On or about June 11, 2018, Maura Escobar sent a written demand for payment of wages, through her attorneys, via the U.S. Postal Service certified mail to NMC.

621.    On or about June 17, 2019, the Escobar, Aceituno, Umana, Alfaro, Vásquez, Dominguez, Garcia, Sanchez, Denbel, Madrigal, Lopez group Plaintiffs, through their attorneys, made written demand via the U.S. Postal Service certified mail to NMC to be paid their unpaid wages in full.

622.    On or about June 17, 2019, Efrain Martinez, Victor Garcia, Ignacio Lopez, Gerardo Ramirez-Cruz, Gerardo Ramirez-Solis, and Jessica Ramirez-Solis, through their attorneys, via the U.S. Postal Service certified mail to NMC to be paid their unpaid wages in full.

623.    On or about September 6, 2019, Patricia Alvarez, through their attorneys, made written demand via U.S. Postal Service certified mail to NMC to be paid their unpaid wages in full.

624.    Despite these demands, NMC has not paid wages owed to them under federal, state, or local wage and hour laws, or under contract.

/ / /

/ / /

/ / /

## V.        CLAIMS FOR RELIEF

### First Claim – Violation of the Fair Labor Standards Act
*Failure to Pay Minimum Wage or Overtime*

625.    NMC violated 29 U.S.C. § 206 when it failed to pay the Aceituno, Martinez, Umana, Alfaro, Dominguez, Alvarez, Garcia, Sanchez, Madrigal, Ramirez, and Solis group Plaintiffs the federal minimum wage rate for all the hours worked.

626.    NMC violated 29 U.S.C. § 207 when it failed to pay the Martinez, Alfaro, Dominguez, Sanchez, and Madrigal group Plaintiffs and individual plaintiffs Emmanuel Alvarez and Jorge Garcia overtime wages for work performed for NMC in excess of forty hours per workweek.

627.    Pursuant to 29 U.S.C. § 216(b), NMC owes the Aceituno, Martinez, Umana, Alfaro, Dominguez, Alvarez, Garcia, Sanchez, Madrigal, Ramirez, and Solis group Plaintiffs unpaid minimum wages, an amount equal to the unpaid wages as liquidated damages and attorneys' fees and costs.

### Second Claim – Violation of Oregon Wage and Hour Laws
*Failure to Pay Minimum Wage*

628.    NMC violated O.R.S. § 653.025 when it failed to pay the Escobar, Aceituno, Martinez, Umana, Alfaro, Vásquez, Dominguez, Alvarez, and Garcia group Plaintiffs the state minimum hourly rate for all the hours worked.

629.    Pursuant to O.R.S. § 653.055, the Escobar, Aceituno, Martinez, Umana, Alfaro, Vásquez, Dominguez, Alvarez, and Garcia group Plaintiffs are entitled to recover unpaid minimum or overtime wages, plus penalty damages in an amount equal to 240 times their hourly rate for NMC's noncompliance with Oregon's minimum and overtime requirements.

630.    The Escobar, Aceituno, Martinez, Umana, Alfaro, Vásquez, Dominguez, Alvarez, and Garcia group Plaintiffs are also entitled to costs and reasonable attorney fees pursuant to 653.055(4).

### Third Claim – Violation of Oregon Wage and Hour Laws
*Failure to Pay Overtime*

631.    NMC violated O.R.S. § 653.261, and its implementing regulations, when it failed to pay the Alfaro group Plaintiffs and individual plaintiff Emmanuel Alvarez overtime wages at a rate of time and a  half their hourly wage rate for all hours worked for NMC in excess of forty hours in a workweek.

632.    Pursuant to O.R.S. § 653.055, the Alfaro group Plaintiffs and individual plaintiff Emmanuel Alvarez are entitled to recover overtime wages, plus penalty damages in an amount equal to 240 times their hourly rate for NMC's noncompliance with Oregon's overtime requirements.

633.    The Alfaro group Plaintiffs and individual plaintiff Emmanuel Alvarez are also entitled to costs and reasonable attorney fees pursuant to O.R.S. § 653.055(4).

### Fourth Claim – Violation of Oregon Wage and Hour Laws
*Failure to Pay Wages When Due Upon Termination*

634.    NMC failed to pay the Escobar, Aceituno, Martinez, Umana, Vasquez, Dominguez, Barraza, and Garcia group Plaintiffs all their wages upon termination of their employment within the specified time in O.R.S. § 652.140.

635.    Pursuant to O.R.S. § 652.150, the Escobar, Aceituno, Martinez, Umana, Vasquez, Dominguez, Barraza, and Garcia group Plaintiffs are entitled to recover penalty wages in an amount equal to 240 times their hourly rate for willfully failing to pay wages upon termination of employment.

636.    The Escobar, Aceituno, Martinez, Umana, Vasquez, Dominguez, Barraza, and Garcia group Plaintiffs are also entitled to costs and reasonable attorney fees pursuant to O.R.S. § 652.200.

### Fifth Claim – Oregon Contractor Registration Act
*Janitorial Labor Contractor Violations of 658.440*

637.    NMC acted as janitorial labor contractor employed the Alfaro, Vásquez, and Dominguez group Plaintiffs and individual plaintiff Emmanuel Alvarez after October 2018.

638.    NMC violated O.R.S. § 658.440(1)(d) for failure to comply with the terms and conditions set in the franchise agreements of Alfaro, Vásquez, and Dominguez group Plaintiffs and individual plaintiff Emmanuel Alvarez.

639.    NMC violated O.R.S. § 658.440(3)(b) for willfully making false, fraudulent, and misleading representations to Alfaro, Vásquez, and Dominguez group Plaintiffs and individual plaintiff Emmanuel Alvarez.

640.    Pursuant to O.R.S. § 658.453, the Alfaro, Vásquez, and Dominguez group Plaintiffs and individual plaintiff Emmanuel Alvarez are entitled to actual damages or $1,000, whichever is greater, for each of NMC's violations of O.R.S. § 658.440.

### Sixth Claim – Washington State Minimum Wage Act
Violation of RCW 49.46 – Failure to Pay Minimum Wage

641.    NMC violated RCW 49.46.020 by failing to pay the Barraza, Garcia, Sanchez, Denbel, Madrigal, Ramirez, and Solis group Plaintiffs minimum wages.

642.    NMC's violations of RCW chapter 49.46 were willful and made with the intent to deprive the Barraza, Garcia, Sanchez, Denbel, Madrigal, Ramirez, and Solis group Plaintiffs of wages and thus gave rise to the exemplary damages under RCW 49.52.050 and RCW 49.52.070.

643.    Pursuant to RCW 49.46.090 and RCW 49.48.030, the Barraza, Garcia, Sanchez, Denbel, Madrigal, Ramirez, and Solis group Plaintiffs are entitled to reasonable attorneys' fees.

644.    As a result of the willful, unlawful actions of NMC, the Barraza, Garcia, Sanchez, Denbel, Madrigal, Ramirez, and Solis group Plaintiffs have been deprived of compensation in amounts to be determined at trial.

### Seventh Claim – Washington State Overtime Wage Act
Violation of RCW 49.46.130

645.    Sanchez and Madrigal group Plaintiffs and individual plaintiff Jorge Garcia under RCW chapter 49.46.

646.    NMC violated RCW 49.46.130 by failing to pay overtime to the Sanchez and Madrigal group Plaintiffs and individual plaintiff Jorge Garcia for work in excess of forty hours per week.

647.    NMC's violations of RCW chapter 49.46 were willful and made with intent to deprive the Sanchez and Madrigal group Plaintiffs and individual plaintiff Jorge Garcia and thus give rise to exemplary damages under RCW 49.52.050 and RCW 49.52.070.

648.    As a result of the willful, unlawful actions of NMC, the Sanchez and Madrigal group Plaintiffs and individual plaintiff Jorge Garcia have been deprived of compensation in amounts to be determined at trial.

649.    Pursuant to RCW 49.46.090 and RCW 49.48.030, the Sanchez and Madrigal group Plaintiffs and individual plaintiff Jorge Garcia are entitled to reasonable attorneys' fees.

### Eight Claim – Washington State Payment Act
Violation of RCW 49.48– Failure to timely pay wages

650.    NMC violated RCW 49.48.010 because it failed to timely pay the Barraza, Garcia, Sanchez, Denbel, Madrigal, and Solis group Plaintiffs.

651.    NMC's violations of RCW chapter 49.46 were willful and made with the intent to deprive the Barraza, Garcia, Sanchez, Denbel, Madrigal, and Solis group Plaintiffs of wages and thus gave rise to the exemplary damages under RCW 49.52.050 and RCW 49.52.070.

652.    Pursuant to RCW 49.48.030, the Barraza, Garcia, Sanchez, Denbel, Madrigal, and Solis group Plaintiffs are entitled to reasonable attorneys' fees.

### Ninth Claim – Violation of Washington Wage and Hour Laws
Violation of RCW 39.12 – Failure to pay Prevailing Wage

653.    NMC violated RCW 39.12.020 when it failed to pay less than the prevailing rate of wage for hour's worked by Plaintiff groups Sanchez, Madrigal, and Ramirez in public works or public building service maintenance contracts of the state or any county.

654.    NMC's violations of RCW chapter 39.12 were willful and made with the intent to deprive the Sanchez, Madrigal, and Ramirez group Plaintiffs of wages and thus gave rise to the exemplary damages under RCW 49.52.050 and RCW 49.52.070.

655.    Pursuant to RCW 49.48.030, the Sanchez, Madrigal, and Ramirez group Plaintiffs are entitled to reasonable attorneys' fees.

656.    As a result of the willful, unlawful actions of NMC, the Sanchez, Madrigal, and Ramirez group Plaintiffs have been deprived of compensation in amounts to be determined at trial.

### Tenth Claim – Oregon and Washington Tort Law Claim
Fraudulent Misrepresentation

657.    Plaintiff groups Alvarez, Barraza, Sanchez, Denbel, Madrigal, Lopez, Ramirez, Solis, and Dikhaindzhiya each entered into one or more written franchise agreement with NMC.

658.    NMC and Marsden made false representations of material fact to the Plaintiff-owners of the Alvarez, Barraza, Sanchez, Denbel, Madrigal, Lopez, Ramirez, Solis, and Dikhaindzhiya Plaintiff groups.

659.    NMC and Marsden knew these statements were untrue or made these false representations with reckless disregard as to their truth or falsity.

660.    NMC and Marsden had the intent to induce Plaintiff groups Alvarez, Barraza, Sanchez, Denbel, Madrigal, Lopez, Ramirez, Solis, and Dikhaindzhiya to provide janitorial labor at illegal wages.

661.    Plaintiff-owners of Plaintiff groups Alvarez, Barraza, Sanchez, Denbel, Madrigal, Lopez, Ramirez, Solis, and Dikhaindzhiya justifiably relied on the misrepresentation made by NMC at the initial meetings and throughout the entire agreement terms.

662.    Plaintiff groups Alvarez, Barraza, Sanchez, Denbel, Madrigal, Lopez, Ramirez, Solis, and Dikhaindzhiya worked for illegal wages because of relying on NMC's misrepresentations.

663.    Alvarez Plaintiffs discovered the fraud or deceit on April 19, 2019.

664.    Barraza Plaintiffs discovered the fraud or deceit on November 30, 2018.

665.    Sanchez Plaintiffs discovered the fraud or deceit on August 9, 2018.

666.    Denbel Plaintiff discovered the fraud or deceit on August 13, 2018.

667.    Madrigal Plaintiffs discovered the fraud or deceit on December 14, 2018.

668.    Ramirez Plaintiffs discovered the fraud or deceit on September 6, 2018.

669.    Solis Plaintiffs discovered the fraud or deceit on August 23, 2018.

670.    Lopez Plaintiffs discovered the fraud or deceit on August 8, 2018.

671.    Dikhaindzhiya Plaintiffs discovered the fraud or deceit on August 22, 2018.

672.    NMC and Marsden is liable to the Alvarez, Barraza, Sanchez, Denbel, Madrigal, Ramirez, Solis, Lopez, and Dikhaindzhiya group Plaintiffs for relief for injuries incurred as a

result of NMC's fraudulent misrepresentations, including recession of contract and restitution, and reasonable attorneys' fees.

### Eleventh Claim – Oregon and Washington Contract Law Claim
Breach of Contract

673.    NMC entered into an agreement with Plaintiff-owners of groups Escobar, Aceituno, Umana, Alfaro, Vásquez, Dominguez, Alvarez, Barraza, Garcia, Denbel, Madrigal, Ramirez, Solis, Lopez, and Dikhaindzhiya wherein it promised gross earnings of $1,000 a month for every $5,000 they paid in franchise fees for five years with two opportunities to renew.

674.    NMC breached its promise to Plaintiff-owners of groups Escobar, Aceituno, Umana, Alfaro, Vásquez, Dominguez, Alvarez, Barraza, Garcia, Denbel, Madrigal, Ramirez, Solis, Lopez, and Dikhaindzhiya when it failed to assign enough service contracts equaling the gross monthly promised earnings.

675.    Plaintiff-owners of groups Escobar, Aceituno, Martinez, Umana, Alfaro, Vásquez, Dominguez, and Garcia Escobar, Aceituno, Umana, Alfaro, Vasquez, Dominguez, Alvarez, Barraza, Garcia, Denbel, Madrigal, Ramirez, Solis, Lopez, and Dikhaindzhiya are entitled to rescission of franchise agreement and continued employment as employees.

### Twelfth Claim – Oregon and Washington Contract Law Claim
Economic Duress

676.    After the initial franchise agreement, Plaintiff-owners of groups Escobar, Aceituno, Umana, Alfaro, Vasquez, Dominguez, Alvarez, Barraza, Garcia, Denbel, Madrigal, Ramirez, Solis, Lopez, and Dikhaindzhiya were under economic duress when entering into subsequent franchise agreements.

677.     Plaintiff-owners had no alternative than to pay more in franchise fees and sign subsequent franchise agreements if they wanted to keep their jobs and did not want to lose their life's savings.

678.     Plaintiffs-owners are entitled to rescission of all franchise agreements and continued employment as employees.

### Thirteenth Claim – Violation of TVPA
Forced Labor

679.     NMC and Marsden attempted to and did subject Plaintiff groups Escobar, Aceituno, Martinez, Umana, Alfaro, Vásquez, Dominguez, Garcia, Sanchez, Denbel, Madrigal, Lopez, Ramirez, and Solis to forced labor in violation of 18 U.S.C. § 1589.

680.     NMC and Marsden knowingly attempted to and did threaten Plaintiff groups Escobar, Aceituno, Martinez, Umana, Alfaro, Vasquez, Dominguez, Garcia, Sanchez, Denbel, Madrigal, Lopez, Ramirez, and Solis with serious harm in order to obtain the labor and services of these Plaintiffs in violation of 18 U.S.C. § 1589(1).

681.     NMC and Marsden knowingly attempted to and did obtain the labor and services of Plaintiff groups Escobar, Aceituno, Martinez, Umana, Alfaro, Vasquez, Dominguez, Garcia, Sanchez, Denbel, Madrigal, Lopez, Ramirez, and Solis using a scheme, plan, or a pattern which, in the totality of circumstances, was intended to coerce and did coerce these Plaintiffs to believe that they would suffer serious harm if they were to leave the employ of NMC in violation of 18 U.S.C. § 1589(2).

682.     The serious harm set forth in paragraphs 661 and 662, *supra*, was psychological, financial, and reputational harm that was sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances as Escobar, Aceituno, Martinez, Umana, Alfaro, Vasquez, Dominguez, Garcia,

Sanchez, Denbel, Madrigal, Lopez, Ramirez, and Solis to perform or to continue performing labor or services in order to avoid incurring that harm.

683.    NMC and Marsden knowingly attempted to and did obtain the labor or services of Escobar, Aceituno, Martinez, Umana, Alfaro, Vasquez, Dominguez, Garcia, Sanchez, Denbel, Madrigal, Lopez, Ramirez, and Solis by means of abuse or threatened abuse of law or legal process.

684.    The abuse or threatened abuse of legal process set forth in the preceding paragraph was the use of the franchise agreements in a manner and for a purpose for which the law was not designed: to coerce Escobar, Aceituno, Martinez, Umana, Alfaro, Vasquez, Dominguez, Garcia, Sanchez, Denbel, Madrigal, Lopez, Ramirez, and Solis to make considerable investments in franchises, which NMC and Marsden fraudulently concocted, that ultimately forced these Plaintiffs to work for NMC for subminimum wages.

685.    As a proximate result of the conduct of NMC and Marsden, Escobar, Aceituno, Martinez, Umana, Alfaro, Vasquez, Dominguez, Garcia, Sanchez, Denbel, Madrigal, Lopez, Ramirez, and Solis have suffered economic and emotional injuries, as well as other damages, and they are entitled to reasonable attorneys' fees under 18 U.S.C. § 1595.

**Fourteenth Claim – Violation of the Internal Revenue Code**
Fraudulent Filing of Information Returns

686.    NMC filed fraudulent information returns with the IRS, in violation of 26 U.S.C. § 7434 by failing to provide Plaintiffs Escobar, Aceituno, Martinez, Umana, Alfaro, Vásquez, Dominguez, Alvarez, Barraza, Garcia, Sanchez, Denbel, Madrigal, Lopez, Ramirez, Solis and Dikhaindzhiya with accurate W-2 Forms for all the tax years they were employed by NMC, and failing to properly record, account for, and report to the IRS all monies paid to Plaintiff as

compensation for all the work Plaintiff during the course of their employment with Defendants, and failing to withhold amounts listed on W-2 Forms as monies withheld.

687.    NMC filed fraudulent information returns with the IRS in violation of 26 U.S.C. § 7434 by failing to properly record, account for, and report to the IRS all the royalty monies paid by Plaintiffs Escobar, Aceituno, Martinez, Umana, Alfaro, Vásquez, Dominguez, Alvarez, Barraza, Garcia, Sanchez, Denbel, Madrigal, Lopez, Ramirez, Solis and Dikhaindzhiya as compensation instead of as royalties in box 2 of the 1099-MISC.

688.    Under 26 U.S.C. § 7434(b), Plaintiffs Escobar, Aceituno, Martinez, Umana, Alfaro, Vásquez , Dominguez, Alvarez, Barraza, Garcia, Sanchez, Denbel, Madrigal, Lopez, Ramirez, Solis and Dikhaindzhiya are entitled to an amount equal to the greater of $5,000 for each false information return or the sum of actual damages, attorney fees and costs.

## VI.        PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that the Court grant the following relief:

A.  Find Plaintiffs to be the prevailing party against each Defendant, jointly and severally for violations under FLSA, *see* Exhibit 2, and award Plaintiffs their unpaid federal minimum wages under 29 U.S.C. § 206, and an equal amount in liquidated damages under 29 U.S.C. § 216(b);

B.  Award Plaintiffs reasonable attorneys' fees and costs under 29 U.S.C. § 216(b);

C.  Find the Oregon Plaintiffs to be the prevailing parties against each Defendant, jointly and severally, for violations under Oregon wage and hour laws and award Oregon Plaintiffs their unpaid minimum and overtime wages under O.R.S. § 653.025 and 653.261, and its implementing regulations, penalties wages in the amount of 240 times Plaintiff's average hourly wage under O.R.S. § 653.055, *see* Exhibit 2;

D.  Award the Oregon Plaintiffs their civil penalties in the amount of 240 times Plaintiff's average hourly wage under O.R.S. §§ 652.140 and 652.150, for failure to pay wages upon termination or when due, *see* Exhibit 2;

E.  Award the Oregon Plaintiffs reasonable attorneys' fees and costs under O.R.S. §§ 653.055 and 652.200;

F.  Find that the Washington Plaintiffs are the prevailing parties against each Defendant, jointly and severally, for failure to pay minimum wage and overtime and award the Washington Plaintiffs their unpaid Washington minimum wages under R.C.W. 49.46.020, and exemplary damages under the Minimum Wage Act, RCW 49.52.070 for willful violation of a wage statute, *see* Exhibit 2;

G.  Award the Washington Plaintiffs reasonable attorneys' fees, expenses, and costs under RCW 49.46.090, RCW 49.48.030, RCW 49.52.050, and RCW 49.52.070;

H.  Find that Plaintiffs are the prevailing party against each Defendant, jointly and severally, for fraudulent misrepresentation of the franchise agreement to Plaintiffs or, in the alternative, for unjust enrichment and promissory estoppel claims, and award each Plaintiff his actual or restitution damages, punitive damages, disgorgement of withheld wages, and prejudgment interest.

I.  Find that Plaintiffs are the prevailing party against each Defendant, jointly and severally, for violations of the TVPA and award Plaintiffs actual damages, including emotion distress damages, and penalty damages for violations of 18 U.S.C. §§ 1589(a), 1589(b), and 1589(c), *see* Exhibit 2;

J.  Award Plaintiffs reasonable attorneys' fees and costs for violations of the TVPA under 18 U.S.C. § 1595(a);

K.  Find that Plaintiffs are the prevailing party against each Defendant, jointly and severally, on Plaintiffs' claims under 26 U.S.C. § 7434 and award Plaintiffs the greater of $5,000 statutory damages per violation or actual damages proximately caused by Defendants, *see* Exhibit 2.

L.  Permanently enjoin Defendants NMC from further violations of 26 U.S.C. § 7434, *see* Exhibit 2;

M.  Award Plaintiffs reasonable attorneys' fees and costs for violations of 26 U.S.C. § 7434;

N.  Award the Oregon Plaintiffs civil penalties equal to actual damages or $1,000, whichever is greater, for violations of O.R.S. § 658.410, *see* Exhibit 2;

O.  Award the Oregon Plaintiffs reasonable attorneys' fees and costs for violations of O.R.S. § 658.410, as set forth in O.R.S. § 658.453(4);

P.  Award Plaintiff pre-judgment interest on sums due under the state law claim and post-judgment interest on all claims; and

Q.  Award Plaintiffs such other relief as this Court deems just and proper.

Respectfully submitted this 30th day of September, 2020, by:

s/ Mayra A. Ledesma
**Mayra A. Ledesma**, OSB #183942

s/ Corinna Spencer-Scheurich
**Corinna Spencer-Scheurich**, OSB #130147

*Attorneys for Plaintiffs*

COMPLAINT - 84