**Mayra A. Ledesma,** OSB #183942
mayra@nwjp.org
**Corinna Spencer-Scheurich,** OSB #130147
corinna@nwjp.org
Northwest Workers' Justice Project
812 SW Washington St, Suite 225
Portland, OR  97205
Telephone: (503) 525-8454
Facsimile: (503) 946-3029

**D. Michael Dale**, OSB #771507
michaeldale@dmichaeldale.net
Law Office of D. Michael Dale
P.O. Box 1032
Cornelius, OR  97113
Telephone: (503) 730-1706
Facsimile: (503) 946-3089

**Daniel Werner**, GSB # 422070
dan@decaturlegal.com
Radford & Keebaugh, LLC
315 W. Ponce de Leon Ave, Suite 1080
Decatur, Georgia 30030
Telephone: (678) 271-0304
Facsimile: (678) 271-0314
(Admitted *pro hac vice*)

**Phil Goldsmith**, OSB #782230
phil@lopglaw.com
Law Office of Phil Goldsmith
1205 NW 25th Street
Portland, OR 97210
Telephone: (503) 545-9904

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **MAURA ESCOBAR, ROGELIO RODRIGUEZ, RAQUEL ESCOBAR, JUAN ACEITUNO, BRENDA** | Case No.: 3:20-cv-01695-SB |

ACEITUNO, EFRAIN MARTINEZ, CECILIA GUTIERREZ, FRANCISCO UMANA, EDWARD UMANA, RAFAELA GUTIERREZ, LUIS ALFARO, LILENA VÁSQUEZ, MARTHA DOMINGUEZ, MARCO SERVIN, PATRICIA ALVAREZ, EMMANUEL ALVAREZ, VICTOR HUGO GARCIA, SILVIA BARRAZA, JORGE GARCIA, ULISAR MORALES, ALEJANDRO SANCHEZ, HILDA ARIVAZU, SOLOMON DENBEL, ZETZAEL MADRIGAL, MARIA MADRIGAL, IGNACIO LOPEZ, CONCEPCION CRUZ, CONCEPCION SOLIS, GERARDO RAMIREZ-CRUZ, GERARDO RAMIREZ-SOLIS, JESSICA RAMIREZ-SOLIS, LUIS SOLIS, KAREN MARTINEZ, TATIANA DIKHAINDZHIYA, and GREGORY DIKHAINDZHIYA**, individuals,

PLAINTIFFS' RESPONSE TO MOTION TO COMPEL ARBITRATION

Plaintiffs,

v.

**NATIONAL MAINTENANCE CONTRACTORS, LLC**, a Delaware limited liability company; **NMC FRANCHISING, LLC**, a Delaware limited liability company; **MARSDEN SERVICES, LLC**, a Delaware limited liability corporation, **GREGG MCDONALD**, **NOE VALLADARES**, **JIM WADE**, **RYAN LEE**, **JESSE WILMORE**, **STEVEN WATKINS**, **LISE WATKINS**, and **GUY MINGO**, individuals,

Defendants.

# TABLE OF CONTENTS

Table of Authorities    iii

I.    INTRODUCTION    1

II.    STATEMENT OF FACTS    3

III.    LACK OF CONSENT DEFEATS DEFENDANTS' MOTION    5

    A.  This is an issue for This Court    5

    B.  The Plaintiff-Buyers Did Not Consent to Arbitrate    7

    C.  The Plaintiff-Families    7

        1.  Introduction    7

        2.  The Arbitration Agreement Itself Excludes Family Members    8

        3.  Equitable estoppel is inapplicable here    8

    D.  Conclusion    11

IV.    QUESTIONS OF ARBITRABILITY ARE NOT DELEGATED TO THE ARBITRATOR    11

    A.  Introduction    11

    B.  This Case Does Not Satisfy the Clear and Unmistakable Test    12

    C.  The Delegation Clause is Unconscionable    15

V.    THE ARBITRATION CLAUSE MUST BE NULLIFIED AS UNCONSCIONABLE    17

    A.  General Principles of Unconscionability    17

    B.  Procedural Unconscionability    18

        1.  Surprise    18

        2.  Oppression    20

    C.  Substantive Unconscionability    20

        1.  Forum Selection Clause    20

        2.   Prohibition on Punitive Damages                   22

        3.   Cost of Arbitration                             23

        4.   The Non-mutual Exemption for Injunctive Relief      24

    D.  Washington and Oregon Law Require the Arbitration Clause Be
        Invalidated                                             26


VI.      ILLEGALITY AND ECONOMIC DURESS REQUIRE NULLIFICATION  27

    A.  Introduction                                27

    B.  Applicable Facts                            27

    C.  Economic Duress                        28

    D.  Illegality                                   29


VII.     NON-SIGNATORIES MARSDEN AND NATIONAL MAINTENANCE CONTRACTORS
          CANNOT COMPEL ARBITRATION                  31


VIII.   PLAINTIFFS ARE NOT MISJOINDED                     33


CONCLUSION                                              36

CASES

*Argueta v. Banco Mexicano, S.A.*, 87 F.3d 320 (9th Cir. 1996)------------------------------------- 20, 21

Armendariz v. Foundation Health Psychcare, 24 Cal.4th 83, 99 Cal.Rptr.2d 745, 6 P.3d 669 (2000) ------------------ 25

*Bagley v. Mt. Bachelor, Inc.*, 356 Or. 543, 340 P.3d 347 (2014) ------------------------------------2, 17, 19, 27

*Bates v. Andaluz Waterbirth Center*, 298 Or. App. 733 447 P.3d 510 (2019) ----------------------------------------- 33

*Berkeley Cty. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d 225 (4th Cir. 2019)------------------------------------------6

*Brennan v. Opus Bank*, 796 F.3d 1125 (9th Cir. 2015) ------------------------------------------------ passim

*Bridge v. Credit One Financial*, 2016 WL 1298712 (D. Nev. 2016)------------------------------------------------ 9

*Brockie v. Spencer Gifts LLC*, 2019 WL 4935616 (D. Or. 2019), *adopted*, 2019 WL 4934944 (D. Or. 2019) -1, 6, 11, 36

*Brown v. BYRV, Inc.*, 2015 WL4507159 (D. Or. 2015) ------------------------------------------------- 21

*Burnett v. Pagliacci Pizza, Inc.*, 196 Wash.2d 38, 470 P.3d 486 (2020) ------------------------------ 2, 3, 20, 25

*Cisneros v. American General Financial Services, Inc.*, 2012 WL 3025913 (N.D. Cal. 2012) -----------------------18,19

*Comer v. Micor, Inc.*, 436 F.3d 1098 (9th Cir. 2006)-------------------------------------------------------9

*Coughlin v. Rogers*, 130 F.3d 1348 (9th Cir. 1997)--------------------------------------------------------------- 35

*David Terry Investments, LLC-PRC v. Headwaters Development Group Limited Liability Corporation*, 13 Wash. App.2d 159, 463 P.3d 117 (Wash. App. 2020) ------------------------------------------------------------- 9

*Eclipse Consulting, Inc. v. BDO USA, LLP*, 2018 WL 5735985 (D. Or. 2018) --------------------------------9, 10

*Eclipse Consulting Inc. v. BDO USA, LLP*, 2018 WL 925616 (D. Or. 2018), *adopted in relevant part*, 2018 WL 1585760 (D. Or. 2018)------------------------------------------------------------------------------------ 10

*Eiess v. USAA Federal Savings Bank*, 404 F. Supp. 3d 1240 (N.D. Cal. 2019)----------------------------------- 14

*Eulrich v. Snap-On Tools Corp.*, 121 Or. App. 25, 853 P.2d 1350, *rev. denied*, 317 Or. 583 (1993), *vacated on other grounds*, 512 U.S. 1231 (1994) --------------------------------------------------------------------------28,29

First Options Chicago v. Kaplan, 514 U.S. 938 (1995) -------------------------------------------------- 12, 14

*Fronckowiak v. Sears Authorized Hometown Stores, Inc.*, 2021 WL 329459 (D. Or. 2021)------------------------------5

*Gandee v. LDL Freedom Enterprises, Inc.*, 176 Wash.2d 598, 293 P.3d 1197 (2013).------------------------------ 26

*Graham Oil Co. v. Arco Products Co.*, 43 F.3d 1244 (9th Cir. 1994)------------------------------------------- 23

*Green Tree Financial Corp. v. Bazzle*, 539 U.S. 444 (2003) ------------------------------------------------- 12

*Hatkoff v. Portland Adventist Medical Center*, 252 Or. App. 210, 287 P.3d 1113 (2012)------------------------------ 25

*Henry Schein, Inc. v. Archer & White Sales, Inc.*, -- U.S. ---, 139 S. Ct. 524 (2019) ----------------------------------- 12

*Hermosillo v. Davey Tree Surgery Co.*, 2018 WL 3417505 (N.D. Cal. 2018)----------------------------------------7, 19

Howsam v. Dean Witter Reynolds, Inc., 537 U. S. 79 (2002)------------------------------------------------- 12

*In re: Auto. Parts Antitrust Litig.* 951 F.3d 377 (6th Cir. 2020) ------------------------------------------------6

John Doe 105 v. Archdiocese of Portland, 2008 WL 1138964 (D. Or. 2008) -------------------------------------- 34

*Jordan v. Nationstar Mortgage*, LLC, 185 Wash. 2d 876, 374 P.3d 1195 (2016), ------------------------------------ 29

*Kairy v. Supershuttle International, Inc.*, 2012 WL 4343220 (N.D. Cal. 2012)------------------------------------- 10

*Lamps Plus, Inc. v. Varela*, 587 U.S. ---, 139 S. Ct. 1406 (2019) ------------------------------------------- 12

*League to Save Lake Tahoe v. Tahoe Regional Planning Agency*, 558 F.2d 914 (9th Cir. 1977)------------------------ 33

*Legacy Wireless Services, Inc. v. Human Capital, L.L.C.*, 314 F. Supp. 2d 1045 (D. Or. 2016)------------------------9, 11

*Legalforce RAPC Worldwide P.C. v. Swyers*, 2018 WL 3159711 (N.D. Cal. 2018) ------------------------------- 10

*Letizia v. Prudential Bache Securities, Inc.*, 802 F.2d 1185 (9th Cir. 1985) ----------------------------------------- 31

*Lloyd's Syndicate 457 v. FloaTEC, L.L.C.*, 921 F.3d 508 (5th Cir. 2019)-----------------------------------------------6

*Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52 (1995) --------------------------------------8

*McClellan v. I-Flow Corp.*, 2010 WL 11595942 (D. Or. 2010)------------------------------------- 34

*McKee v. AT&T Corp.*, 164 Wash.2d 372, 191 P.3d 845 (2008) -------------------------------------26,27

*Meadows v. Dickey's Barbecue Restaurants, Inc.*, 144 F. Supp. 3d 1069 (N.D. Cal. 2013) ----------------------- 13, 14

*Mendez v. Palm Harbor Homes, Inc.*, 111 Wash. App. 446, 45 P.3d 594 (2002)------------------------------2, 23, 24

*Mikeladze v. Raymours Furniture Co.*, 2020 WL 7240379 (E.D. Pa. 2020) --------------------------------------7

*Mikhak v. University of Phoenix*, 2016 WL 3401763 (N.D. Cal. 2016) ------------------------------------ 14

*Mohamed v. Uber Technologies, Inc.*, No. C–14–5200 EMC, 2015 WL 3749716 (N.D.Cal. June 9, 2015) ----------- 14

*Motsinger v. Lithia Rose-FT, Inc.*, 211 Or. App. 610, 156 P.3d 156 (2007)------------------------------------- 23, 25

*MZM Construction Co. v. New Jersey Building Laborers Statewide Benefit Funds*, 974 F.3d 386 (3rd Cir. 2020) ----6

*Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257 (9th Cir. 2006)------------------------------------------- 24

*Nebraska Mach. Co. v. Cargotec Sols., LLC*, 762 F.3d 737 (8th Cir. 2014).-------------------------------------6

*Nuang-Tanedo v. East Baton Rouge Parish School Board*, 790 F. Supp. 2d 1134 (C.D. Cal. 2012) -------------------- 30

*Oracle America, inc. v. Myriad Group, A.G*, 724 F.3d 1069(9th Cir. 2013)------------------------------------ 12

*Papagiannis v. Pontikis*, 108 F.R.D. 177 (N.D. Ill. 1985)----------------------------------------------- 35

*Petersen v. EMC Telecom Corp.*, 2010 WL 2490002 (D. Ariz. 2010)-------------------------------------- 9, 10

*Philpott v. Ernst & Young LLP*, 2010 WL 11406230 (W.D. Wash. 2010)------------------------------------- 23

*Rajagopalan v, NoteWorld, LLC*, 718 F.3d 844 (9th Cir. 2013)-------------------------------------------- 31, 32

*Revitch v. DIRECTV, LLC*, 977 F.3d 713 (9th Cir. 2020) ----------------------------------------------6

*Roberts v. TriQuint Semiconductors, Inc.*, 358 Or. 413, 364 P.3d 328 (2015) -------------------------------------- 22

*Saravia v. Dynamex, Inc.*, 310 F.R.D. 412 (N.D. Cal. 2015) -----------------------------------------------2, 15, 16

*Selman v. Pfizer, Inc.*, 2011 WL 6655354 (D. Or. 2011) ----------------------------------------------- 33, 34

*Setty v. Shrinivas Sugandhalaya, LLP*, 986 F.3d 1139 (9th Cir. 2021) ------------------------------------- 31

*Sixel, LLC v. Penning*, 2019 WL 451796 (D. Or. 2019)----------------------------------------------- 12

*Solis v. Zep LLC*, 2020 WL 1439744 (S.D. N.Y. 2020)-------------------------------------------------7, 28

*Strand v. U.S. Bank, N.A.*, 693 N.W. 2d 918 (N.D. 2005)----------------------------------------------- 20

*Townsend v. Quadrant Corp.*, 173 Wash.2d 451, 268 P.3d 917 (Wash. 2012)

*The Bremen v. Zapata Off–Shore Co.*, 407 U.S.1 (1972)------------------------------------------- 20, 21

*Three Valleys Municipal Water District v. E. F. Hutton & Co.*, 926 F.2d 1136 (9th Cir. 1991) ------------------------------1

*TRINITY V. APEX DIRECTIONAL DRILLING LLC*, 363 OR. 257, 434 P.3D 20 (2018) ------------------------------ 22

*Twilleager v. RDO Vermeer, LLC*, 2011 WL 1637469, *adopted*, 2011 WL 1630353 (D. Or. 2011) -------------3, 21, 25

*Varcak v. Envoy Mortgage, LTD*, 2019 WL 6887292 at *1 (D. Or.), *adopted*, 2019 WL 6883789 (D. Or. 2019)---- 12

*Vasquez-Lopez v. Beneficial Oregon, Inc.* 230 Or. App. 553, 152 P.3d 940 (2007)------------------------------ passim

*Wallace v. Amsurg Holdings, Inc.*, 2015 WL 7568592 (D. Or. 2015)----------------------------------------- 10, 11

*West v. Jackson*, 561 US 63 (2010)----------------------------------------------------------------6

*Willis v. National Debt Settlement Group*, 878 F. Supp. 2d 1208 (D. Or. 2012) --------------------------------- passim

*Yang v. Majestic Blue Fisheries, LLC*, 876 F.3d 996 (9th Cir. 2017) ------------------------------------------8

*Zuver v. Airtouch Communications, Inc*., 153 Wash.2d 293, 103 P.3d 753 (2004)------------------------------- 17, 23

*Zweizig v. Rote*, 818 Fed. Appx. 645 (9th Cir. 2020) -------------------------------------------------- 33

<u>STATUTES</u>

18 U.S.C. § 1962(c)---------------------------------------------------------------------------- 29

28 U.S.C. §§1341 and 1343 -------------------------------------------------------------------- 29

9 U.S.C. § 2 -----------------------------------------------------------------------------------5

R.C.A. § 9A.60.030----------------------------------------------------------------------------- 30

R.C.W. § 9A.82.100(4)(f)(ii)------------------------------------------------------------------------------- 30

R.C.W. §§ 9A.82.60 and 9A.82.100 ------------------------------------------------------------------ 30

Racketeering and Corrupt Organizations Act ("RICO") --------------------------------------------- 29

Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1589 ------------------------------- 28, 29, 30

REGULATIONS

16 C.F.R. 436.2(a)----------------------------------------------------------------------------------------18

# I.

# INTRODUCTION

In *Brockie v. Spencer Gifts LLC,* 2019 WL 4935616 (D. Or. 2019), *adopted*, 2019 WL 4934944 (D. Or. 2019), this Court explained the proper role of a court in considering a motion to compel arbitration.  First, the court must determine as a matter of state contract law whether the plaintiffs have agreed to arbitrate, a question on which defendants bear the burden of proof. 2019 WL 4935616 at *3   If it finds such an agreement, the court must also "determin[e] whether a valid arbitration agreement exists and whether the agreement encompasses the disputes at issue," with the recognition that an "arbitration agreement[ ] can be invalidated for fraud, duress or unconscionability."  *Id.* at *2, internal quotations and citations omitted.

In assessing the factual record, the court must "constru[e] all facts and reasonable inferences that can be drawn from those facts in a light most favorable to the non-moving party." *Id.* at 1 n1, internal quotations and citation omitted.  If the facts are in doubt, "the matter * * * should be submitted to a jury."  *Three Valleys Municipal Water District v. E. F. Hutton & Co.*, 926 F.2d 1136, 1142 (9th Cir. 1991).

Section III will demonstrate that no valid arbitration agreement was established with the Plaintiff-Buyers, who had little or no capacity to read the English language terms of the Franchise Agreement.  In addition, it will show that the language of the Franchise Agreement excludes the Plaintiff-Families from arbitration.

Even if this Court were to conclude that one or more plaintiffs did agree to arbitrate, section IV demonstrates that agreement did not clearly and unmistakably delegate decision of arbitrability issues to the arbitrator. That section will show that Defendants mischaracterize Ninth Circuit precedent, which limits the delegative effect of incorporating AAA rules to agreements between sophisticated parties. It also establishes that, in this context, delegation itself is unconscionable.

Defendants devote only two paragraphs to their argument that "[t]he arbitration provisions in the Franchise Agreements are valid and enforceable." Defendants' Motion and Memorandum of Law in Support of Motion to Dismiss and Compel Arbitration ("Motion to Compel"), 13. They fail to grapple with key issues presented by their motion, which are discussed in section V, namely:

1. Are these arbitration agreements procedurally unconscionable (a) because the arbitration requirement was a surprise to the plaintiffs, who were unable to understand technical language in the English language Franchise Agreement or were never informed of the arbitration requirement by the Franchisor's representatives, *Saravia v. Dynamex, Inc.*, 310 F.R.D. 412, 420-22 (N.D. Cal. 2015), or (b) because its terms were non-negotiable. *Bagley v. Mt. Bachelor, Inc.*, 356 Or. 543, 555, 340 P.3d 347 (2014); *Burnett v. Pagliacci Pizza, Inc.*, 196 Wash.2d 38, 470 P.3d 486, 496 (2020).

2. Does a clause selecting an arbitral forum in Minneapolis "effectively deny Plaintiffs a meaningful day in court"? *Willis v. National Debt Settlement Group,* 878 F. Supp. 2d 1208, 1221 (D. Or. 2012).

3. Is the arbitration requirement unconscionable (a) because it prohibits the arbitrator from "assess[ing] punitive or exemplary damages;" *Willis*, 878 F. Supp. 2d at 1226; (b) because it requires plaintiffs to pay such steep arbitration costs as to make that forum inaccessible, *Vasquez-Lopez v. Beneficial Oregon, Inc.* 230 Or. App. 553, 574, 152 P.3d 940 (2007), *Mendez v. Palm Harbor Homes, Inc.*, 111 Wash. App. 446, 45 P.3d 594, 605 (2002); or (c) because it creates an exception, applicable only for the franchisor, for injunctive relief claims, *Burnett.* 470 P.3d at 497; *Twilleager v. RDO Vermeer, LLC,* 2011 WL 1637469 at *9-10, *adopted,* 2011 WL 1630353 (D. Or. 2011).

4. Is the appropriate remedy the severance of these provisions or the non-enforcement of the arbitration requirement? *Vasquez-Lopez,* 230 Or. App. at 576-777.[1]

Section VI establishes that the Oregon Plaintiff-Buyers also can successfully challenge arbitration on the basis of economic duress and that the Washington Plaintiff-Buyer can successfully challenge it on the basis of illegality. Section VII explains why non-signatories National Maintenance Contractors, LLC and Marsden Services, LLC cannot compel arbitration. Section VII demonstrates that the plaintiffs are not misjoined. Before discussing these issues, section II will contain a limited statement of facts.

II.

STATEMENT OF FACTS

---

[1] To the extent defendants offer new arguments on these points in their reply, plaintiffs will seek to strike them unless both defendants and this Court permit plaintiffs to file a surreply.

Plaintiffs will here summarize the essential facts and respond to misstatements in the factual statement of the Motion to Compel. Additional facts will appear in the course of the argument.

Plaintiffs rely on the factual allegations in the First Amended Complaint ("Complaint"), the Declaration of Imre S, Szalai ("Szalai Dec"), the declarations filed by individual plaintiffs[2] and certain factual submissions of the Defendants. For the benefit of the Court, the declarations of the individual plaintiffs are summarized in the Index of Plaintiff Declarations filed concurrently.

Defendants' janitorial business model included outsourcing work to individuals who were characterized as franchisees and who were required to sign Franchise Agreements.[3] Plaintiffs allege they were misclassified, but here will use the terms "Franchise Agreement" and "Plaintiff-Buyers" without qualifying language to simplify the argument. In no way is this a concession that they were properly classified as franchisees.

Presently, NMC Franchising, LLC acts as the franchisor. It required the Plaintiff-Buyers to sign a standard form Franchise Agreement. Declaration of Peter Cain ("Cain Dec"), Exs. B-R. Section 19 of that agreement, entitled Dispute Resolution, requires franchisors to resolve all disputes in "arbitration on an individual basis." The first of its three subsections is accurately set forth in full in the Motion to Compel, 7. Portions of the first two subsections will be quoted and examined in the course of the argument.

---

[2] The plaintiffs associated with PA Janitorial Services, LLC, will be dismissing their claims due to Patricia Alvarez's present health condition.

[3] Some janitorial work was performed by individuals who Defendants acknowledged were employees. *E.g.,* Declaration of Jorge Garcia, ¶¶6-8.

All Plaintiff-Buyers immigrated to the United States as teenagers or adults and are not native English speakers.[4]  As their declarations show, at contract formation none had sufficient proficiency to read technical and legal English, and some could not read any English.  The franchisor's representatives involved in contract formation understood this but did not offer any of them a translation of the English language Franchise Agreement.  Nor did they tell any of them that the Franchise Agreement required them to arbitrate disputes.

Some of the Plaintiff-Buyers were required to sign the Franchise Agreement the day they received the Franchise Disclosure Document.  None knew anybody capable of translating the lengthy disclosure document, and none could afford to hire a translator.

The plaintiffs all live in Washington or Oregon.  None can afford the costs of arbitrating in Minneapolis as required by the Franchise Agreement. Many would not be able to take time off work to travel out of state for an arbitration.

III.

LACK OF CONSENT DEFEATS DEFENDANTS' MOTION

A.  This is an Issue for This Court

An agreement between the parties is necessary for a dispute to be subject to arbitration. It is not enough that one party asserts the existence of a delegation clause which provides that the arbitrator is to decide all questions of arbitrability.  If the other party did not consent, that purported agreement is a nullity.

---

[4]      All grew up speaking Spanish, except Solomon Denbel, whose first language is Amharic, and Tatiana Dikhandizha, a native Russian speaker.

A long line of United States Supreme Court decisions assign to courts responsibility for resolving such issues. The most recent expression is *Henry Schein, Inc. v. Archer & White Sales, Inc.*, -- U.S. ---, 139 S. Ct. 524, 530 (2019) ("before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists. See 9 U.S.C. § 2.") As Judge Aiken recently observed, "it would indeed be unjust to require plaintiff to submit a dispute about arbitration to an arbitrator where she has not agreed to do so." *Fronckowiak v. Sears Authorized Hometown Stores, Inc.*, 2021 WL 329459 at *6 (D. Or. 2021) (construing the various documents which plaintiff signed as exhibiting her consent to arbitration).

In *MZM Construction Co. v. New Jersey Building Laborers Statewide Benefit Funds*, 974 F.3d 386, 396-401 (2020), the Third Circuit held that "the text of section 4 of the FAA – mandating that the court be 'satisfied' that an arbitration agreement exists – tilts the scale in favor of a judicial forum when a party rightfully resists arbitration on the grounds it never agreed to arbitrate at all." It added:

> We are not alone in reaching this conclusion. After *Rent-A-Center [West v. Jackson,* 561 US 63], several sister circuits have * * * declined to enforce delegation provisions when the formation or existence of the container contract was at issue. *See In re: Auto. Parts Antitrust Litig.* 951 F.3d 377, 385-86 (6th Cir. 2020); *Berkeley Cty. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d 225, 234 (4th Cir. 2019); *Lloyd's Syndicate 457 v. FloaTEC, L.L.C.*, 921 F.3d 508, 515 (5th Cir. 2019); *Nebraska Mach. Co. v. Cargotec Sols., LLC*, 762 F.3d 737, 741 & n.2 (8th Cir. 2014).

*MZM*, 974 F.3d 401-402.

*Revitch v. DIRECTV, LLC*, 977 F.3d 713 (9th Cir. 2020) reached a similar result in a slightly different context. Revitch signed a contract with AT&T Mobility LLC containing an arbitration clause years prior to the latter acquiring DIRECTV. *Id.* at 715. When Revitch sued DIRECTV, it invoked that arbitration clause and Revitch contended California contract

construction principles prevented DIRECTV from doing so. *Id.* at 717-718. The Ninth Circuit

held this question raised an issue of contract formation for a court's decision. *Id.* at 719. *Accord:*

*Brockie*, 2019 WL 4935616 at 2 n2 ("Courts, not arbitrators, must always resolve challenges to

contract formation").

    B.   <u>The Plaintiff-Buyers Did Not Consent to Arbitrate</u>

        The essential facts bearing on the question whether the Plaintiff-Buyers consented to

arbitration are (1) none of the Plaintiff-Buyers had sufficient English literacy to comprehend the

Dispute Resolution section of the Franchise Agreement and (2) none was told when they were

presented with the Franchise Agreement that it required arbitration.

        Under these circumstances, no contract to arbitrate was formed with any Plaintiff-Buyer.

*Hermosillo v. Davey Tree Surgery Co.,* 2018 WL 3417505 (N.D. Cal. 2018), illustrates this

principle. The plaintiffs there read "only minimal English, but the arbitration agreement was

written in English." *Id.* at \*11. The Court concluded that "Defendants have failed to establish

the existence of an agreement to arbitrate" when they "did nothing to alert the employees of the

contractual nature of the agreement" and "Plaintiffs denied actual knowledge of the Arbitration

Agreement." *Id.* at 12. The same result was reached under similar facts in *Mikeladze v.

Raymours Furniture Co.*, 2020 WL 7240379 (E.D. Pa. 2020) at \*1, 4-5 (plaintiff who "did not

speak or understand English" had "no meaningful opportunity to learn of the arbitration

provisions of the [employment] Agreement" and therefore did not manifest assent to them); *Solis

v. Zep LLC*, 2020 WL 1439744 (S.D. N.Y. 2020) at \*6 ("Because Solis was illiterate in English

and did not \* \* \* have a meaningful opportunity to have the purported agreement to arbitrate

translated into English, a valid agreement to arbitrate was not formed").

C. The Plaintiff-Families

   1. Introduction

       Defendants acknowledge the Plaintiff-Families are non-signatories, but invoke the doctrine of equitable estoppel in seeking to compel arbitration. This argument fails for two reasons. First, the agreement limits "arbitration proceedings" to "controversies between you [*i.e.*, the franchisee] and us [*i.e.* the franchisor]." *See* Motion to Compel, 7. Second, applicable Ninth Circuit precedent undermines defendants' estoppel argument.

   2. The Arbitration Agreement Itself Excludes Family Members

       The language of the Franchise Agreement is unambiguous: "[a]ny arbitration proceedings will be limited to controversies between you and us." *Id.* The first paragraph of the Franchise Agreement defines "us" as "NMC Franchising, LLC" and "you" as the entity signing as the franchisee. *Id.*

       This language precludes including non-signatories in arbitration. Even if there were some lurking ambiguity in this language, that would not benefit defendants. NMC Franchising, LLC drafted the Franchise Agreement, so ambiguities are construed against it. *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62-63 (1995) (applying this "common-law rule of contract interpretation").

   3. Equitable estoppel is inapplicable here

       The Ninth Circuit most recently addressed this question in *Yang v. Majestic Blue Fisheries, LLC*, 876 F.3d 996 (9th Cir. 2017). Yang was killed in a maritime accident and his widow brought statutory and general maritime law claims against Dongwon Industries Co. Ltd., which had provided the crew for the voyage. *Id.* at 997-998. Yang's employment agreement with Majestic Blue Fisheries contained an arbitration clause. *Id.* at 998. Dongwon, which was

closely connected with Majestic Blue, sought to compel arbitration, invoking equitable estoppel. *Id.* at 998, 1002. The Ninth Circuit held that doctrine inapplicable because Yang's estate "ha[d] a claim independent of the agreement containing the arbitration provision." *Id.* at 1002, internal quotations and citation omitted.

The Ninth Circuit reached the same result in *Comer v. Micor, Inc.,* 436 F.3d 1098,1099-1100 (9th Cir. 2006), where the investment manager of an ERISA trust sought, by invoking equitable estoppel, to hold a plan participant to the arbitration agreement the manager had with the plan trustees. The Ninth Circuit rejected that argument because the participant, who based his lawsuit on ERISA, "did not seek to enforce the terms of the management agreements." *Id.* at 1210.

Judges of this Court have "applied" equitable estoppel "narrowly" so as not to "'overwhelm the fundamental premise that a party cannot be compelled to arbitrate a matter without its agreement.'" *Eclipse Consulting, Inc. v. BDO USA, LLP*, 2018 WL 5735985 at \*6 (D. Or. 2018) (Acosta, M.J.), *quoting Legacy Wireless Services, Inc. v. Human Capital, L.L.C.*, 314 F. Supp. 2d 1045, 1056 (D. Or. 2016) (Mosman, J.). These cases establish the following principles:

"[A] nonsignatory does not knowingly exploit an agreement when participation is merely passive and the nonsignatory does not seek to enforce the terms of the agreement or otherwise take advantage of them." *Eclipse Construction*, 2018 WL 6735085 at \*7.

A benefit is not direct "when it derives correlatively from the contractual relationship between signatories and not from the terms of the agreement." *Id.* at \*8. Thus, when "[t]he Agreement contains no mention of compensation to a third party," the fact that a person receives

compensation from the mere existence of a contractual relationship between [other] parties * * * falls short of the mark." *Id.* at 9.

Even the fact that a corporation is wholly owned by individuals who are parties to an arbitration agreement "does not mean that it is estopped from avoiding arbitration." *Wallace v. Amsurg Holdings, Inc.,* 2015 WL 7568592 at *5 (D. Or. 2015) (McShane, J.).[5]

Defendants rely heavily on *Kairy v. Supershuttle International, Inc.*, 2012 WL 4343220 (N.D. Cal. 2012). A later decision from that court distinguishes *Kairy* on the basis that its plaintiffs "were 'intended third party beneficiaries who knowingly exploited the agreements.'" *Legalforce RAPC Worldwide P.C. v. Swyers*, 2018 WL 3159711 at *3 (N.D. Cal. 2018), *quoting Kairy,* 2012 WL 4343220 at *9. By contrast, the plaintiffs in *Legalforce* "had not sought relief under the agreement" nor did they ever have "any duties thereunder, so they were not "estopped from avoiding * * * the arbitration clause." 2018 WL 3159711 at *3.

Section 20(G) of the Franchise Agreement, quoted in the Motion to Compel, 25 n9, makes clear that it "is not intended, and will not be deemed to confer any rights or remedies upon any person * * * not a party to this Agreement." Accordingly, this case is like *Legalforce*, not *Kairy*.[6]

---

[5]     Defendants misread *Townsend v. Quadrant Corp.*, 173 Wash.2d 451, 268 P.3d 917 (Wash. 2012) in claiming that it "enforce[ed] arbitration against non-signatory children of signatory parents." Motion to Compel, 23. Defendants cite to the opinion of Justice Alexander, 268 P.3d at 922-23, but only three other members of the nine person court joined that opinion on this issue. The majority joined the opinion of Judge Stephens, which holds that "nonsignatories are [not] bound to arbitrate tort claims that do not arise out of the contract." 268 P.2d at 924. *See David Terry Investments, LLC-PRC v. Headwaters Development Group Limited Liability Corporation*, 13 Wash. App.2d 159, 463 P.3d 117, 123 (Wash. App. 2020) ("The majority [in *Townsend*] concluded that the childrens' pursuit of personal injury claims outside of arbitration was not inequitable because their rights were wholly independent of the building contract").

[6]     Defendants cite two other decisions from district courts in this circuit, *Bridge v. Credit One Financial*, 2016 WL 1298712 (D. Nev. 2016) and *Petersen v. EMC Telecom Corp.*, 2010

Finally, Defendants argue the Plaintiff-Families' claims "are substantively indistinguishable from and intertwined with, those of the Plaintiff-Buyers," thus making it "inequitable to permit [them] to litigate their claims in court while the Plaintiff-Buyers are bound to arbitrate their claims." Motion to Compel, 25. Courts in this District have rejected this intertwining theory. "[S]olely because the claims are 'inextricably intertwined' is not enough to bind a nonsignatory." *Wallace*, 2015 WL 7568592 at *6, *quoting Legacy Wireless*, 314 F. Supp.2d at 1056.

In summary, Ninth Circuit law and precedent from this District foreclose Defendants' attempt to employ equitable estoppel to require the Plaintiff-Families to arbitrate.

D. Conclusion

For the reasons given in the prior two subsections, defendants fail to satisfy their burden of proof that any of these plaintiffs agreed to arbitrate.

IV.

QUESTIONS OF ARBITRABILITY ARE NOT DELEGATED TO THE ARBITRATOR

1. Introduction

The delegation issue here is considerably different than that presented in *Brockie*. There the arbitration agreement expressly delegated resolution of gateway issues to an arbitrator. 2019 WL 4935616 at *1. This agreement does not.

---

WL 2490002 (D. Ariz. 2010). Judge Acosta in *Eclipse Consulting* distinguished each in ways that make them inapplicable here. 2018 WL 6735085 at *7 (*Bridge*); *Eclipse Consulting Inc. v. BDO USA, LLP*, 2018 WL 925616 at *7-*8 (D. Or. 2018), *adopted in relevant part*, 2018 WL 1585760 (D. Or. 2018) (*Peterson*).

The linchpin of defendants' argument is a provision of the American Arbitration Association's ("AAA") Commercial Arbitration Rules. Defendants overstate Ninth Circuit precedent as creating a blanket rule that "incorporating the AAA arbitration rules sufficiently designates questions of arbitrability to the arbitrator." Motion to Compel, 10. In fact, *Brennan v. Opus Bank,* 796 F.3d 1125 (9th Cir. 2015) limits that rule to "an arbitration agreement 'between *sophisticated parties*'." *Id.* at 1131, emphasis added. These plaintiffs are far from sophisticated; they are immigrants with limited English and occupational skills and mostly with limited education.

In all events, as subsection 3 shows, in this context the delegation clause is unconscionable.

2. <u>This Case Does Not Satisfy the Clear and Unmistakable Test</u>

Defendants acknowledge that, to prevail on their delegation argument, the arbitration agreement must "clearly and unmistakably provide that the arbitrator will decide arbitrability." Motion to Compel, 9, internal quotations and citations omitted. But they fail to add that the United States Supreme Court has created in this context a presumption which they must overcome, which was summarized recently in *Lamps Plus, Inc. v. Varela*, 587 U.S. ---, 139 S. Ct. 1406, 1416-17 (2019), as follows:

> we presume that parties have *not* authorized arbitrators to resolve certain "gateway" questions, such as "whether the parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy." *Green Tree Financial Corp. v. Bazzle*, 539 U.S. 444, 452, 123 S.Ct. 2402, 156 L.Ed.2d 414 (2003) (plurality opinion). Although parties are free to authorize arbitrators to resolve such questions, we will not conclude that they have done so based on "silence *or* ambiguity" in their agreement, because "doing so might too often force unwilling parties to arbitrate a matter they reasonably would have thought a

> judge, not an arbitrator, would decide." *First Options [of Chicago, Inc. v. Kaplan}*, 514 U.S. at 944, 115 S.Ct. 1920 (emphasis added); see also *Howsam [v. Dean Witter Reynolds, Inc.]*, 537 U.S. [79] at 83–84, 123 S.Ct. 588. Emphasis in original

The Ninth Circuit has limited the reach of the doctrine that incorporation of the Commercial Arbitration Rules delegates questions of arbitrability to an arbitrator to "an arbitration agreement between *sophisticated parties.*" *Brennan*, 977 F.3d at 1131, emphasis added.[7]

The circumstances in *Brennan* are markedly different from those of the Plaintiff-Buyers here. Mr. Brennan had previously been "a partner at Jones Day from 1984 to 2001, and Senior Vice President, General Counsel, and Deputy Chief Legal Officer of Washington Mutual from 2001 to 2008," before being hired as "Executive Vice President * * * for Opus Bank." 796 F.3d at 1126-27, 1131.[8] The Plaintiff-Buyers are immigrants with very limited vocational skills and English facility.

Most District Courts in the Ninth Circuit hold that the clear and unmistakable test is not satisfied when an unsophisticated party enters into an arbitration agreement that designates use

---

[7]     *Oracle America, inc. v. Myriad Group, A.G,* 724 F.3d 1069, 1071 (9th Cir. 2013) involves the incorporation of the United Nations Commission on International Trade Law, not the Commercial Arbitration Rules. *Brennan* acknowledges that "the question regarding incorporation of the AAA rules" was not "squarely before us" in *Oracle America*. 796 F.3d at 1130.

[8]     Defendants also cite two opinions from this District. There is no indication that, in either, the party resisting application of the delegation provision in the Commercial Arbitration Rules disputed that it was sophisticated. In *Sixel, LLC v. Penning*, 2019 WL 451796 at *1, *3 (D. Or. 2019), it was the employer - the drafter of the Employment Agreements containing the arbitration clause - who was resisting delegation. And the employee in *Varcak v. Envoy Mortgage, LTD,* 2019 WL 6887292 at *1 (D. Or.), *adopted,* 2019 WL 6883789 (D. Or. 2019), was the Producing Area Manager for Oregon and Washington for a Texas limited partnership.

of the Commercial Arbitration Rules. Particularly instructive is *Meadows v. Dickey's Barbecue Restaurants, Inc.*, 144 F. Supp. 3d 1069 (N.D. Cal. 2013):

> [An] inquiry about whether the parties clearly and unmistakably delegated arbitrability by incorporation should first consider the position of those parties. See *Rent–A–[Center]*, 561 U.S. at 70 n. 1, 130 S.Ct. 2772 (explaining that the "clear and unmistakable" requirement "is an 'interpretive rule,' based on an assumption about the parties' expectations); see also *Mohamed v. Uber Technologies, Inc.*, No. C–14–5200 EMC, 2015 WL 3749716, at *10 (N.D.Cal. June 9, 2015) ("[W]hether the language of a delegation clause is "clear and unmistakable" should be viewed from the perspective of the particular parties to the specific contract at issue. What might be clear to sophisticated counterparties is not necessarily clear to less sophisticated employees or consumers."). After all, the question is whether the language of an agreement provides "clear and unmistakable" evidence of delegation. To a large corporation (like Oracle) or a sophisticated attorney (like Brennan), it is reasonable to conclude that it does. But applied to an inexperienced individual, untrained in the law, such a conclusion is likely to be much less reasonable.

144 F. Supp. 3d at 1078. The *Meadows* court then spends several paragraphs analyzing the facts and law before concluding:

> [T]he Toff Plaintiffs were not "sophisticated," and * * * the rule announced in *Brennan* * * * does not apply in this case. The Supreme Court has held that "courts should not assume that the parties agreed to arbitrate arbitrability unless there is "clea[r] and unmistakabl[e]" evidence that they did so." *First Options*, 514 U.S. at 944, 115 S.Ct. 1920 (alterations in original). For persons such as Plaintiffs here, incorporation of the AAA rules does not meet that test. As to the Toff Plaintiffs, the Court will decide the question of arbitrability.

144 F Supp 3d at 1079.[9]

---

[9] *Accord: Eiess v. USAA Federal Savings Bank,* 404 F. Supp. 3d 1240, 1253 (N.D. Cal. 2019):

Plaintiffs with much greater facility in English and greater occupational skills than these Plaintiffs have been deemed unsophisticated in the context of the relatively complex question of locating and interpreting the Commercial Arbitration Rules. For example, the Court was unwilling to consider the plaintiff in *Mikhak v. University of Phoenix*, 2016 WL 3401763 (N.D. Cal. 2016), to be sophisticated even though she was "a former faculty candidate denied a full-time faculty position" and was "a former researcher" who had "graduate degrees in Epidemiology and Biostatistics, and Genetic and Molecular Epidemiology." *Id.* at *1, 5, 8. The Court could not conclude that she was sophisticated because she was "not a savvy entrepreneur with prior dealings in the business world, she does not possess a professional license in a legal or related field, and she certainly is not an experienced attorney and businesswoman." *Id.* at *5. Plainly, these plaintiffs are much more unsophisticated.

Defendants seek an unwarranted expansion of *Brennan*. Defendants make no effort to engage the policy reasons which have led most District Courts in this Circuit to refuse to expand *Brennan* to unsophisticated plaintiffs. Undoubtedly, defendants have not because there is no answer favorable to their position. This Court should reject their argument that resolution of arbitration gateway issues has been clearly and unmistakably delegated to an arbitrator.

3. The Delegation Clause is Unconscionable

---

For an unsophisticated plaintiff to discover she had agreed to delegate gateway questions of arbitrability, she would need to locate the arbitration rules at issue, find and read the relevant rules governing delegation, and then understand the importance of a specific rule granting the arbitrator jurisdiction over questions of validity – a question the Supreme Court itself has deemed rather arcane," internal quotations omitted.

This case is quite similar to *Saravia*, 310 F.R.D. at 420-22, which concluded "the delegation provisions were procedurally and substantively unconscionable" and were therefore "unenforceable."

The facts on which *Saravia* based its conclusion that the delegation clause there was presented "in an oppressive manner" and "constituted unfair surprise," 310 F.R.D. at 421, are comparable to the plaintiffs' circumstances. The agreements were "form contracts * * * that Saravia was tersely instructed to sign" and "given no opportunity to re-negotiate any provisions." *Id.* at 420. They were "written in English" although the defendant "knew that Saravia's comprehension of English was limited." *Id.* Beyond that, defendant "never provided Saravia with a copy of the AAA rules." *Id.* Finally, the employer did not "explain[ ] the significance of the rights affected by the delegation * * * provision[ ]." *Id.*

Delegation was substantively unconscionable in *Saravia* in part because of the requirement in the Commercial Arbitration Rules that he pay half of the arbitral fees to resolve arbitrability, costs "which he would not face in court." *Id.* at 421. Here, plaintiffs would be liable for half of arbitrator fees for an arbitrability decision ranging from $2,100 to $8,400. Declaration of Imre S, Szalai ("Szalai Dec"), 5. None of the plaintiffs can afford these amounts.

**T**he delegation clause in *Saravia* was substantively unconscionable also because it required all proceedings to be conducted in Dallas, Texas, "over a thousand miles" from plaintiff's residence. 310 F.R.D. at 421. This "would require Saravia to incur a prohibitive cost" to arbitrate arbitrability." *Id.*

The distance between Minneapolis and plaintiffs' homes in the Northwest is comparable. Plaintiffs' declarations establish that the cost of arbitrating arbitrability in Minneapolis would similarly be prohibitive.

The *Saravia* court determined that, under these circumstances, the appropriate remedy was to invalidate the delegation provision. "Severing the unenforceable provisions" was insufficient as that "would allow an employer to draft one-sided agreements and then whittle down * * * if faced with litigation rather than drafting fair agreements in the first instance." 310 F.R.D. at 421. In addition, to cure some of "those problems would require redrafting that clause." *Id.* at 422. Section V E, below at 26-27 , shows that the law of unconscionability in Oregon and Washington also favors invalidation in these circumstances.[10]

IV.

THE ARBITRATION CLAUSE MUST BE NULLIFIED AS UNCONSCIONABLE

A. General Principles of Unconscionability

Whether an arbitration clause or one of its terms is unconscionable is a question of state law. *Willis*, 878 F.Supp. 2d at 1215. The elements of unconscionability in Oregon are set forth in *Bagley*, 356 Or. at 555-56, citations omitted, as follows:

> Unconscionability may be procedural or substantive.
> Procedural unconscionability refers to the conditions of contract
> formation and focuses on two factors: oppression and surprise.
> Oppression exists when there is inequality in bargaining power
> between the parties, resulting in no real opportunity to negotiate
> the terms of the contract and the absence of meaningful choice.
> Surprise involves whether terms were hidden or obscure from the
> vantage of the party seeking to avoid them. Generally speaking,
> factors such as ambiguous contract wording and fine print are the
> hallmarks of surprise. In contrast, the existence of gross inequality
> of bargaining power, a take-it-or-leave-it bargaining stance, and

---

[10] Some courts have severed comparable substantively unconscionable provisions rather than invalidate a delegation clause. *E.g. Galen v. Redfin Corp.*, 2015 WL 734137 at *7-10 (N.D. Cal. 2015); *Gountoumas v. Giaran, Inc.,* 2018 WL 6930761 at *7-13 (N.D. Cal. 2018). But neither case involved the surprise element of procedural unconscionability. As the Oregon Court of Appeals explained in *Vasquez-Lopez*, 210 Or App at 577, "[m]erely excising the offensive substantive provisions would not cure that unfairness."

the fact that a contract involves a consumer transaction, rather than a commercial bargain, can be evidence of oppression.

Substantive unconscionability, on the other hand, generally refers to the terms of the contract, rather than the circumstances of formation, and focuses on whether the substantive terms contravene the public interest or public policy. Both procedural and substantive deficiencies—frequently in combination—can preclude enforcement of a contract or contract term on unconscionability grounds.

Washington law as set forth in *Zuver v. Airtouch Communications, Inc.*, 153 Wash.2d

293, 103 P.3d 753, 759 (2004), citations and quotations omitted, is similar:

In Washington, we have recognized two categories of unconscionability, substantive and procedural. Substantive unconscionability involves those cases where a clause or term in the contract is alleged to be one-sided or overly harsh. "'Shocking to the conscience", "monstrously harsh", and "exceedingly calloused" are terms sometimes used to define substantive unconscionability. Procedural unconscionability is the lack of meaningful choice, considering all the circumstances surrounding the transaction including the manner in which the contract was entered, whether each party had a reasonable opportunity to understand the terms of the contract, and whether the important terms [were] hidden in a maze of fine print. We have cautioned that these three factors should not be applied mechanically without regard to whether in truth a meaningful choice existed.

B.   Procedural Unconscionability

1. Surprise

All the Plaintiff-Buyers are immigrants who are not native English speakers.[11]   At contract

formation none had enough facility in English to be able to read the technical contract elements

of the Franchise Agreement or to understand them in oral communications in English.  The

Franchisor's representative(s) at that meeting knew or should have known of these language

---

[11]      Most are Spanish speakers.  Solomon Denbel's first language is Amharic.  Tatiana Dikhaindzhiya grew up speaking Russian.

barriers.  .  Almost without exception, the Franchisor did not offer an interpreter.   It never offered to translate the Franchise Agreement.  Its representatives never explained in these meetings the requirement to arbitrate disputes.

Courts presented with similar facts have found the surprise element of procedural unconscionability to be satisfied.  For example, *Cisneros v. American General Financial Services, Inc.,* 2012 WL 3025913 at *1 (N.D. Cal. 2012) involved "a door-to-door scheme selling personal computers and software financed" by American General pursuant to a contract requiring arbitration.  The plaintiff "was born in Mexico" and "received only a fourth grade education there."  *Id.* at *5.  She "cannot read or write in English," the language of the transaction documents.  *Id.*  While – unlike here -- the oral communications between her and the sales agent were in Spanish, the latter "did not verbally translate the forms, provide Spanish versions of the forms, or even alert [her] to the arbitration clause."  *Id.*  The court concluded that both plaintiff's "inability to understand arbitration terms because they were written in English" and the fact that the sales agent "did not mention the arbitration provision to [her] though he did explain other aspects of the transaction" made the transaction procedurally unconscionable.  *Id.* at 6.

Many courts have reached the same conclusion under similar facts.  *See Hermasillo*, 2018 WL 3417505 at *13-14 and cases there cited.  *See also Vasquez-Lopez*, 210 Or. App. at 568-69, internal quotations omitted (elements of procedural unconscionability included that "the contract was in a language," English, which these Spanish-speaking plaintiffs "did not understand").

For some Plaintiff-Buyers, the element of surprise is exacerbated by the fact that they were required to sign the Franchise Agreement in their initial meeting with a representative of the franchisor, contrary to the requirement of the FTC's Franchise Rule that a potential franchisee

receive a franchise disclosure document including the franchise agreement at least 14 days in advance.  16 C.F.R. 436.2(a). [12]

### 2.  Oppression

The terms of the Franchise Agreement were non-negotiable.  This is demonstrated by the fact that the form presented in the Franchise Disclosure Document was signed by the Plaintiff-Buyers unchanged except for inserting the name of the franchisee.  Cain Dec, Exs. B-R.  In Oregon, this establishes oppression.  *Bagley,* 356 Or. at 562, *quoting Strand v. U.S. Bank, N.A.*, 693 N.W. 2d 918. 925 (N.D. 2005) ("[w]hen one party is in such a superior bargaining position that it totally dictates all terms of the contract and the only option presented to the other party is to take it or leave it, some quantum of procedural unconscionability is established").

In Washington, the analysis is more nuanced; the issue is not the non-negotiability of the contract terms but whether the weaker party "lacked meaningful choice."  *Burnett*, 470 P.3d at 496, internal quotations and citation omitted.  That element was met in *Burnett* as that plaintiff "had no reasonable opportunity to understand the arbitration policy before signing the employment contract."  *Id.*  The same is true here.

### C.  Substantive Unconscionability

### 1.  Forum Selection Clause

The Franchise Agreement dictates that arbitration take place in Minneapolis.  All plaintiffs reside in Oregon or Washington.

---

[12]      The Plaintiff-Buyers who did have at least 14 days to review the Franchise Disclosure Document state in their declarations that they were unable to comprehend it and could not afford to hire a translator.

*Willis* derived from *Argueta v. Banco Mexicano, S.A.,* 87 F.3d 320 (9th Cir. 1996),[13] the following standards for enforceability of forum selection clauses:

> Federal law governs the validity of a forum selection clause. The enforceability of forum selection clauses in international agreements is controlled by the Supreme Court's decision in *The Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972). In *Bremen*, the Court first held that forum selection clauses are *prima facie* valid and should not be set aside unless the party challenging enforcement of such a provision can show it is " 'unreasonable' under the circumstances." 407 U.S. at 10, 92 S.Ct. at 1913. The Supreme Court has construed this exception narrowly. A forum selection clause is unreasonable if (1) its incorporation into the contract was the result of fraud, undue influence, or overweening bargaining power, (2) the selected forum is so gravely difficult and inconvenient that the complaining party will for all practical purposes be deprived of its day in court; or (3) enforcement of the clause would contravene a strong public policy of the forum in which the suit is brought. To establish the unreasonableness of a forum selection clause, Appellants have the "heavy burden of showing that trial in the chosen forum would be so difficult and inconvenient that the party would effectively be denied a meaningful day in court."

*Willis,* 878 F. Supp.2d at 1220-21, *quoting Argueta*, 87 F.3d at 324-25, most citations and internal quotations omitted).

*Willis* held that a clause selecting San Joaquin County, California as the forum for arbitration was not enforceable for two reasons. First, based on the Declaration of Tina Willis, the Court concluded that "plaintiffs are not capable of paying for and participating in arbitration in San Joaquin County, California, and, therefore, that enforcement of the forum-selection provision would effectively deny Plaintiffs of a meaningful day in court." 878 F. Supp. 2d at 1221. Second, the forum selection clause was contrary to a "strong public policy of Oregon." *Id.* Judge Brown, the author of *Willis,* has subsequently characterized a challenge to a forum

---

[13]    *Argueta* has been followed by the Ninth Circuit as recently as February, 2021. *Fouad v. State of Qatar*, --- Fed. Appx. ----, 2021 W.L. 567769 at *2.

selection clause as an unconscionability question. *Brown v. BYRV, Inc.*, 2015 WL4507159 at

*13 (D. Or. 2015).

Similarly, *Twilleager*, 2011 WL 1637469 at *9, held that a North Dakota forum selection

clause contributed to the unconscionability of that arbitration agreement because it would "make

more financially onerous and even impracticable the employee's task of arbitrating."

The evidence that the Court relied on in *Willis* is as follows:

> As a family facing financial difficulties and trying to get out from
> under debts, we would be unable to afford the costs of filing a
> lawsuit away from home.  For example, we would not be able to
> afford the costs (for ourselves and/or our counsel) of travel,
> lodging, and other expenses for hearings, depositions, or discovery
> if we were required to bring suit outside of Oregon * * *.  In
> addition to paying down our debts, our current monthly income
> goes toward paying typical living expenses such as mortgage,
> utilities, transportation, food, and the costs of raising our children.
> * * * [O]ur monthly expenses relative to our monthly income
> simply would not leave us much if any money to pay fees and
> costs to litigate our claims.

Declaration of Tina Willis, ¶. 12.  *Willis*, Case No. 3-11-CV-450-ST (D. Or.),

document 39.  Each of the plaintiffs has tendered a declaration of comparable

import.

In *Willis*, the strong public policy was reflected in a statute only applicable to consumer

contracts.  But the Oregon Supreme Court has recently articulated a strong public policy

applicable here: "if the forum-selection clause is contained in a '"contract[ ] of adhesion" that

[was] "the product of unequal bargaining power between the parties,"' the clause should be

disregarded." *Trinity v. Apex Directional Drilling LLC*, 363 Or. 257, 261, 434 P.3d 20 (2018),

*quoting Roberts v. TriQuint Semiconductors, Inc.*, 358 Or. 413, 427, 364 P.3d 328 (2015),

alternations in original, further citation omitted.

Accordingly, both reasons for invalidating the forum selection clause in *Willis* exist here as well.

2. <u>Prohibition on Punitive Damages</u>

The arbitration clause directs that "the arbitrator(s) may not under any circumstances * * * assess punitive or exemplary damages." Plaintiffs seek punitive damages on several claims.

In *Willis*, plaintiffs sought punitive damages under the federal Credit Repair Organizations Act and the Oregon Unlawful Trade Practices Act. 878 F. Supp.2d at 1226. Recognizing that "[w]ithout the availability of punitive damages, the most significant deterrent effect of these laws is lost," *Willis* held that prohibiting punitive damages was "against public policy" and "unreasonably favors" the proponent of that ban. *Id.* It therefore was unenforceable. *Id.*

To the extent that plaintiffs seek punitive damages on federal claims, *Graham Oil Co. v. Arco Products Co.*, 43 F.3d 1244, 1248 (9th Cir. 1994) compels the same conclusion here. To the extent that plaintiffs seek punitive damages on Washington common law claims, decisions of the Washington courts compel that conclusion. *Zuver,* 103 P.3d at 766; *Philpott v. Ernst & Young LLP,* 2010 WL 11406230 at *6 (W.D. Wash. 2010). Under Oregon law, a prohibition on punitive damages is a relevant factor in an unconscionability analysis. *Motsinger v. Lithia Rose-FT, Inc.*, 211 Or. App. 610, 626 and 626 n 14,156 P.3d 156 (2007).[14]

3, <u>Cost of Arbitration</u>

The Franchise Agreement effectively requires arbitration using AAA's Commercial Arbitration Rules.[15] Those rules potentially can impose unconscionable costs because they

---

[14]     *Motsinger* is discussed at greater length below at 25.

[15]     Specifically, it provides: "The proceedings will be conducted under the Commercial Arbitration Rules of the American Arbitration Association, or the rules of such other arbitration services organization as the parties otherwise may agree upon in writing." *See* Motion to

require the expenses of arbitration, including the arbitrator's compensation, to be divided equally between the parties. *E.g., Mendez*, 45 P.3d at 604.

The American Arbitration Association has tried to mitigate against this by providing in its Commercial Arbitration Rules that employment disputes, including matters involving "an independent contractor (working or performing as an individual and not incorporated)**,** will be subject instead to its Employment Rules.**"** Commercial Arbitration Rule R-1 *, adr.org/sites/default/files/Commercial-Rules-Web.pdf. 10 (visited April 2, 2021). However, franchisees here were required to incorporate, Motion to Compel, 4, making this safety valve inapplicable.

Plaintiffs' expert establishes that the cost of arbitrating arbitrability here is likely to be between $2,100 and $8,400, and the cost of arbitrating the merits is likely to run from $11,000 to $39,600. Szalai Dec, 5-6. The plaintiffs' declarations establish that they do not have the resources to pay half of these arbitration costs. Under both Oregon and Washington law, arbitration costs are unconscionable when they are "sufficiently onerous to act as a deterrent to plaintiffs' vindication of their claim." *Vasquez-Lopez*, 210 Or. App. at 574. *Accord: Mendez*, 45 P.3d at 605 ("prohibitive costs [that] are likely to render the arbitral forum inaccessible").

4,     The Non-mutual Exemption for Injunctive Relief

Section 19A of the Franchise Agreement generally dictates that "all disputes, claims and controversies between the parties * * * will be resolved by arbitration. Section 19B creates a single exception: "if you [i.e., the Franchisee] breach or threaten to breach any of the terms of the Agreement, we [i.e., the Franchisor] will be entitled to injunctive relief restraining such breach

---

Compel, 7. The only other arbitration services organization in Minneapolis which has its own rules, to plaintiffs' knowledge, is JAMS. Its default rule also provides that arbitration costs be divided equally between the parties. JAMS Consolidated Arbitration Rules and Procedures Rule 31(a). www.jamsadr.com/rules-comprehensive-arbitration/#Rule-31 (visited April 2, 2021).

and/or a decree of specific performance * * * made by a court having proper jurisdiction." Cain
Dec, Ex B, Franchise Agreement, §19 B. Franchisees have no similar right to seek equitable
relief in court.

In *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1285-87 (9th Cir. 2006), the *en banc*
Ninth Circuit applying California law held that a "contract [that] gives MailCoups access to a
judicial forum to obtain provisional remedies to protect its intellectual property, while it provides
Nagrampa with only the arbitral forum to resolve her claims" was substantively unconscionable.
The Washington Supreme Court recently reached the same result in *Burnett*, 470 P.3d at 497.

In Oregon, such provisions are not *per se* unconscionable. *Hatkoff v. Portland Adventist
Medical Center,* 252 Or. App. 210, 220-21, 287 P.3d 1113 (2012); *Motsinger*, 211 Or. App. at
619-27. Rather, Oregon cases require examination of the effect of non-mutuality in the context
of the entire contract.

This analysis is most fully developed in *Motsinger*, which adopts "an approach that
focuses on the one-sided *effect* of an arbitration clause – rather than on its one-sided
*application*." 211 Or. App. at 623, emphasis in original. Thus, a court applying Oregon
unconscionability law examines "whether plaintiff's opportunity to vindicate her rights in an
arbitral forum, when compared to the remedies available to defendant, is substantively
unconscionable." *Id,* at 625.

In *Motsinger*, the Oregon Court of Appeals stressed what that arbitration clause "does not
do." *Id.* at 626. Among other things, that court noted "the arbitration clause does not impose
any limits on the type or amount of recovery that can be awarded by the arbitrator," and
specifically observed that it did not exclude punitive damages. *Id.* It distinguished the leading
California case, *Armendariz v. Foundation Health Psychcare,* 24 Cal.4th 83, 99 Cal.Rptr.2d 745,

6 P.3d 669 (2000), on the grounds that "the agreement in *Armendariz* included significant damages limitations." 211 Or. App. at 626 n 14. Here too there is a significant limitation, the prohibition on punitive damages.

In *Twilleager,* 2011 WL 1637469 at *9-10, a nonmutual arbitration clause was held to be unconscionable under Oregon law when it was paired with several other terms including a North Dakota forum selection clause "that impose a heavy burden on the employee." This case is comparable.

D.  Washington and Oregon Law Require the Arbitration Clause Be Invalidated

The plaintiffs' inability to comprehend written English and defendants' failure to inform them of the arbitration requirement satisfies the surprise element of procedural unconscionability. "Merely excising the offensive substantive provisions would not cure that unfairness." *Vasquez-Lopez*, 210 Or. App. at 577. The Oregon Court of Appeals identified "[a]n additional consideration" for invalidation: "curing unconscionable contracts by severing the unconscionable provisions provides those who draft such contracts no disincentive to including such provisions in the first instance." *Id.*, 210 Or. App. at 577 n7.

In *McKee v. AT&T Corp.,* 164 Wash.2d 372, 191 P.3d 845, 860-861, the Washington Supreme Court dealt with an arbitration clause which contained "four unconscionable terms." It held that "when unconscionable provisions so permeate an agreement, we strike the entire section or contract" because "they taint the entire dispute resolution section." *Id.*, 191 P.3d at 860.

*McKee* also was concerned with the adverse societal consequences of "[p]ermitting severability * * * in the face of a contract that is permeated with unconscionability." *Id.* at 861.

Doing so would "encourage[ ] those who draft contracts of adhesion to overreach." *Id.* This is so because, "[i]f the worst that can happen is the offensive provisions are severed and the balance enforced, the dominant party has nothing to lose by inserting one-sided, unconscionable provisions." *Id. See also Gandee v. LDL Freedom Enterprises, Inc.*, 176 Wash.2d 598, 293 P.3d 1197, 1202 (2013).

*Vasquez-Lopez* and *McKee* dictate that this Court invalidate section 19 of the Franchise Agreement.

VI.

ILLEGALITY AND ECONOMIC DURESS REQUIRE NULLIFICATION

A.  Introduction

Only the Oregon Plaintiffs claim economic duress as a defense. Washington takes a far more restrictive view of that doctrine which the Washington Plaintiffs agree they cannot satisfy. Subsection C will establish the existence of economic duress under Oregon law.

Only the Washington Plaintiffs, in subsection D, make a separate argument about illegality. Under *Bagley*, 356 Or. at 555 n6, the "practical effect" of unconscionability and illegality are usually "identical," as they are here.

Plaintiffs will begin with a summary of the applicable facts, drawn from the Complaint, in subsection B.

B.  Applicable Facts

The Defendants misled the Plaintiff-Buyers into signing franchise agreements through misrepresentations about how much money they could earn "based on the amount of money that was paid as franchisee fees," Complaint, ¶79(b). The defendants also did not disclose that nearly all prior franchises had failed, were terminated, or earned far less than Defendants had promised,

*Id.,* ¶79(c), and misrepresented royalty fees as administrative fees, *Id.* at ¶103-105.  When the Plaintiffs had unsustainably low earnings, the Defendants induced them "to pay additional franchise fees and enter into new franchise agreements * * * [on] empty promises that they would earn more."  *Id.,* ¶113; *see, e.g., Id.* ¶¶173, 204.

Certain Plaintiffs[16] allege Defendants NMC and Marsden violated the forced labor prohibitions of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1589.  Complaint, ¶¶822-28.  The core of these allegations is that the Defendants used Plaintiffs' substantial investments in the franchises to force them to continue working, leveraging their dismal earnings and the threat of financial harm and abuse of legal process arising out of the contracts themselves,

C.  Economic Duress

In Oregon, an economic distress defense to enforcement of a contract requires proof of "(1) wrongful acts or threats, (2) financial distress caused by those wrongful acts or threats, and (3) the absence of any reasonable alternative to the terms presented by defendants."  *Eulrich v. Snap-On Tools Corp.*, 121 Or. App. 25, 31, 853 P.2d 1350, *rev. denied,* 317 Or. 583 (1993), *vacated on other grounds*, 512 U.S. 1231 (1994).[17]

The facts in *Eulrich*, where the Court held the underlying contract was not enforceable due to economic duress, are analogous to those of the Oregon Plaintiffs.   Eulrich was a Snap-On auto parts dealer.  Snap-On "fraudulently induced Plaintiff to enter into the dealership agreement by misrepresenting to him the earning potential of the dealership."  121 Or. App. at 28.  As the

---

[16]      The Escobar, Aceituno, Martinez, Umana, Alfaro, Vásquez, Dominguez, Garcia, Sanchez, Denbel, Madrigal, Lopez, Ramirez, and Solis Plaintiff Groups.  Complaint. ¶822.

[17]      *Eulrich's* punitive damages ruling was vacated by the United States Supreme Court.   Its other holdings have been recognized as precedent.  *E.g., Venture Properties, Inc. v. Parker*, 223 Or. App. 321, 349, 195 P.3d 470 (2008)

promises of profitability proved false, the plaintiff was in a financially untenable position, and he tried to return the Snap-On tools for a refund. *Id.* at 29-30. The Snap-On representative pressured him to sign a "termination agreement" he did not have the opportunity to review. *Id.* at 30. Unbeknownst to the plaintiff, that agreement included a release of all claims arising out of the terminated agreement. *Id.* Under these circumstances, the court determined the plaintiff was entitled to rescind the release. *Id.* at 31.

The allegations in the Complaint establish all three elements of the Oregon test for economic duress. Accordingly, the Oregon Plaintiff-Buyers' franchise agreements, including any purported agreements to arbitrate, are unenforceable.

D. Illegality

The Washington franchise agreements are illegal under state and federal law and therefore none of their provisions, including the dispute resolution section, can be enforced. In Washington, "'it is the general rule that a contract which is contrary to the terms and policy of an express legislative enactment is illegal and unenforcible [sic]." *Jordan v. Nationstar Mortgage, LLC*, 185 Wash. 2d 876, 374 P.3d 1195, 1199, 1202 (2016), internal quotations and citation omitted (contractual provision permitting lender to lock out defaulting borrower prior to foreclosure "conflict[s] with state law" and is "unenforceable").[18]

Here, the arbitration agreement essentially functioned as an instrumentality of violations of the TVPA and the Racketeering and Corrupt Organizations Act ("RICO"). Plaintiffs have alleged that Defendants, through their enterprises, engaged in a pattern of mail fraud and wire

---

[18] The only exception is if "a contract violates a business statute or regulation," in which case "the contract is not void unless the act expressly provides for invalidation of the conflicting contract provisions." *Parker v. Tumwater Family Practice Clinic*, 118 Wash App 425, 432-433 (2003). Plaintiffs are not claiming illegality of the contract based in a violation of a business statute or regulation.

fraud to induce Plaintiffs to enter into the franchise agreements.  Complaint, ¶¶684-712.  The

mail and wire fraud itself violated federal law.  28 U.S.C. §§1341 and 1343.  By engaging in a

pattern of committing violations, Defendants also violated 18 U.S.C. § 1962(c).

In *Nuang-Tanedo v. East Baton Rouge Parish School Board*, 790 F. Supp. 2d 1134,

1137-39 (C.D. Cal. 2012), the plaintiffs paid substantial recruitment fees for jobs as

schoolteachers. *Id.* at 1137-1139.  Defendants then added more fees knowing plaintiffs could not

afford to forfeit the money they had already paid. *Id.* The court found this threat of financial

harm, if proven, would violate the TVPA's forced labor prohibition.  *Id.* at 1145.[19]

The Washington Plaintiff-Buyers allege that the Defendants violated R.C.A. § 9A.60.030

by obtaining their "signatures on written instruments—the franchise agreements—by knowingly

misrepresenting information about the Washington Plaintiff-Buyers' prospective earnings,

employment status, terms and conditions of employment, and fees."  Complaint, ¶756. This

constitutes one of the two predicate acts the Defendants committed that make up the Washington

Plaintiff-Buyers' claims under the Criminal Profiteering Act ("CPA").  R.C.W. §§ 9A.82.60 and

9A.82.100.

One remedy for such a violation is the forfeiture of "any contractual right * * * used to

influence any enterprise that a person has established, operated, controlled, conducted, or

participated in the conduct of, in violation of [the CPA]."  R.C.W. § 9A.82.100(4)(f)(ii).  The

franchise agreements are the contractual tool which the Defendants used to conduct their

enterprises.  *See generally* Complaint, §§743-767.

The franchise agreements themselves function as instrumentalities of Defendants'

racketeering and violate federal and state law.  Accordingly, the Franchise Agreements signed by

---

[19]	In contrast with the Plaintiffs here, the school teachers were highly educated and fluent English speakers.

Washington Plaintiff-Buyers, including their agreements to arbitrate, are illegal and unenforceable.

## VII.

## NON-SIGNATORIES MARSDEN AND NATIONAL MAINTENANCE CONTRACTORS CANNOT COMPEL ARBITRATION

Plaintiffs agree the D&O Defendants have the same ability as NMC Franchising to seek to enforce provisions of the Franchise Arbitration.  But under Ninth Circuit precedent, Marsden and National Maintenance Contractors, to the extent the latter is not a signatory, do not.[20]

The Ninth Circuit recently clarified that, when as here plaintiffs allege federal law claims and the court has federal question jurisdiction, the court "appl[ies] 'federal substantive law,' for which we look to 'ordinary contract * * * principles,' in determining the arbitrability of federal claims * * * against nonsignatories to an arbitration agreement." *Setty v. Shrinivas Sugandhalaya, LLP*, 986 F.3d 1139, 1141 (9th Cir. 2021), *quoting Letizia v. Prudential Bache Securities, Inc.*, 802 F.2d 1185, 1187 (9th Cir. 1985).  As *Setty* confirms, the Ninth Circuit has "never previously allowed a non-signatory defendant to invoke equitable estoppel against a signatory plaintiff[.]"  986 F.3d at 1142, *quoting Rajagopalan v, NoteWorld, LLC*, 718 F.3d 844, 847 (9th Cir. 2013).

*Rajagopalan* was, like *Willis,* a lawsuit arising out of a debt settlement program in which the plaintiff filed RICO and Washington state law claims against NoteWorld, the payment processor.  *Id.* at 845-46.  The Ninth Circuit explained its decision to "decline to expand the

---

[20]     Some plaintiffs may have claims against National Maintenance Contractors under franchise agreements to which it is a signatory.  The arguments in this section do not apply to such contracts.

[equitable estoppel] doctrine" as based on the fact the plaintiff did not allege breach of contract but instead "statutory claims that are separate from the contract itself." *Id.* at 847, internal quotations and alternation omitted.[21]

Assuming Oregon state law is applied to the equitable estoppel argument directed toward the state law claims,[22] the non-signatories fare no better. Under Oregon law, "it is the text of the arbitration clause that will determine whether the parties to the agreement intended that third parties could enforce its provisions." *Livingston v Metropolitan Pediatrics, LLC,* 234 Or. App. 137, 150, 227 P.3d 796 (2010).

---

[21]   *Willis v. Nationwide Debt Settlement Group*, 2012 WL 13055512 (D. Or. 2012), on which Defendants principally rely (Motion to Compel, 20-21), cannot be harmonized with *Rajagopalan.* Defendants accurately summarize the context of the equitable estoppel issue in that case, Motion to Compel, 20. Plaintiffs, "who had entered into debtor services agreements," alleged "violations of federal and state laws" against "Nationwide's back-end services processor, Debt Care." *Id.*

*Willis* recognized the Ninth Circuit had previously expressly refused to apply equitable estoppel in similar circumstances in *Mundi v. Union Security Life Insurance Co.*, 555 F.3d 1042 (9th Cir. 2009). *Willis,* 2012 WL 13055512 at *7. But *Willis* believed this doctrine could be employed because the claims against Debt Care of "violations of federal and state law" were "committed * * * pursuant to the relevant agreements with Plaintiffs * * * that provide[ ] for arbitration." *Id.* After *Rajagopalan*, the proper analysis requires rejecting the equitable estoppel argument because those statutory claims are separate from a claim based on the agreements.

Defendants' accurate characterization of *Key Contracting, Inc. v. Contech International, LLC*, 2018 WL 2105376 (D. Or. 2018), Motion to Compel, 21, demonstrates the vast factual difference between that case and this one. Key had a contractual arbitration agreement with Contech. *Id.* at *1. Contech's successor corporation and that corporation's majority owner successfully invoked that agreement to compel arbitration of Key's counterclaims against them. *Id.* at *1, *4. These circumstances are analytically distinct from the present case. *Mundi*, 555 F.3d at 1046.

The argument in the text does not apply to plaintiffs' breach of contract claim.

[22]   Judge Sullivan recently noted "some uncertainty" on this question, which did not need to be resolved in that case. *Ortega v. Barrett Business Services, Inc.*, 2016 WL 5030396 at *6 and *6 n6, *adopted*, 2016 WL 5030397 (D. Or. 2016). For the reasons given in the text, that question does not need to be resolved here either.

A non-party cannot enforce an arbitration agreement that "applies only to disputes" between "the parties to the agreement." *Zweizig v. Rote*, 818 Fed. Appx. 645, 647 (9th Cir. 2020), *citing Bates v. Andaluz Waterbirth Center*, 298 Or. App. 733, 739-40, 447 P.3d 510 (2019). This is such an agreement. Section 20G makes plain in its final sentence that "this Agreement is not intended to, and will not be deemed, to confer any rights * * * upon any person or legal entity not a party to this Agreement." Cain Dec, Ex B, Franchise Agreement, §20G.

Accordingly, under both federal and state law, these non-signatories cannot employ the doctrine of equitable estoppel to force the arbitration of disputes pursuant to an arbitration agreement to which they are not parties.

## VIII.

## PLAINTIFFS ARE NOT MISJOINED

Thirty-five individuals are named as plaintiffs. They do not seek to maintain this case as a class action. Defendants misinterpret Federal Rule of Civil Procedure 20 in claiming they are misjoined.[23]

Rule 20 "is to be construed liberally." *League to Save Lake Tahoe v. Tahoe Regional Planning Agency*, 558 F.2d 914, 917 (9th Cir. 1977). Courts in this District thus have permitted joinder in circumstances similar to this case.

For example, in *Selman v. Pfizer, Inc.*, 2011 WL 6655354 at *1 (D. Or. 2011), three individuals alleged "that they developed breast cancer after using hormone replacement drugs manufactured by" Pfizer. Judge Simon, in rejecting Pfizer's argument that the plaintiffs had been fraudulently misjoined, held they were properly joined because their claims arose "from the

---

[23] Plaintiffs here only address joinder in litigation. If this Court were to compel arbitration, plaintiffs request leave to brief Defendants' alternative argument that arbitration should proceed individually.

same series of transactions," namely, "the manufacture and marketing of the hormone replacement therapy drugs at issue." *Id.* at 12.

Similarly, in *John Doe 105 v. Archdiocese of Portland*, 2008 WL 1138964 at *4 (D. Or. 2008), Judge Papak held two plaintiffs were properly joined when they alleged that, as grade school students in McMinnville, they had "suffered similar forms of ill treatment at the hands of the same abuser during overlapping time periods." Thus, their claims arose "out of a series of related occurrences and raise common questions of law," namely *respondeat superior*. *Id.* Therefore, "it would clearly advance judicial economy to permit claims with such similar factual underpinnings to go forward as one action." *Id.*

And in *McClellan v. I-Flow Corp.*, 2010 WL 11595942 at *1-2 (D. Or. 2010), Judge Aiken relied in part on Rule 20 in consolidating for trial the claims of several plaintiffs who alleged "the same claims of negligence and product liability" against a manufacturer of pain pumps that caused the same injury to each plaintiff. Judge Aiken recognized the cases would involve a number of plaintiff-specific issues, but concluded "the interests of convenience, efficiency and judicial economy outweigh the risk of confusion and potential prejudice, given the common legal and factual issues." *Id.* at 3-4.[24]

The Complaint alleges that NMC and its agents made the same series of representations to Plaintiffs in order to induce them to purchase the franchises. The representations were either identical or substantially similar, and all had a central theme: the business model was sound and profitable and a franchise's earnings were based on the amount paid as franchise fees.

---

[24]     The strength of these precedents makes unnecessary an extended discussion of Defendants' authority. But it is worth noting that the basis for finding misjoinder in *Martinez v. Encore Credit Corp.*, 2009 WL 3233531 at * 2 (C.D. Cal. 2009) included the fact that the plaintiffs did not sue the same financial institution.

Defendants' fraudulent conduct fits snugly into the Ninth Circuit's definition of the "same transaction" as one having "similarity in the factual background of a claim," and that arises out of a "systematic pattern of events." *Coughlin v. Rogers*, 130 F.3d 1348, 1350 (9th Cir. 1997).

All Plaintiffs claim to have been misclassified as franchisees rather than employees. The Franchise Agreements were uniform and virtually identical. Moreover, they were not individually negotiated, and were induced by the same series of misrepresentations made by Defendants. Thus, Plaintiffs' claims arise from the same series of transactions or occurrences.

Defendants' reliance on *Papagiannis v. Pontikis*, 108 F.R.D. 177, 179 (N.D. Ill. 1985) is misplaced. That case involved "two victims" with "wholly separate encounters with a confidence man * * * follow[ing] the same routine in cheating each of them." *Id.* at 179. In contrast, Defendants purposefully sought out people primarily from immigrant communities, most of whom understood no more than elementary level English, and none of whom had a business background. Fully aware of language barriers and differences in bargaining positions, Defendants led Plaintiff-Buyers to believe that they would be able to control how much they earned monthly — never being transparent about critical terms outlined in the Franchise Agreement that Plaintiff-Buyers would ultimately sign. Moreover, Defendant treated Plaintiffs as employees, dictating the manner and means by which work was done by them. In short, the transactions between Defendants and Plaintiff constitute the "same . . . series of transactions or occurrences."

CONCLUSION

For the reasons argued above, the Motion to Compel should be denied and this case should proceed in court. If this Court concludes differently, then as in *Brockie*, 2019 WL 4935616 at *5 and *5 n4, this case should be dismissed without prejudice.[25]

DATED: April 5, 2021.

> LAW OFFICE OF D. MICHAEL DALE
> NORTHWEST WORKERS' JUSTICE PROJECT
> RADFORD & KEEBAUGH, LLC
>
> /s/ D. Michael Dale
>
> D. Michael Dale, OSB No. 771507
>
> Daniel Werner, GSB No. 422070, *pro haec vice*
>
> Mayra A. Ledesma, OSB No. 183942
>
> Of Attorneys for Plaintiffs
>
>
> Phil Goldsmith, OSB No. 782230, notice of appearance forthcoming

---

[25] Should this Court grant the Motion to Compel, Plaintiffs ask for leave to brief whether the arbitrations of the Washington plaintiffs should take place in Washington or Minneapolis. *See* Motion to Compel, 29 n 10.