IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MAURA ESCOBAR *et al.*,                                          Case No. 3:20-cv-01695-SB

            Plaintiffs,                                  **OPINION AND ORDER**

     v.

NATIONAL MAINTENANCE
CONTRACTORS, LLC *et al.*,

          Defendants.

_____

**BECKERMAN, U.S. Magistrate Judge.**

     Plaintiffs, thirty-three individual franchise owners and employees, filed this action

against defendants National Maintenance Contractors, LLC ("NMC"), NMC Franchising,

Marsden Services, LLC ("Marsden"), and NMC Franchising directors and officers Gregg

McDonald, Noe Vallardes, Jim Wade, Ryan Lee, Jesse Wilmore, Steven Watkins, Lise Watkins,

and Guy Mingo (the "D&O Defendants") (together, "Defendants"). Plaintiffs allege that

Defendants engaged in unlawful franchising practices and assert seventeen claims for violations

of state and federal law.

     Before the Court is Defendants' motion to compel arbitration. (ECF No. 39.) The Court

has jurisdiction over this matter under 28 U.S.C. §§ 1331, 1337, and 1367, and all parties have

consented to the jurisdiction of a U.S. Magistrate Judge pursuant to 28 U.S.C. § 636. For the

reasons discussed below, the Court grants Defendants' motion to compel arbitration.

**BACKGROUND**[1]

## I.    THE PARTIES

Plaintiffs are thirty-three individuals who either owned or operated an NMC franchise

("Plaintiff-Buyers"), or who worked in the franchised businesses ("Plaintiff-Employees").

(Second Am. Compl. ("SAC") ¶¶ 20-35; id. Ex. 1.)

NMC is a Washington-based janitorial and building maintenance services company.

(SAC ¶¶ 1, 77.) NMC Franchising is the NMC's franchisor. (Id. ¶ 3.) Marsden is an affiliated

sister company of NMC Franchising that provides administrative services to several companies

within the Marsden family of companies, including NMC Franchising. (Id. ¶ 2; Decl. of Peter

Cain ("Cain Decl.") ¶ 8, ECF No. 40.) Marsden acquired NMC in 2006. (SAC ¶ 2.)

The D&O Defendants served in the following capacities for NMC Franchising: Gregg

McDonald as the regional director (id. ¶ 44); Noe Valladares as the director and chief executive

officer ("CEO") (id. ¶ 46); Jim Wade as the director of franchising (id. ¶ 48); Ryan Lee as a

district manager (id. ¶ 50); Jesse Wilmore as a regional director for the western Washington

branch (id. ¶ 52); Steven Watkins as a director of operations (id. ¶ 54); and Lise Watkins as a

quality control manager (id. ¶ 57). Guy Mingo was the CEO for Marsden and a manager of NMC

Franchising. (Id. ¶¶ 58-59.)

///

---

[1] "When evaluating a motion to compel arbitration, courts treat the facts as they would
when ruling on a motion for summary judgment, construing all facts and reasonable inferences
that can be drawn from those facts in a light most favorable to the non-moving party." *Totten v.
Kellogg Brown & Root, LLC*, 152 F. Supp. 3d 1243, 1249 (C.D. Cal. 2016) (citation and
quotation marks omitted).

## II.    THE FRANCHISE AGREEMENT

Between 2001 and 2017, Plaintiff-Buyers purchased janitorial service franchises from NMC Franchising. (SAC ¶¶ 416, 438.) Each Plaintiff-Buyer signed a franchise agreement that included the following arbitration agreement:

> [A]ll disputes, claims and controversies between the parties arising under or in connection with this Agreement or the making, performance or interpretation thereof (including claims of fraud in the inducement and other claims of fraud in the arbitrability of any matter) will be resolved by arbitration on an individual basis under the authority of the Federal Arbitration Act in Minneapolis, Minnesota.

(Cain Decl. Exs. B-R-1 ("Arbitration Agreement").)

## III.    THE LAWSUIT

On September 30, 2020, Plaintiffs filed this action alleging that Defendants engaged in unlawful franchising practices by misclassifying Plaintiffs as franchisees rather than employees. Plaintiffs assert seventeen claims for violations of federal and state wage and hour laws, the Racketeer Influenced and Corrupt Organizations Act (RICO), and state law claims for fraudulent misrepresentation, economic duress, and breach of contract. On February 9, 2021, Defendants filed a motion to compel arbitration. (Defs.' Mot. to Compel, ECF No. 39.)

## DISCUSSION

## I.    LEGAL STANDARDS

The Federal Arbitration Act ("FAA") "provides that any arbitration agreement within its scope shall be valid, irrevocable, and enforceable, and permits a party aggrieved by the alleged refusal of another to arbitrate to petition any federal district court for an order compelling arbitration in the manner provided for in the agreement." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000) (simplified). "The FAA requires federal district courts to stay judicial proceedings and compel arbitration of claims covered by a written and

enforceable arbitration agreement." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (citation omitted); *Chiron*, 207 F.3d at 1130 ("[T]he Act 'leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.'") (citation omitted).

"The FAA limits the district court's role to determining whether a valid arbitration agreement exists, and whether the agreement encompasses the disputes at issue." *Nguyen*, 763 F.3d at 1175 (citing *Chiron*, 207 F.3d at 1130). "Like other contracts, arbitration agreements can be invalidated for fraud, duress, or unconscionability." *Chavarria v. Ralphs Grocery Co.*, 733 F.3d 916, 921 (9th Cir. 2013) (citing *AT & T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)). In determining whether an arbitration agreement encompasses the dispute at issue, courts must be mindful that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986). "[A]s a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Optimum Prods. v. Home Box Off.*, 839 F. App'x 75, 77 (9th Cir. 2020) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983)).

## II.    ANALYSIS

Plaintiffs oppose Defendants' motion to compel on the following grounds: (1) Plaintiff-Buyers did not consent to the Arbitration Agreement; (2) Plaintiff-Employees cannot be compelled to arbitrate; (3) nonsignatory defendants Marsden and NMC cannot enforce the Arbitration Agreement against Plaintiffs; (4) the Arbitration Agreement is unconscionable; and

(5) the franchise agreement is unenforceable due to economic duress and illegality of its terms. The Court addresses each argument in turn.

### A.    Contract Formation[2]

#### 1.    Plaintiff-Buyers

Plaintiffs argue that the Plaintiff-Buyers did not assent to the Arbitration Agreement because (1) they lacked sufficient English language proficiency to understand the arbitration provisions and (2) Defendants did not explain the Arbitration Agreement or advise them of the consequences of signing it. (Pls.' Opp'n to Defs.' Mot. to Compel ("Pls.' Opp'n") at 7, 11.)

As the party seeking to compel arbitration, Defendants have "the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014). Federal courts determine whether parties have entered into a binding arbitration agreement by "apply[ing] ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (citations omitted). Because Plaintiff-Buyers signed the franchise agreements in both Oregon and Washington, the Court applies Oregon and Washington law to determine if the agreements are valid.

To form a valid contract, the contracting parties must objectively manifest their mutual assent. *See Rhoades v. Beck*, 260 Or. App. 569, 572 (2014) ("Oregon subscribes to the objective theory of contract, which provides that the existence and terms of a contract are determined by

---

[2] Courts, not arbitrators, must resolve challenges to contract formation. *See Brown v. Stored Value Cards, Inc.,* 3:15-cv-01370-MO, 2016 WL 755625, at *2 n.1 (D. Or. Feb. 25, 2016) (noting that "whether [the parties] formed the [arbitration] agreement is for district courts to decide"); *Kum Tat Ltd. v. Linden Ox Pasture, LLC*, No. 14-cv-02857-WHO, 2014 WL 6882421, at *4 (N.D. Cal. Dec. 5, 2014) ("Challenges to a contract's very existence[,] as opposed to its continued validity, are decided by the court.").

evidence of the parties' communications and acts."); *Weimin Chen v. Sierra Trading Post, Inc.*, No. 2:18-cv-1581-RAJ, 2019 WL 3564659, at *4 (W.D. Wash. Aug. 6, 2019) ("To determine mutual assent, Washington courts follow the objective manifestation theory of contracts, meaning they look to the reasonable meaning of the contract language instead of the subjective intent of the parties." (citing *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wash. 2d 493, 505 (2005))). In both Oregon and Washington, "the law requires only evidence of 'mutual assent,' whether that assent is expressed through an offer and an acceptance or is manifested by conduct." *Citibank S. Dakota N.A. v. Santoro*, 210 Or. App. 344, 349 (2006) (citation omitted); *accord Keystone Land & Dev. Co. v. Xerox Corp.*, 152 Wash. 2d 171, 177-78 (2004) ("Generally, manifestations of mutual assent will be expressed by an offer and acceptance."); *Jacob's Meadow Owners Ass'n v. Plateau 44 II, LLC*, 139 Wash. App. 743, 765 (2007) ("The existence of mutual assent may be deduced from the circumstances.").

Plaintiff-Buyers argue that they did not assent to the Arbitration Agreement because they did not have "sufficient proficiency to read technical and legal English" when they signed the franchise agreements, Defendants "did not offer any of them a translation of the English language Franchise Agreement[,]" and Defendants did not "tell any of them that the Franchise Agreement required them to arbitrate disputes." (Pls.' Opp'n at 4-5.)

It is well settled under both Oregon and Washington law that "[a] party's failure to read a contract is no defense to enforcement of the contract absent special circumstances." *Torrance v. Aames Funding Corp.*, 242 F. Supp. 2d 862, 869 (D. Or. 2002) (quoting *Knappenberger v. Cascade Ins. Co.*, 259 Or. 392, 398 (1971)); *see also First Interstate Bank of Or., N.A. v. Wilkerson*, 128 Or. App. 328, 337 n.11 (1994) ("A person is presumed to be familiar with the contents of any document that bears the person's signature.") (citation omitted). "Where a party

has signed a contract without reading it, that party cannot successfully argue that mutual assent was lacking as long as the party was not deprived of the opportunity to read the contract, the contract was 'plain and unambiguous', the party was capable of understanding the contract, and no fraud, deceit, or coercion occurred." *Yakima Cnty. (W. Valley) Fire Prot. Dist. No. 12 v. City of Yakima*, 122 Wash. 2d 371, 389 (1993) (en banc) (citation omitted).

The record before the Court does not suggest that Plaintiff-Buyers were deprived of the opportunity to investigate any provisions they did not understand before deciding whether to sign the franchise agreement. Plaintiff-Buyers do not allege that they attempted to ask questions that went unanswered, or that they requested additional time to review the documents, take the franchise agreement home, consult with an attorney, or obtain a translation, and were refused.[3] Further, the current record does not support a conclusion that Defendants engaged in fraud, deceit, or coercion in connection with obtaining Plaintiff-Buyers' signatures on the franchise agreements. Under these circumstances, the Plaintiff-Buyers' inability to read or understand the technical or legal terms in the franchise agreement is not a valid defense to enforcing the Arbitration Agreement. *See, e.g.*, *Molina v. Scandinavian Designs, Inc.*, No. 13-cv-04256, 2014 WL 1615177, at *4 (N.D. Cal. Apr. 21, 2014) (finding that "Molina's inability to read English does not relieve him of the duty to learn the contents of the contract before signing" and therefore "the undisputed facts establish that Molina assented to the Arbitration Agreement").[4]

---

[3] In fact, nine of the fifteen Plaintiff-Buyers acknowledge they were given a Franchise Disclosure Document (which included a complete copy of the franchise agreement) to review at least fourteen days before signing the franchise agreement. (*See* Decl. of Juan Aceituno ("Aceituno Decl.") ¶¶ 10-12; Decl. of Victor Hugo Garcia ¶¶ 8-10; Decl. of Martha Dominguez ¶¶ 10, 13; Decl. of Maura Escobar ¶¶ 10, 12; Decl. of Ignacio Lopez ¶¶ 9-12; Decl. of Zetzael Madrigal ¶¶ 11-20; Decl. of Efrain Martinez ¶¶ 16-17; Decl. of Alejandro Sanchez ("Sanchez Decl.") ¶¶ 10-12; Decl. of Lilena Vázquez ¶¶ 5-6.)

[4] *See also Soto v. State Indus. Prods., Inc.*, 642 F.3d 67, 78 (1st Cir. 2011) ("[I]t is a general and well established principle of contract law that 'one who is ignorant of the language

Furthermore, Defendants were under no obligation to explain the nuances of the franchise agreement to Plaintiffs, translate the agreement, nor highlight the arbitration clause therein. *Cf. Hermosillo v. Davey Tree Surgery Co.*, No. 18-cv-00393-LHK, 2018 WL 3417505, at *12 (N.D. Cal. July 13, 2018) (noting that the employer was not required to "explain the nuances of each contract to each employee," "translate each contract into each of its employees' native languages," nor do "Defendants ha[ve] some special obligation to highlight the Arbitration Agreement because it was an agreement to arbitrate, as opposed to any other type of contract").

Based on the record before the Court, the Court concludes that the Plaintiff-Buyers assented to the Arbitration Agreement. It is undisputed that each Plaintiff-Buyer received and signed the franchise agreement, operated an NMC franchised business, and accepted payments under the franchise agreements. These acts demonstrate Plaintiff-Buyers' objective assent to the terms of the franchise agreement, including the arbitration provision included therein.[5] *See, e.g.*,

---

in which a document is written, or who is illiterate,' may be bound to a contract by negligently failing to learn its contents."); *Morales v. Sun Constructors*, 541 F.3d 218, 222 (3d Cir. 2008) ("In the absence of fraud, the fact that an offeree cannot read, write, speak, or understand the English language is immaterial to whether an English-language agreement the offeree executes is enforceable."); 1 WILLISTON ON CONTRACTS (4th ed.) § 4:19 ("[O]ne who is ignorant of the language in which a document is written, or who is illiterate, [who] executes a writing proposed as a contract under a mistake as to its contents . . . is bound.").

[5] The cases on which Plaintiffs rely are distinguishable. For example, in *Solis v. ZEP LLC*, No. 19-4230, 2020 WL 1439744, at *5 (S.D.N.Y. Mar. 24, 2020), the court held that the arbitration agreement was unenforceable because the plaintiff, a restaurant delivery worker who could not read English, was presented with an arbitration agreement while at work and was made to sign the agreement "on the spot" without "a meaningful opportunity to have the agreement translated." *Solis*, 2020 WL 1439744, at *5; *see also Mikeladze v. Raymours Furniture Co.*, No. 20-2224, 2020 WL 7240379 (E.D. Pa. Dec. 8, 2020) (finding that the plaintiff had "no meaningful opportunity to learn of the arbitration provisions in the agreement" because "he was not allowed to take [the agreement] home to review and have translated"). In *Hermosillo*, the plaintiffs did not sign the arbitration agreement, and it was unclear if they had received it. *See* 2018 WL 3417505, at *12 ("The Court stresses that its finding is specific to the facts of this case. The Court does not broadly hold that employers must explain the nuances of each contract to each employee, nor does the Court hold that employers must translate each contract into each of its employees' native languages."). In contrast here, Plaintiff-Buyers do not dispute that they

*Chico v. Hilton Worldwide, Inc.*, No. CV 14-5750-JFW (SSx), 2014 WL 5088240, at *6 (C.D. Cal. Oct. 7, 2014) ("By signing the documents, Plaintiff manifested his assent to the . . . Arbitration Agreements. Accordingly, in the absence of any alleged fraud, overreaching, or excusable neglect, Plaintiff is deemed to have assented to all of the terms of these agreements whether or not he actually understood them or whether or not he could even read them."). Accordingly, the Plaintiff-Buyers are bound by the terms of the Arbitration Agreement.

### 2.    Plaintiff-Employees

Defendants argue that the Plaintiff-Employees, who are nonsignatories to the Arbitration Agreement, are bound by the Arbitration Agreement under the theory of equitable estoppel.[6] (Defs.' Mot. to Compel at 16-23.) The Court agrees.

"Generally, parties who have not assented to an arbitration agreement cannot be compelled to arbitrate under its terms." *Namisnak v. Uber Techs., Inc.*, 971 F.3d 1088, 1094 (9th Cir. 2020) (quoting *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960)). However, "[t]he United States Supreme Court has held that a litigant who is not a party to an arbitration agreement may invoke arbitration under the FAA if the relevant state contract law allows the litigant to enforce the agreement." *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1128 (9th Cir. 2013) (citation omitted). "General contract and agency principles apply in determining the enforcement of an arbitration agreement by or against nonsignatories." *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1045 (9th Cir. 2009) (citing *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006)). These principles include equitable estoppel. *Id.*

---

received and signed the franchise agreements, and they do not allege that Defendants forced them to sign the agreements immediately upon receipt.

[6] Plaintiff-Employee Jorge Garcia is the only non-relative plaintiff who worked for the Plaintiff-Buyers' franchises. (SAC ¶ 126.)

"Equitable estoppel precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes." *Mundi*, 555 F.3d at 1045. A nonsignatory may be compelled to arbitrate his claims when he (1) "knowingly exploits the benefits of the agreement" and (2) "receives benefits flowing directly from the agreement." *Eclipse Consulting, Inc., v. BDO USA, LLP*, No. 3:17-cv-826-AC, 2018 WL 6735085, at *6 (D. Or. Nov. 13, 2018) (quoting *Nguyen*, 763 F.3d at 1179).

"A nonsignatory knowingly exploits an agreement when it undertakes some affirmative action to benefit from the agreement, and is aware of the agreement from which the benefit is sought." *Legacy Wireless Servs., Inc. v. Hum. Cap., L.L.C.*, 314 F. Supp. 2d 1045, 1056 (2004). Conversely, "a nonsignatory does not knowingly exploit an agreement when participation is merely passive and the nonsignatory does not seek to enforce the terms of the agreement or otherwise take advantage of them." *Eclipse Consulting*, 2018 WL 6735085, at *7 (citing *Comer*, 436 F.3d at 1102).

Plaintiffs argue that the Plaintiff-Employees did not knowingly exploit the franchise agreement because they assert only statutory claims that are independent of, and do not seek to enforce, the terms of the franchise agreement. (Pls.' Opp'n at 8-12.) The Court disagrees.

As an initial matter, Plaintiffs do not dispute that the Plaintiff-Employees were aware of the franchise agreements, as the Plaintiff-Employees are either the spouses or children of the Plaintiff-Buyers, or were present at the meetings where Plaintiff-Buyers signed the franchise agreements.[7]

---

[7] Seven of the nineteen Plaintiff-Employees acknowledge being present at the meeting where the Plaintiff-Buyer signed the franchise agreement. *See* Maura Escobar Decl. ¶¶ 12, 14 ("My daughter, Plaintiff Raquel Escobar, also attended the meetings with me . . . . My daughter interpreted certain portions of the meeting."); Decl. of Raquel Escobar ¶ 7 ("I was present at the initial meeting that NMC Franchising [] held with my family, and at every meeting after that.");

As to whether the Plaintiff-Employees took any affirmative action to benefit from the franchise agreement or seek now to take advantage of its terms, the franchise agreements expressly require that the Plaintiff-Buyers hire employees for their franchise, obtain workers compensation insurance, and comply with all laws pertaining to their franchise employees.[8] Thus, the Plaintiff-Employees directly benefitted from the franchise agreements by performing services and receiving compensation pursuant to the rights and duties provided therein.[9] *See*

*Kairy v. Supershuttle Int'l, Inc.*, No. C 08-02993 JSW, 2012 WL 4343220, at *9 (N.D. Cal. Sept.

_____

Decl. of Concepcion Solis ("C. Solis Decl.") ¶ 22 (stating that her daughter and Plaintiff-Employee, Jessica Ramirez, "attended the meeting to assist with translation"); Decl. of Gerardo Ramirez-Solis ¶¶ 9, 11 (stating he was present at the meeting and assisted with translation when his parents, Plaintiff-Buyers Gerardo Ramirez-Cruz and Concepcion Solis, signed the franchise agreement); Decl. of Jorge Garcia ¶ 11 ("I attended a meeting with Mr. Valladares, Gregg McDonald, Ulisar Morales, and Justa Morales at NMC's Tigard office to purchase the franchise."); Decl. of Ulisar Morales ¶ 15 ("A meeting was scheduled with Noe Valladares, a representative from NMC Franchising, LLC . . . my mother Justa Morales, Plaintiff Jorge Garcia, and myself on September 30, 2017."); Sanchez Decl. ¶ 11 (stating that his wife, Plaintiff-Employee Hilda Arvizu, attempted to read through the franchise agreement); Decl. of Martha Dominguez ¶¶ 10, 13 (noting that her husband, Plaintiff-Employee Marco Servin, attended both meetings between her and NMC franchise representatives). In addition, it appears that three Plaintiff-Employees were former NMC franchisee owners, and thus were familiar with the franchise agreements. (*See* C. Solis Decl. ¶¶ 18, 20, 27, 36, noting that she and her husband, Gerardo Ramirez-Cruz, purchased two franchises in 2010 and 2015, transferred the second franchise to their son in 2016, and now occasionally work as employees of the second franchise; Aceituno Decl. ¶¶ 11-12, 16, 18, stating that a year after purchasing a franchise, "the franchise was transferred into my wife's name").

[8] *See* Franchise Agreement, § 9(C) (providing that Plaintiff-Buyers "will hire all employees," "be exclusively responsible for the terms of their employment and compensation," "implement a training program," and "maintain at all times a staff of trained employees sufficient to operate the NMC Franchising Business that complies with NMC's standards"); *id.* § 9(G) (Plaintiff-Buyers "must comply with all laws and regulations respecting employment and labor, including all laws, regulations and ordinances relating to any obligation to pay any withholding taxes, social security, unemployment insurance, workers' compensation insurance, disability insurance, and employee benefits").

[9] The Court's finding also satisfies the "direct benefits" element of equitable estoppel. *See Eclipse Consulting*, 2018 WL 6735085, at *7 ("The 'direct benefits' requirement requires a nonsignatory to have obtained a benefit flowing directly from an agreement.") (citation omitted).

20, 2012) (holding that the plaintiffs, who were nonsignatory franchise employees asserting wage and hour claims against the franchisor, knowingly exploited the franchise agreement in part because (1) "[t]he claims made by the nonsignatory [plaintiffs] require that they participated actively and for compensation in the rights and duties described in the [agreements]"; and (2) "the language of the [agreements] clearly contemplated and permitted that the franchisees could hire [employees]"). In addition, any employment relationship between the Plaintiff-Employees and Defendants would not exist but for the franchises, and the Plaintiff-Employees now seek to rescind the relationships established by the franchise agreements to reach Defendants as their ultimate employer. *See Supershuttle Int'l, Inc. v. Aysov*, No. CIV 535204-08, 2015 WL 10388413, at *2 (Cal. Super. Dec. 23, 2015) ("[Plaintiffs] received financial benefits from the Franchise Agreement, and they now seek to enforce Labor Code statutes against [the franchisor]. The Labor Code claims are premised on a contention that [the plaintiffs] were employees of [the franchisor], a relationship which could exist, if at all, only through the Franchise Agreements."); *see also* SAC ¶ 7 ("Plaintiffs seek rescission of NMC's franchise agreement and demand that they be treated as employees[.]"). For these reasons, the Court finds that the Plaintiff-Employees knowingly exploited the rights and privileges granted by the franchise agreements and received benefits flowing directly from the agreements, and are therefore estopped from avoiding the arbitration clause in the franchise agreements. *See Aysov*, 2015 WL 10388413, at *2 ("Since [the plaintiffs] sought and received benefits from the Franchise Agreement and now seek to enforce legal rights through that agreement, [Plaintiffs] are estopped from disavowing applicability of the arbitration provision in that agreement.").

///

///

### 3.      Marsden and NMC[10]

The parties dispute whether nonsignatory defendants Marsden and NMC may enforce the terms of the Arbitration Agreement against Plaintiffs.[11] (Defs.' Mot. to Compel at 20-22.) Defendants assert that the Court should estop Plaintiffs from avoiding arbitration of their claims against Marsden and NMC because Plaintiffs' claims are intertwined with and directly relate to the franchise agreement. (*Id.*) The Court agrees.

A nonsignatory may enforce an arbitration agreement against a signatory where the subject matter of the dispute is "intimately founded in and intertwined with the underlying contract obligations." *Kramer*, 705 F.3d at 1129; *see also Mundi*, 555 F.3d at 1047 (denying a nonsignatory's motion to compel arbitration on the basis of equitable estoppel because the claim was not "intertwined with the contract providing for arbitration," did not "arise out of" or "relate directly to" that contract, and did not "require the examination of any provisions of the [contract]").

According to Plaintiffs, Marsden is an affiliated sister company that acquired NMC Franchising in 2006, and NMC is a predecessor in interest to NMC Franchising. (SAC ¶¶ 2-3.) Plaintiffs assert federal and state RICO claims against both Marsden and NMC, alleging that, in concert with the other defendants, Marsden and NMC "made material misrepresentations to the Plaintiffs regarding their earnings, employment status, terms and conditions of employment, and fees." (*Id.* ¶¶ 652, 657, 663.) With respect to the Washington RICO claims, Plaintiffs allege that Marsden and NMC committed forgery by obtaining "Plaintiffs' signatures on written

---

[10] The parties agree that the D&O Defendants have the same ability as NMC Franchising to enforce the arbitration agreement. (*See* Defs.' Mot. to Compel at 16; Pls.' Opp'n at 31.)

[11] Although Plaintiffs allege in the SAC that NMC was the authorized agent of Marsden (SAC ¶ 82), Defendants do not argue that NMC or Marsden may enforce the Arbitration Agreement under agency principles.

instruments—the franchise agreements—by knowingly misrepresenting information about the Washington Plaintiffs' prospective earnings, employment status, terms and conditions of employment, and fees." (SAC ¶ 715.) Thus, Plaintiffs' allegations make clear that their claims against Marsden and NMC are intertwined with and arise out of the obligations of the franchise agreements.[12] *See Willis v. Nationwide Debt Settlement Grp.*, No. 11-CV-430-BR, 2012 WL 13055512, at *7 (D. Or. May 22, 2012) ("Plaintiffs assert Defendants committed the various violations of federal and state law in concert pursuant to the relevant agreements with Plaintiffs. Thus, by Plaintiff's own allegations, their claims are necessarily intertwined with the Nationwide Services Agreement that provides for arbitration.").

Further, there is no dispute that Plaintiffs' claims against Marsden and NMC rely on those entities' relationship with NMC Franchising (*see* SAC ¶ 3, "National Maintenance Contractors, LLC, and NMC Franchising, LLC are collectively referred to herein as the "NMC")), and those relationships necessarily mean Plaintiffs' claims against Marsden and NMC are intertwined with the franchise agreements. *See Key Contracting, Inc., v. Contech Int'l, LLC*, No. 3:17-cv-1599-SI, 2018 WL 2105376, at *3 (D. Or. May 7, 2018) (holding that nonsignatory successor corporation of signatory could compel arbitration where claims against it relied on its relationship with predecessor corporation and were intertwined with and arose out of the contract containing the arbitration agreement).

///

///

---

[12] In addition to state and federal RICO claims, Plaintiffs allege all seventeen claims against both NMC and NMC Franchising, including state law claims for wage and hour violations, fraudulent representation, breach of contract, and economic duress (SAC ¶¶ 727-83), all of which arise out of or directly relate to the franchise agreement.

For these reasons, Plaintiffs' claims against Marsden and NMC are directly related to and intertwined with the franchise agreement, and therefore Marsden and NMC may rely on the franchise agreement's arbitration provision to compel arbitration of Plaintiffs' claims.

## B.    Arbitrability

The Court now turns to whether the Court can compel Plaintiffs to arbitrate their claims. As an initial matter, the Court must determine whether the arbitrability of Plaintiffs' claims is itself a question reserved for arbitration.

Courts must generally analyze two gateway issues when deciding whether to compel arbitration under the FAA: (1) whether a valid agreement to arbitrate exists; and (2) if it does, whether the agreement encompasses the dispute at issue. *See Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015). However, "parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Ctr., West, Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010); *see also New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 538 (2019) ("A delegation clause gives an arbitrator authority to decide even the initial question [of] whether the parties' dispute is subject to arbitration.") (citation omitted). Contracting parties may delegate these gateway issues to the arbitrator by including a "clear and unmistakable" delegation provision in the arbitration agreement. *See Brennan*, 796 F.3d at 1130; *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (noting that whether the court or the arbitrator decides arbitrability is "an issue for judicial determination unless the parties clearly and unmistakably provide otherwise").

Here, the Arbitration Agreement's delegation clause provides that arbitration will be administered "under the commercial Arbitration Rules of the American Arbitration Association" (the "AAA Rules"). (Arbitration Agreement § 19.A.) The relevant AAA Rules provide that "the arbitrator shall have the power to rule on his or her own jurisdiction, including any objections

with respect to the existence, scope or validity of the arbitration agreement or the arbitrability of

any claim[.]" (AMERICAN ARB. ASS'N, *Commercial Arbitration Rules and Mediation Procedure*,

R-7(a), available at https://adr.org/sites/default/files/CommercialRules_Web-Final.pdf (last

visited Aug. 12, 2021)).

Defendants argue that NMC Franchising's incorporation of the AAA Rules clearly and

unmistakably provides that the arbitrator, and not a court, must determine all gateway questions

of arbitrability. (Defs.' Mot. to Compel at 9.) Plaintiffs respond that incorporating the AAA

Rules does not demonstrate clear intent to delegate gateway questions to an arbitrator when at

least one party to the arbitration agreement is unsophisticated. (Pls.' Opp'n at 13.)

The Ninth Circuit has held that "incorporation of the AAA rules constitutes clear and

unmistakable evidence that contracting parties agreed to arbitrate arbitrability." *Brennan*, 796

F.3d at 1130; *accord Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069 (9th Cir.

2013) ("Virtually every circuit to have considered the issue has determined that incorporation of

the American Arbitration Association's (AAA) arbitration rules constitutes clear and

unmistakable evidence that the parties agreed to arbitrate arbitrability."). However, Plaintiffs

correctly note that the Ninth Circuit limited its holding in *Brennan* to the facts of that case, which

involved an arbitration agreement in an employment contract between sophisticated parties. *See

Brennan,* 796 F.3d at 1130-31 ("[W]e need not decide nor do we decide here 'the effect [if any]

of incorporating [AAA] arbitration rules into consumer contracts' or into contracts of any nature

between 'unsophisticated' parties.") (quoting *Oracle*, 724 F.3d at 1075). The *Brennan* court

cautioned that courts should not interpret its holding to "foreclose the possibility that this rule

could also apply to unsophisticated parties or to consumer contracts." *Id.* at 1131. Thus, the

question of whether the *Brennan* rule applies to arbitration agreements involving at least one

unsophisticated party is an open one in the Ninth Circuit. *See Meadows v. Dickey's Barbecue Rests.*, 144 F. Supp. 3d 1069, 1078 (N.D. Cal. Nov. 12, 2015) (noting that "[b]oth *Brennan* and *Oracle* left open the question of whether the same rule would apply when fewer than all the parties to an arbitration agreement were sophisticated").

District courts in the Ninth Circuit are split as to whether the holding in *Brennan* applies to contracts involving at least one unsophisticated party. *Compare, e.g.*, *Vargas v. Delivery Outsourcing, LLC*, No. 15-03408, 2016 WL 946112, at *8 (N.D. Cal. Mar. 14, 2016) ("The Court concludes that incorporation of AAA's rules does not evince a 'clear and unmistakable' intent to delegate disputes involving unsophisticated employees."), *and Meadows*, 144 F. Supp. 3d at 1078 (same), *with Weimin Chen*, 2019 WL 3564659, at *4 (concluding that "*Brennan*'s holding also applies to disputes involving non-sophisticated parties"), *and Hernandez v. United Healthcare Servs., Inc.*, No. SA CV 18-0420-DOC (KESx), 2018 WL 7458649, at *6 (C.D. Cal. July 26, 2018) ("Plaintiff's argument that her purported lack of sophistication—due to her being a regular hourly worker performing basic administrative duties for Defendant—does not preclude enforcement of the delegation clause requiring the arbitrator to resolve arbitrability.").

In *Meadows*, the district court held that the rule announced in *Oracle* and *Brennan* did not apply to franchisee plaintiffs whom the court determined were unsophisticated parties. *See Meadows*, 144 F. Supp. 3d at 1078. In reaching this conclusion, the court first considered the relative position of the parties, noting that the plaintiffs were "asked to sign a complicated, 60-page agreement" containing "a myriad of legal terms" drafted by a well-established franchisor corporation, they lacked prior experience running a business or owning a franchise, and "there [was] no evidence that the franchisee plaintiffs had legal training or experience dealing with complicated contracts." *Id.* at 1078-79. The court explained that, "[a]fter all, the question is

whether the language of an agreement provides 'clear and unmistakable' evidence of delegation" and "[t]o a large corporation (like *Oracle*) or a sophisticated attorney (like *Brennan*), it is reasonable to conclude that it does[,]" "[b]ut applied to an inexperienced individual, untrained in the law, such a conclusion is likely to be much less reasonable." *Id.*

Although not binding authority, the Court is persuaded by the reasoning in *Meadows*. Like the plaintiffs in *Meadows*, Plaintiff-Buyers here are prospective franchise owners "untrained in the law" who signed a complicated, thirty-page franchise agreement drafted by Defendants. *Id.* at 1078. That the Arbitration Agreement here cross referenced the AAA Rules generally, including the rule on an arbitrator's jurisdiction, is hardly "clear and unmistakable" evidence of who decides arbitrability from the standpoint of relatively unsophisticated laypersons. *See, e.g.*, *Mikhak v. Univ. of Phoenix*, No. C16-00901 CRB, 2016 WL 3401763, at *5 (N.D. Cal. June 21, 2016)* (holding that a university professor was an unsophisticated party and therefore unlikely to find the language in the arbitration provision clear because she was not a "savvy entrepreneur with prior dealings in the business world, she does not possess a professional license in a legal or related field, [and] she certainly is not an experienced attorney and business[wo]man") (simplified).

The Court finds that, considering the relative position of the parties here, it is unreasonable to expect that Plaintiff-Buyers would have understood that the language of the Arbitration Agreement provided clear and unmistakable evidence of arbitrability. Accordingly, the Court concludes that the rule announced in *Brennan* and *Oracle* does not apply here. *See Eiess v. USAA Fed. Sav. Bank*, 404 F. Supp. 3d 1240, 1253 (N.D. Cal. 2019) ("Although incorporation by reference may fairly be deemed a clear and unmistakable delegation where there are sophisticated parties, a different result may obtain where one party is unsophisticated.

For an unsophisticated plaintiff to discover she had agreed to delegate gateway questions of arbitrability, she would need to locate the arbitration rules at issue, find and read the relevant rules governing delegation, and then understand the importance of a specific rule granting the arbitrator jurisdiction over questions of validity–a question the Supreme Court itself has deemed 'rather arcane.'"); *Vargas*, 2016 WL 946112, at *8 ("In this circumstance, the Court cannot conclude that the parties clearly and unmistakably intended to delegate the question of arbitrability to an arbitrator through reference to AAA's Commercial Rules. Plaintiff—an unsophisticated luggage delivery driver—executed the Owner/Operator Agreement without an opportunity to review the documents or consult with an attorney, and the parties dispute Plaintiff's English language proficiency."); *Aviles v. Quik Pick Express, LLC*, No. 15-5214, 2015 WL 9810998, at *6 (C.D. Cal. Dec. 3, 2015), *vacated on other grounds by* 703 F. App'x 631, 632 (9th Cir. 2017) (citing *Meadows* and concluding that "it would strain credulity to conclude that [the p]laintiff held a clear and unmistakable intent to delegate questions of arbitrability to an arbitrator" where the plaintiff was an independent contractor who operated his own trucking business).

Having found that the Arbitration Agreement did not clearly and unmistakably delegate questions of arbitrability to the arbitrator, the Court now turns to Plaintiffs' arguments that the Arbitration Agreement is unenforceable.

### C.    Unconscionability

Plaintiffs argue that the Court should deny Defendants' motion to compel arbitration because the Arbitration Agreement is unconscionable. (Pls.' Opp'n at 24.)

Under both Oregon and Washington law, courts analyze unconscionability for both procedural and substantive unconscionability. "Procedural unconscionability refers to the conditions of contract formation, and substantive unconscionability refers to the terms of the

contract." *Gist v. ZoAn Mgmt., Inc.*, 305 Or. App. 708, 716 (2020). Under Oregon law, a party

seeking to invalidate a contract on unconscionability grounds must prove substantive

unconscionability, whereas under Washington law, a finding of either procedural or substantive

unconscionability is sufficient to void an agreement. *Compare, e.g*, *Siggelkow v. Nw. Grp., Inc.*,

No. 3:18-cv-01494-HZ, 2019 WL 294759, at *7 (D. Or. Jan. 22, 2019) (noting that Oregon law

"requires only substantive unconscionability to invalidate a contract"), *with Luna v. Household*

*Fin. Corp. III*, 236 F. Supp. 2d 1166, 1174 (W.D. Wash. 2002) ("[U]nder Washington law a

contract may be invalidated on procedural unconscionability or substantive unconscionability

grounds."). The party opposing arbitration has the burden of proving that the agreement is

unconscionable. *See Luna*, 236 F. Supp. 2d at 1174 ("The burden of proving that a contract is

unconscionable rests with the party attacking the contract.").

### 1.    Procedural Unconscionability

Under Oregon law, "[p]rocedural unconscionability focuses on oppression and surprise."

*Gist*, 305 Or. App. at 716. Oppression arises "when there is inequality in bargaining power

between the parties to a contract, allowing no real opportunity to negotiate the terms of the

contract." *Id.* at 716-17. "Surprise may be found when the terms were hidden from the party

seeking to avoid enforcement of the agreement." *Id.* at 717. Similarly, under Washington law,

procedural unconscionability is a "lack of meaningful choice." *Zuver v. Airtouch Comm.*, 153

Wash. 2d 293, 303 (2004). Washington courts inquire into "the manner in which the contract was

entered, whether each party had a reasonable opportunity to understand the terms of the contract,

and whether the important terms were hidden in a maze of fine print." *Nelson v. McGoldrick*,

127 Wash. 2d 124, 131 (1995) (en banc) (simplified).

Plaintiffs argue that the Arbitration Agreement is procedurally unconscionable because

Plaintiff-Buyers are non-native English speakers and were not provided with translations of the

PAGE 20 – OPINION AND ORDER

franchise agreement. (Pls.' Opp'n at 25-26.) However, as discussed above, Plaintiffs do not allege that Defendants ever prevented them from having the franchise agreement translated, nor that they asked NMC Franchising to provide a translated copy of the agreement. *See, e.g.*, *Chicos*, 2014 WL 5088240, at *9 (rejecting the plaintiff's argument that the arbitration agreement was unconscionable because it was in English because the plaintiff "does not claim that he ever attempted to ask questions, or that he requested an opportunity to consult with an attorney, take the arbitration agreements home, or obtain a Spanish translation, or that [the defendants] actually denied these requests"). Without more, Plaintiffs' inability to understand the Arbitration Agreement without translation or consulting with an attorney is insufficient to render the agreement procedurally unconscionable.

Plaintiffs also argue that the Arbitration Agreement is unconscionable because the franchise agreement was non-negotiable. (Pls.' Opp'n at 20; *see Bagley v. Mt. Bachelor, Inc.*, 356 Or. 543, 556 (2014) ("Oppression exists when there is inequality in bargaining power between the parties, resulting in no real opportunity to negotiate the terms of the contract and the absence of meaningful choice."); *accord Burnett v. Pagliacci Pizza, Inc.*, 196 Wash. 2d 38, 54 (2020) ("A contract is 'procedurally unconscionable' when a party with unequal bargaining power lacks a meaningful opportunity to bargain, thus making the end result an adhesion contract.").)

The parties disagree about whether the franchise agreements were negotiable. Plaintiffs argue that they were unable to negotiate any of the terms of the agreement. (Pls.' Opp'n at 16.) Defendants assert that Plaintiff-Buyers could have negotiated the terms of the franchise agreement, or had the agreement interpreted or explained by an attorney, but chose not to. (*See* Defs.' Reply at 21-23.) It is undisputed that Defendants prepared the franchise agreements

(including the Arbitration Agreement therein) and presented them to Plaintiff-Buyers, and

Plaintiffs have presented no evidence that they requested any revisions to the agreement and

were refused. Viewing the facts in the light most favorable to Plaintiffs, the Court assumes

without deciding that Defendants offered the franchise agreements on a take-it-or-leave-it basis.

*See Bagley*, 356 Or. at 562 ("When one party is in such a superior bargaining position that it

totally dictates all terms of the contract and the only option presented to the other party is to take

it or leave it, some quantum of procedural unconscionability is established.") (citation omitted).

However, "the take-it-or-leave-it nature of [a contract] is insufficient to render it

unenforceable" when the arbitration clause "was not hidden or disguised and where the plaintiff

was given time to read the documents before assenting to their terms." *Chalk v. T-Mobile USA,

Inc.*, 560 F.3d 1087, 1094 (9th Cir. 2009); *accord Burnett*, 196 Wash. 2d at 55 (noting that "[t]he

fact that a contract is an adhesion contract is relevant but not determinative" of procedural

unconscionability, and that "[t]he key inquiry is whether the party lacked meaningful choice");

*Siggelkow*, 2019 WL 294759, at *7 (noting that, "in Oregon, 'more than a contract of adhesion

and unequal bargaining power is required to void an arbitration clause'").

Having considered all of the circumstances surrounding the execution of the Arbitration

Agreement, including whether Plaintiff-Buyers had a reasonable opportunity to understand its

terms, the Court finds that the level of procedural unconscionability here, standing alone, is

insufficient to void the Arbitration Agreement. Thus, to render the Arbitration Agreement

unconscionable, Plaintiffs must demonstrate substantive unconscionability. *See Siggelkow*, 2019

WL 294759, at *7 ("Under Oregon law, the test for unconscionability has both procedural and

substantive components."); *Luna*, 236 F. Supp. 2d at 1175 ("That an agreement constitutes a

contract of adhesion is insufficient alone to support a finding that the agreement is procedurally unconscionable in Washington.").

### 2.    Substantive Unconscionability

"Substantive unconscionability generally refers to the terms of the contract as opposed to the circumstances of formation, and focuses on whether the substantive terms contravene the public interest or public policy." *Bagley*, 356 Or. at 555-56. A contract is substantively unconscionable if it is too one sided or overly harsh. *See Zuver*, 153 Wash. 2d at 303 ("Shocking to the conscience, monstrously harsh, and exceedingly calloused are terms sometimes used to define substantive unconscionability.") (simplified).

### a.    Forum Selection Clause

Plaintiffs allege that the Arbitration Agreement is substantively unconscionable because it requires Plaintiffs, all of whom reside in Oregon or Washington, to arbitrate in Minneapolis, Minnesota. (Pls.' Opp'n at 16.) The Court agrees.

Generally, "forum selection clauses are prima facie valid and should not be set aside unless the party challenging enforcement of such a provision can show that it is 'unreasonable under the circumstances.'" *Willis v. Nationwide Debt Settlement Grp.*, 878 F. Supp. 2d 1208, 1220-21 (D. Or. 2012) (citing *Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1971)); *see also Atl. Marine Const. Co., Inc. v. U.S. Dist. Ct. for W. Dist. Tex.*, 571 U.S. 49, 63 (2013) ("[A] valid forum-selection clause should be given controlling weight in all but the most exceptional cases.") (simplified). A forum selection clause is unreasonable if: "(1) its incorporation into the contract was the result of fraud, undue influence, or overweening bargaining power"; "(2) the selected forum is so 'gravely difficult and inconvenient' that the complaining party will 'for all practical purposes be deprived of its day in court," or "(3) enforcement of the clause would contravene a strong public policy of the forum in which the suit is brought." *Id.* (citations omitted). Whether a

forum selection clause is unconscionable "must be assessed on the basis of facts in existence at the time the contract was made." *Brown v. BYRV*, No. 3:14-cv-01213-AC, 2015 WL 4507159, at *10 (D. Or. July 24, 2015) (citation omitted).

Plaintiffs here reside in either Oregon or Washington, and most are low-income individuals. (Pls.' Opp'n at 27.) Given Plaintiffs' geography and respective financial situations, the Court finds the Arbitration Agreement's selection of Minneapolis as the arbitration forum is substantively unconscionable because it would effectively deny Plaintiffs the opportunity to arbitrate their case. *See Willis*, 878 F. Supp. 2d at 1221 ("[P]laintiffs are not capable of paying for and participating in arbitration in San Joaquin County, California, and, therefore, that enforcement of the forum-selection provision would effectively deny Plaintiffs of a meaningful day in court."); *Twilleager v. RDO Vermeer, LLC*, No. 10-1167-AC, 2011 WL 1637469, at *9 (D. Or. Apr. 1, 2011) (holding that a forum selection clause requiring arbitration in North Dakota was unconscionable because the distance "imposes commensurate unnecessary expense on an Oregon employee who chooses to arbitrate: the employee must travel to North Dakota to arbitrate, must pay for food and lodging while there, must also pay for his or her attorney to travel to and stay in North Dakota, and must pay for Portland-based witnesses to do the same").

### b.    Arbitration Costs

Plaintiffs also argue that the Arbitration Agreement is unconscionable because the cost-sharing provision is prohibitively expensive. (Pls.' Opp'n at 16.)

"An arbitration agreement is unenforceable under the FAA if it denies a litigant the opportunity to vindicate his or her rights in the arbitral forum." *Vasquez-Lopez v. Beneficial Or., Inc.*, 210 Or. App. 553, 573 (2007) (citing *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 90 (2000)). "Denial of access to an arbitral forum occurs when the cost of arbitration is large in absolute terms, but also, comparatively, when that cost is significantly larger than the cost of a

trial." *Id.* at 574. "[T]he party who asserts an arbitration clause is invalid on the ground that a cost-sharing provision renders the arbitration clause unconscionable bears the burden of showing the likelihood of incurring such costs." *Willis*, 878 F. Supp. 2d at 1221 (citing *Motsinger v. Lithia Rose-FT, Inc.*, 211 Or. App. 610, 617-18 (2007)). Courts "will not invalidate [an] arbitration clause simply because of the possibility that [the] plaintiff, if she were to lose, would bear some undetermined costs of arbitration." *Motsinger*, 211 Or. App. at 618; *see also Vasquez-Lopez*, 210 Or. App. at 574 (noting that an arbitration clause is not rendered substantively unconscionable because of the mere possibility that the plaintiff may have to bear a prohibitive share of the costs).

Here, the Arbitration Agreement incorporates Rule 54 of the AAA Rules, which provides that "expenses of the arbitration . . . shall be born equally by the parties, unless they agree otherwise or unless the arbitrator in the award assesses such expenses or any part thereof against any specified party or parties." AAA Rules, R-54. As initial matter, a finding that the cost-sharing provision of the AAA Rules is substantively unconscionable would render every arbitration clause incorporating the AAA Rules unconscionable. In addition, Defendants correctly point out that the AAA Rules allow the arbitrator to shift arbitration expenses based on the outcome of the arbitration, and therefore it may be that Plaintiffs end up paying no costs if they prevail at arbitration. (*See* AAA Rules, R-47(c) ("In the final award, the arbitrator shall assess the fees, expenses, and compensation provided in Sections R-53, R-54, and R-55. The arbitrator may apportion such fees, expenses, and compensation among the parties in such amount as the arbitrator determines is appropriate.").) The risk that Plaintiffs *may* have to pay arbitration expenses does not support a finding of unconscionability here. *See Gist*, 305 Or. App. at 720 ("[In this case, we do not know that plaintiff will bear any costs in arbitration, because

arbitration fees can be shifted to the losing party," and therefore "we cannot determine that the cost of arbitration is truly a barrier to arbitration or an indication of unconscionability"); *Khraibut v. Chahal*, No. C15-04463 CRB, 2016 WL 1070662, at *11 (N.D. Cal. Mar. 18, 2016) (holding that "[t]he fee-shifting provision here is discretionary" and therefore "does not deny [Plaintiff] any rights, and therefore does not render the Arbitration Provision or its delegation to the AAA substantively unconscionable"); *Bettencourt v. Brookdale Senior Living Cmtys., Inc.*, No. 09-CV-1200-BR, 2010 WL 274331, at *12 (D. Or. Jan. 14, 2010) "(T]he Agreement does not identify who will absolutely bear the costs of the arbitration. The Agreement leaves that determination to the arbitrator based on the outcome of the arbitration. . . . Thus, if the Court found the cost-allocation provision to be unconscionable on this ground, the Court would be invalidating the Agreement on the basis of mere speculation.").

### c.    Limitation on Damages

Plaintiffs argue that the Arbitration Agreement clause barring punitive damages is substantively unconscionable. (Pls.' Opp'n at 23; *see also* Arbitration Agreement §19.A., "[T]he arbitrator(s) may not under any circumstances . . . assess punitive of exemplary damages[.]").)

It is well established that "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 26 (1991) ("[T]he fact that franchisees may agree to an arbitral forum for the resolution of statutory disputes in no way suggests that they may be forced by those with dominant economic power to surrender the statutorily-mandated rights and benefits that Congress intended them to possess."). The Ninth Circuit has made clear that "the arbitral forum must allow the employee to adequately pursue statutory rights" and "to provide for all of the types of relief that would otherwise be available in court." *Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 895 (9th Cir. 2002).

Consistent with Ninth Circuit precedent, Oregon and Washington courts have found that arbitration provisions prohibiting a party from seeking punitive damages are unconscionable. *See, e.g.*, *Philpott v. Ernst & Young LLP*, No. C10-264RAJ, 2010 WL 11406230, at *7 (W.D. Wash. Dec. 29, 2010) (finding arbitration provision barring punitive or exemplary damages unconscionable "because it limits employees' relief to actual damages, even though other forms of relief would be statutorily available if employees could pursue their claims in court"); *Young v. Regis Corp.*, No. 06-6068-AA, 2006 WL 8459710, at *5 (D. Or. Aug. 2, 2006) (finding arbitration provision prohibiting the plaintiff from seeking punitive damages or injunctive relief unconscionable); *Torrance*, 242 F. Supp. 2d at 874 ("By not allowing for full recovery of statutory damages, the limitation on damages provision clearly violates federal law.").

Defendants argue that the limitation on damages is enforceable because it applies equally to both parties, and assert that the cases cited by Plaintiffs are distinguishable because they involve only unilateral prohibitions on punitive damages. (*See Defs.' Reply at 27*; *Zuver*, 153 Wash. 2d at 318-19 (holding that a unilateral bar on punitive damages is unconscionable because it "blatantly and excessively favors the employer in that it allows the employer alone access to a significant legal recourse"); *Willis*, 878 F. Supp. 2d at 1225-26 (holding that unilateral prohibition on damages was unconscionable because "it is unreasonably one-sided and is contrary to public policy").)

While Defendants are correct that both *Zuver* and *Willis* involved a unilateral prohibition on punitive damages, neither case held that a bilateral prohibition would have rendered the provision conscionable, nor do Defendants point to any cases so holding. Further, at least one court in this district has expressly rejected Defendants' argument, concluding that a damages limitation provision is unconscionable regardless of mutuality because it hinders a party's ability

to vindicate her statutory rights. *See Torrance*, 242 F. Supp. 2d at 872-73 ("Defendant argues that the limitation on damages is enforceable because it applies to both parties. However, 'the arbitral forum must allow the employee to adequately pursue statutory rights.'" (quoting *Circuit City Stores*, 279 F.3d at 895, and *Gilmer*, 500 U.S. at 28)); *see also Philpott*, 2010 WL 11406230, at *6 ("Because [the bilateral remedies limitation] does not allow Ms. Philpott to pursue the full range of substantive rights afforded by applicable statutes, it is unconscionable and therefore unenforceable."); *Young*, 2006 WL 8459710, at *4 (finding bilateral limitation on damages unconscionable because it "requires plaintiff to forfeit her right to seek punitive damages").

Plaintiffs have pleaded an award of punitive damages under both the state and federal RICO statutes and the Trafficking Victims Protection Act. (*See* SAC ¶¶ 9, 10, 16.) Because the Arbitration Agreement requires Plaintiffs "to arbitrate [their] statutory claims without affording [them] the benefit of the full range of statutory remedies" (*Circuit City Stores*, 279 F.3d at 894-95), the Court finds that the damages limitation clause is substantively unconscionable.

### d.    Injunctive Relief

Plaintiffs argue that the Arbitration Agreement's non-mutual exemption for injunctive relief is unconscionable because it requires Plaintiffs to arbitrate all claims but allows Defendants to seek equitable relief in court. (Pls.' Opp'n at 24-26.)

Section 19.B of the Arbitration Agreement provides:

Injunctive Relief. Notwithstanding Section 19(A) above, you recognize that a single franchisee's failure to comply with the terms of its agreement could cause irreparable damage to us and/or to some or all other National Maintenance Contractors franchisees. Therefore, if you breach or threaten to breach any of the terms of this Agreement, we will be entitled to injunctive relief restraining such breach and/or a decree of specific performance, without showing or proving any actual damage, together with recovery of legal fees and expenses and other costs incurred in obtaining such equitable relief, until such time as a final determination is made by a court having proper jurisdiction.

(Arbitration Agreement §19.B.)

"Washington courts have long held that mutuality of obligation means both parties are bound to perform the contract's terms—not that both parties have identical requirements." *Romney v. Franciscan Med. Grp.*, 186 Wash. App. 728, 742 (2015) (quoting *Zuver*, 153 Wash. 2d at 317). Instead, it is "the effect of [an] arbitration provision" that determines whether it "is so one-sided and harsh that it is substantively unconscionable." *Zuver*, 153 Wash. 2d at 317 n.16. Similarly, Oregon courts apply an "approach that focuses on the one-sided *effect* of an arbitration clause rather than on its one-sided *application* to evaluate substantive unconscionability[.]" *Motsinger*, 211 Or. App. at 623; *see also Torrance*, 242 F. Supp. 2d at 871-72 (holding that Oregon law does not require mutual obligations for a contract to be enforceable and an arbitration agreement is not rendered unconscionable simply because the employer is not required to arbitrate all claims).

The Arbitration Agreement here lacks mutuality because it allows Defendants, but not Plaintiffs, to seek judicial equitable relief. However, Plaintiffs have not demonstrated that the clause is "so one-sided and harsh" as to render it substantively unconscionable under the circumstances present here. *Zuver*, 153 Wash. 2d at 317 n.16. First, Defendants' right to seek judicial relief is limited in scope to obtaining injunctive relief or specific performance in the event of a breach of contract, which other courts have recognized is not an unconscionable clause. *See Sammy Enter. v. O.P.E.N. Am., Inc.*, No. 60069-9-1, 2008 WL 2010357, at *5 (Wash. Ct. App. May 12, 2008) (concluding that a nearly identical provision was not substantially unconscionable under Washington law in part because "[t]he text of [the provision] plainly states that [Defendants'] right to seek judicial relief is limited to obtaining injunctive relief and/or specific performance when an alleged breach of the franchise agreement by [the plaintiff]

PAGE 29 – OPINION AND ORDER

occurs"). In addition, the language of the provision does not prevent Plaintiffs from seeking injunctive relief, as Plaintiffs have mutual access to equitable relief in arbitration. *See* AAA Rule 47(a) ("The arbitrator may grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties, including, but not limited to, specific performance of a contract."); *see also Hamrick v. Aqua Glass, Inc.*, No. 07-3089-CL, 2008 WL 2853992, at *4 (D. Or. Feb. 20, 2008) (finding an arbitration clause's non-mutual exemption of injunctive relief not substantively unconscionable where "it is clear from the [agreement's] language that plaintiff may seek and be awarded injunctive relief" and that the AAA rules allow the arbitrator to grant equitable relief).

For these reasons, the Court concludes that the Arbitration Agreement's injunctive relief provision is not so impermissibly one-sided or overly harsh as to render it unconscionable. *See Wisely v. Amazon.com, Inc.*, 709 F. App'x 862, 865 (9th Cir. 2017) (applying Washington law and holding that "the arbitration clause's exemption of intellectual property claims for injunctive relief does not make the provision overly harsh or one-sided"); *Hoober v. Movement Mortg., LLC*, 382 F. Supp. 3d 1148, 1160 (W.D. Wash. 2019) ("[T]he Court finds that on the facts at bar, Plaintiffs have not met their burden as the party opposing arbitration to show that an exception in favor of [the defendants] for injunctive relief is unconscionable."); *Hamrick*, 2008 WL 2853992, at *4 (finding non-mutual injunctive relief exemption enforceable under Oregon law).[13]

///

---

[13] The cases on which Plaintiffs rely either applied California law or involved one-sided arbitration agreements that applied to all of a party's claims (as opposed to a single, non-mutual injunctive relief provision), and are therefore inapplicable here. *See Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1265 (9th Cir. 2006) (applying California law); *Armendariz v. Found. Health Psychcare*, 24 Cal. 4th 83, 92 (2000) (applying California law); *Twilleager*, 2011 WL 1637469, at *8 (addressing an arbitration clause that applied unilaterally to all claims brought by the plaintiff employees).

### 3.    Severability

Plaintiffs argue that the Arbitration Agreement's unconscionable provisions require this Court to find the Arbitration Agreement unenforceable despite its severability clause. (Pls.' Opp'n at 26.) Defendants respond that the agreement's severability clause allows the Court to strike any unconscionable provisions and enforce the remainder of the agreement. (Defs.' Reply at 32.)

"When parties agreed to a severability clause in an arbitration agreement, courts often strike the offending unconscionable provisions to preserve the contract's essential term of arbitration." *Zuver*, 153 Wash. 2d at 320. However, "where such terms 'pervade' an arbitration agreement, [courts] 'refuse to sever those provisions and declare the entire agreement void.'" *Hoober*, 382 F. Supp. 3d at 1154 (citation omitted); *accord Torrance*, 242 F. Supp. 2d at 876 ("An arbitration agreement is not severable if it is 'permeated' by unconscionability.") (citation omitted).

The parties agreed when they signed the franchise agreement that a court could sever any unenforceable provisions of the agreement. (*See* Franchise Agreement § 20A., "Severability. All provisions of this Agreement are severable and this Agreement will be interpreted and enforced as if all completely invalid or unenforceable provisions were not contained herein and partially valid and enforceable provisions will be enforced to the extent valid and enforceable."). Although the Court found that the Arbitration Agreement contains two substantively unconscionable provisions (i.e., the forum selection clause and the punitive damages limitation), the agreement is not permeated with unconscionability. *See Zuver*, 153 Wash. 2d at 320 ("We can easily excise the confidentiality and remedies provisions but enforce the remainder."); *Adler v. Fred Lind Manor*, 153 Wash. 2d 331, 359 (2004) ("In this case, however, [the] arbitration

agreement contains just two substantively unconscionable provisions."). Accordingly, the Court

severs the forum selection clause and the punitive damages limitation, and enforces the

remainder of the Arbitration Agreement. *See Willis*, 878 F. Supp. 2d at 1212 (severing forum

selection clause and requiring arbitration in Oregon because "[t]he Court does not see any basis

in this record to conclude this arbitration clause is permeated by unconscionability"); *Philpott*,

2010 WL 11406230, at *8 (severing damages limitation provision and enforcing remainder of

the arbitration agreement).[14]

### D.    Economic Duress and Illegality

Plaintiffs also argue that the franchise agreements, and therefore the Arbitration

Agreements, are unenforceable because Plaintiffs executed the franchise agreements under

economic duress,[15] and because the Washington franchise agreements are illegal under state and

federal law. (Pls.' Opp'n at 27-29.)

"Challenges to the validity of arbitration agreements . . . can be divided into two types":

(1) "challenges specifically [to] the validity of the agreement to arbitrate," and (2) "challenges

[to] the contract as a whole, either on a ground that directly affects the entire agreement (e.g., the

agreement was fraudulently induced), or on the ground that the illegality of one of the contract's

provisions renders the whole contract invalid." *Buckeye Check Cashing, Inc. v. Cardegna*, 546

---

[14] Absent a valid forum selection clause, the default AAA Rules provide that "[w]hen the parties' arbitration agreement is silent with respect to locale . . . the AAA may initially determine the place of arbitration, subject to the power of the arbitrator after appointment, to make a final determination on the locale." AAA Rules, R-11(a). The Court notes that Defendants have agreed to arbitrate the Washington Plaintiffs' claims in Washington, and to consider conducting arbitration via video for those Oregon Plaintiffs for whom traveling to Minnesota would impose a hardship. (*See* Defs.' Reply at 25.)

[15] Only the Oregon Plaintiffs assert economic duress as a defense to arbitration. (Pls.' Opp'n at 27.)

U.S. 440, 444 (2006) (citations omitted). The Ninth Circuit explained in *Cox v. Ocean View Hotel Corporation* that challenges to a contract's validity as a whole, rather than to the arbitration provision alone, must be considered by the arbitrator. 533 F.3d 1114, 1120 (9th Cir. 2008) (noting that "our case law makes clear that courts properly exercise jurisdiction over claims raising (1) defenses existing at law or in equity for the revocation of (2) the arbitration clause itself"); *see also Buckeye*, 546 U.S. at 445 ("[U]nless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance.").

Turning to Plaintiffs' economic duress argument, Plaintiffs do not specifically challenge the validity of the arbitration provision standing alone, but instead allege that the franchise agreements are unenforceable because Plaintiffs executed the agreements under economic duress. (*See* SAC ¶¶ 778-79, alleging that Plaintiff-Buyers were under economic duress when entering into subsequent franchise agreements because they "had no alternative than to pay more in franchise fees and sign subsequent franchise agreements if they wanted to keep their jobs and did not want to lose their life's savings"). Plaintiffs' argument challenges the validity of the contract as a whole, and therefore the Court must refer the question to the arbitrator.

Similarly, Plaintiffs assert that the illegality of the franchise agreements' terms render the entire contract void. (*See* Pls.' Opp'n at 30-31, arguing that "[t]he franchise agreements themselves function as instrumentalities of Defendants' racketeering and violate federal and state law" and are therefore "illegal and unenforceable"). Accordingly, the arbitrator must evaluate Plaintiffs' challenge to the legality of the Washington franchise agreements. *See Buckeye*, 546 U.S. at 446 (holding that the respondent's challenge to a contract containing an arbitration

provision as void for illegality must be determined by an arbitrator, not a court, "because respondents challenge the Agreement, but not specifically its arbitration provisions").

For the foregoing reasons, the Court concludes that the Arbitration Agreement is enforceable, and therefore compels individual arbitration of Plaintiffs' claims against Defendants.[16]

## CONCLUSION

For the reasons stated, the Court GRANTS Defendants' motion to compel arbitration (ECF No. 39), and dismisses this case without prejudice.[17]

DATED this 12th day of August, 2021.

*Stacie F. Beckerman*

_____

HON. STACIE F. BECKERMAN
United States Magistrate Judge

---

[16] At oral argument, Plaintiffs acknowledged that if the Court were to compel arbitration, the arbitration provision expressly requires individual arbitration of each plaintiff's claims. (*See* Arbitration Agreement § 19A., "Any arbitration proceedings will be limited to controversies between you and us, and will not be expanded to include any other National Maintenance Contractor franchisee or include any class action claims."); *see also Dorman v. Charles Schwab Corp.*, 780 F. App'x 510, 514 (9th Cir. 2019) ("No party can be compelled under the FAA to arbitrate on a class-wide or collective basis unless it agrees to do so by contract.").

[17] "Although the FAA authorizes a court to stay an action that is subject to a valid agreement to arbitrate, 9 U.S.C. § 3, a court can dismiss an action, rather than merely staying it, when all issues are arbitrable." *Campos v. Bluestem Brands, Inc.*, No. 3:15-cv-00629-SI, 2016 WL 297429, at *12 (D. Or. Jan. 22, 2016) ("Because [the plaintiff's] only claim is subject to arbitration, the Court finds that dismissal is appropriate."); *Hermida v. JP Morgan Chase Bank, N.A.*, No. 3:15-cv-00810-HZ, 2015 WL 6739129, at *6 (D. Or. Nov. 3, 2015) (granting the defendant's motion to compel arbitration and stay or abate proceeding, and dismissing case); *PNI, Inc. v. Leyton*, No. 03-1344-MO, 2004 WL 555249, at *6 (D. Or. Mar. 1, 2004) (granting the defendants' motion to compel arbitration and for dismissal or stay of proceedings, and dismissing case without prejudice).